No. 2015-1902

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

_____

**INTENDIS GMBH, INTRASERV GMBH & CO. KG,
BAYER HEALTHCARE PHARMACEUTICALS INC.,**

*Plaintiffs-Appellees,*

v.

**GLENMARK PHARMACEUTICALS INC., USA,
GLENMARK PHARMACEUTICALS LTD.,**

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the District of Delaware
No. 13-cv-421, Hon. Sue L. Robinson

_____

**APPELLANTS' OPENING BRIEF**

_____

Elizabeth J. Holland
Huiya Wu
Linnea P. Cipriano
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

William M. Jay
Brian T. Burgess
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, DC 20001
(202) 346-4000

David J. Zimmer
GOODWIN PROCTER LLP
Three Embarcadero Center
San Francisco, CA 94111
(415) 733-6000

September 4, 2015

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants certifies the following:

1.    The full name of every party or *amicus curiae* represented by me is:

Glenmark Pharmaceuticals Limited and Glenmark Pharmaceuticals Inc., USA.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

See response to number 1.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

(a) Glenmark Pharmaceuticals Inc., USA, is wholly owned by Glenmark Pharmaceuticals Ltd., a corporation duly formed and publicly traded under the laws of India.

(b) Glenmark Pharmaceuticals Ltd. has no parent company, and no publicly traded company owns 10% or more of Glenmark Pharmaceuticals Ltd.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Elizabeth J. Holland
Huiya Wu (*formerly with Kenyon & Kenyon LLP*)
William M. Jay
Brian T. Burgess
Linnea P. Cipriano
David J. Zimmer
Wyatt Delfino (*formerly with Kenyon & Kenyon LLP*)
Alexandra D. Valenti
GOODWIN PROCTER LLP

James Galbraith
Michael W. Glynn
Ajita Shukla
KENYON & KENYON LLP

Douglas H. Carsten
Shaun R. Snader
WILSON SONSINI GOODRICH & ROSATI, P.C.

Karen E. Keller
Jeffrey T. Castellano
David M. Fry
Stephanie E. O'Byrne
Andrew Russell
SHAW KELLER LLP


September 4, 2015                                    /s/ Elizabeth J. Holland

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ........................................................ vii

TABLE OF ABBREVIATIONS ......................................................... viii

JURISDICTIONAL STATEMENT ...........................................................1

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUES ON APPEAL ...............................................4

STATEMENT OF THE CASE...............................................................5

I.    Background.................................................................................5

      A. Azelaic Acid ..........................................................................5

      B. The '070 Patent......................................................................6

      C. Glenmark's ANDA Product ..................................................8

II.   Bayer Did Not Disclose Lecithin and Triglycerides as Penetration
      Enhancers......................................................................................8

      A. The '070 Patent Does Not Identify the Functions of Lecithin or
         Triglycerides in the Claimed Formulation ................................8

      B. Bayer Told FDA That Lecithin and Triglycerides Function as
         Emollients and Emulsifiers in the Claimed Formulation ........11

      C. Skilled Artisans Do Not Regard Lecithin and Triglycerides as
         Penetration Enhancers ...............................................................12

III.  Bayer's Formulation Consists Entirely Of Elements Already Well
      Known In The Art.........................................................................13

      A. Skinoren Cream Contains the Same Active Ingredient and Nearly
         All the Same Excipients .............................................................13

      B. The Prior Art Disclosed Hydrogel Formulations with All of the
         Claimed Excipients......................................................................13

      C. The Prior Art Disclosed Gel Formulations of Azelaic Acid, Which
         Were Preferable to Cream Formulations.....................................14

         1. *Maru* ....................................................................................14

         2. *Gasco* ...................................................................................15

      D. The '070 Patent Did Not Disclose Any Unexpected Breakthrough
         in Azelaic Acid Delivery ............................................................16

IV.   The District Court's Decision ......................................................................17

    A. Infringement Under the Doctrine of Equivalents ....................................17

    B. Defenses to the Doctrine of Equivalents ................................................19

    C. Obviousness ...........................................................................................20

SUMMARY OF ARGUMENT ........................................................................20

STANDARD OF REVIEW ............................................................................24

ARGUMENT ...................................................................................................25

I.   The District Court Erred as a Matter of Law In Its Application of the "Function" Prong of the Test for Infringement Under the Doctrine of Equivalents ..........................................................................................25

    A. Bayer's "Function" Theory Has No Basis in the Patent .........................27

    B. Evidence from Outside the Patent Also Refuted Bayer's Function Theory ....................................................................................................30

    C. The District Court Erred by Accepting Bayer's Function Theory on the Ground that the Evidence "Did Not Exclude" the Possibility that Lecithin and Triglycerides Could Function as Penetration Enhancers ................................................................................................31

II.   Bayer's Attempt To Capture Formulations Without Lecithin Is Barred By Prosecution History Estoppel Because Bayer Expressly Disavowed and Disclaimed A Formulation Without Lecithin .....................37

III.  Bayer's Doctrine-of-Equivalents Argument Is Legally Impermissible Because It Ensnares Prior-Art Formulations Containing Penetration Enhancers ..................................................................................................42

    A. The District Court's Hypothetical Claim Is Inexplicably Narrower Than Bayer's Range of Equivalents .........................................................43

        1. A Proper Hypothetical Claim Matches the Scope of Bayer's Theory of Infringement by Equivalents and Extends to All "Penetration Enhancers" ...................................................................43

        2. The District Court's Narrow Hypothetical Claim Is Legally Flawed Because It Fails To Reflect Bayer's "Range of Equivalents" ......................................................................................46

    B. The Proper Hypothetical Claims Are Anticipated By or Obvious Over the Prior Art .................................................................................50

IV.  The District Court's Conclusion that the Asserted Claims Were Non-Obvious Was Legal Error ..............................................................................53

    A.  The Asserted Patent Claims Were Obvious Because the Prior Art Taught Azelaic Acid Hydrogels and the Claimed Excipients and a Skilled Artisan Would Have Known How To Combine Them Successfully ...........................................................................................54

    B.  Secondary Considerations Do Not Overcome Glenmark's Strong Case of *Prima Facie* Obviousness ..........................................................59

        1.  The District Court's Unexpected-Results Finding Was Clear Error .......................................................................................................59

        2.  Bayer's Equivocal Evidence Concerning Commercial Success Provides No Meaningful Support for the District Court's Non-Obviousness Determination ................................................................62

CONCLUSION .......................................................................................................63

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**C**ASES:                                                                                          **Page(s)**

*A.H. Robins Co. v. Erbamont, Inc.*,
  No. C2-89-864, 1991 WL 229150 (S.D. Ohio Apr. 18, 1991)....................49, 50

*Abbott Labs. v. Dey, L.P.*,
  287 F.3d 1097 (Fed. Cir. 2002) ..................................................................42, 44

*Abbott Labs. v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009) ..........................................................22, 33, 34

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ........................................................................58

*AquaTex Indus., Inc. v. Techniche Solutions*,
  479 F.3d 1320 (Fed. Cir. 2007) ...............................................................*passim*

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
  181 F.3d 1291 (Fed. Cir. 1999) .............................................................37, 38, 40

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) .......................................................................32

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
  752 F.3d 967 (Fed. Cir. 2014) ........................................................................25

*Conroy v. Reebok Int'l, Ltd.*,
  14 F.3d 1570 (Fed. Cir. 1994) ........................................................................43

*Cordis Corp. v. Medtronic Ave, Inc.*,
  511 F.3d 1157 (Fed. Cir. 2008) ..................................................................40, 41

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) .......................................................................43

*Dynastar Textilfarben GmbH v. C.H. Patrick Co.*,
  464 F.3d 1356 (Fed. Cir. 2006) .......................................................................56

*Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*,
  305 F.3d 1303 (Fed. Cir. 2002) .......................................................................37

*Eastcott v. Hasselblad USA, Inc.*,
   564 F. App'x 590 (Fed. Cir. 2014) ....................................................36

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)........................................................................27, 37, 39

*Gemalto S.A. v. HTC Corp.*,
   754 F.3d 1364 (Fed. Cir. 2014) ................................................44, 45

*Genentech, Inc. v. Wellcome Found. Ltd.*,
   29 F.3d 1555 (Fed. Cir. 1994) ..................................................27

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
   456 U.S. 844 (1982)......................................................................24

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007).........................................................24, 53, 56, 57

*Lear Siegler, Inc. v. Sealy Mattress Co.*,
   873 F.2d 1422 (Fed. Cir. 1989) ..................................................26

*Marquip, Inc. v. Fosber Am., Inc.*,
   198 F.3d 1363 (Fed. Cir. 1999) ............................................42, 43, 44

*In re Mayne*,
   104 F.3d 1339 (Fed. Cir. 1997) ..................................................60

*Merck & Co., Inc. v. Mylan Pharmaceuticals, Inc.*,
   19 F. Supp. 2d 334 (E.D. Pa. 1998) ............................................48, 49

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ..................................................53

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997) ..................................................21, 27

*Streamfeeder LLC v. Sure-Feed Sys., Inc.*,
   175 F.3d 974 (Fed Cir. 1999) ....................................................45

*Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*,
   90 F.3d 1558 (Fed. Cir. 1996) ..................................................31

*Toro Co. v. White Consol. Indus., Inc.*,
    266 F.3d 1367 (Fed. Cir. 2001) ..........................................................................33

*Ultra-Tex Surfaces, Inc. v. Hill Bros. v. Chem. Co.*,
    204 F.3d 1360 (Fed. Cir. 2000) ...................................................................42, 48

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
    904 F.2d 677 (Fed. Cir. 1990) ..................................................................*passim*

*Wyers v. Master Lock Co.*,
    616 F.3d 1231 (Fed Cir. 2010) ........................................................................62

## STATUTES:

28 U.S.C. § 1295(a)(1) .............................................................................................1

28 U.S.C. § 1331 ......................................................................................................1

28 U.S.C. § 1338 ......................................................................................................1

35 U.S.C. § 103 ......................................................................................................53

## RULE:

Fed. R. Civ. P. 52(a)(6) ...........................................................................................24

## STATEMENT OF RELATED CASES

Counsel for Appellants are not aware of any related cases.

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '070 patent | United States Patent No. 6,534,070 (A3877-84) |
| '163 PCT | PCT Application Pub. No. WO 95/05163 (A6149-203) |
| '752 PCT | PCT Application Pub. No. WO 93/18752 (A6114-48) |
| Bayer | Plaintiffs-Appellees Intendis GmbH, Intraserve GmbH & Co. KG and Bayer Healthcare Pharmaceuticals Inc. |
| Clinical Study AU36 | Schering Clinical Study Report No. AU36 (A4747-807) |
| DMSO | Dimethyl sulfoxide |
| Finacea NDA | Bayer's New Drug Application No. 21-470 |
| FDA | United States Food and Drug Administration |
| *Gasco* | M.R. Gasco et al., "In vitro permeation of azelaic acid from viscosized microemulsions," 69 Int'l J. Pharm. 193 (1991) (A6084-87) |
| Glenmark | Defendants-Appellants Glenmark Pharmaceuticals Inc., USA and Glenmark Pharmaceuticals Ltd. |
| Glenmark's ANDA | Glenmark's Abbreviated New Drug Application No. 204637 |
| *Maru* | U. Maru et al., "Diffusion in vitro et pénétration cutanée de preparations d'acide azélaïque: recherché de corrélations [In Vitro Diffusion and Cutaneous Permeation of Azelaic Acid from Dermic Preparations: Research of Correlations]," 37(3) J. Pharm., Belg. 207 and translation (A6088-105) |
| POSA | Person of ordinary skill in the art |
| PTO | United States Patent and Trademark Office |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338.  The district court entered a final judgment in favor of Bayer on July 27, 2015, and an amended final judgment on August 14, 2015.  A1; A73-74.  Glenmark filed its timely notice of appeal on July 31, 2015.  A7357.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

This is a Hatch-Waxman case in which Bayer sought to claim new patent protection for a skin treatment it has marketed for more than 25 years.  Bayer kept the same active ingredient, azelaic acid, but turned the formulation from a cream into a hydrogel.  Hydrogels were nothing new when the '070 patent issued, and neither was the use of any of the specific excipients (inactive ingredients) that Bayer's patent claims.

Bayer chose to claim a very specific formulation containing half a dozen particular excipients, including lecithin and triglycerides.  As the district court found, Glenmark made "substantial" efforts to develop a non-infringing product that would still meet bioequivalence standards for delivering the active ingredient.  A45.  Glenmark accordingly proposed to make a formulation *without* lecithin or triglycerides, but Bayer sued Glenmark anyway.  At trial, Bayer argued Glenmark's design-around efforts were for naught under the doctrine of

equivalents, emphasizing that Glenmark's formulation was bioequivalent.  But Bayer's decision to claim inactive ingredients as indispensable elements of its patent claims meant that it could not prove *patent* equivalence by showing *bio*equivalence under FDA standards.

Bayer's doctrine-of-equivalents theory is replete with problems, as the district court found even in ruling for Bayer.  An infringing formulation must contain an element that possesses the same function disclosed in the patent for each of the claim elements.  *See AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1327-28 (Fed. Cir. 2007).  Bayer's patent, however, never identifies lecithin or triglycerides as "penetration enhancers."  Nor does *any* document ever written by Bayer; nor does the scientific literature admitted into evidence.  In fact, Bayer told FDA that lecithin and triglycerides perform entirely different functions in its formulation.  To plug that gaping hole, Bayer had an expert attempt to infer the function of the excipients from an example in the patent specification.  But the expert made significant mistakes, leading the district court to find that his testimony "lack[ed] . . . scientific rigor" and could not be relied upon.  A32.  Yet the district court held for Bayer.  That ruling was wrong as a matter of law because it is contrary to binding Federal Circuit precedent, which establishes that Bayer's failure to show that lecithin and triglycerides function as penetration enhancers *in the claimed formulation* dooms its infringement case.

2

The problems do not end there.  Patentees cannot use the doctrine of equivalents to capture a formulation that they disclaimed during prosecution or that would ensnare the prior art.  Here, Bayer has done *both*.  During prosecution, the applicants confirmed that lecithin is critical to the claimed formulation:  they specifically disclaimed any intent to reach formulations that do not contain lecithin and even amended the claims to disavow formulations without lecithin.  That is exactly what Glenmark proposes to make, and Bayer is estopped from trying to recapture what the applicants gave up.  And even if Bayer were not estopped by the prosecution history, its infringement theory impermissibly overreaches.  Bayer asserts that Glenmark's formulation infringes if it contains *any* penetration enhancer.  But Bayer could never have overcome the prior art to obtain a patent on a formulation claiming "any penetration enhancer" instead of the specific ingredients, lecithin and triglycerides, that it chose to claim.

Even if Bayer could establish that Glenmark's product would infringe under the doctrine of equivalents, Bayer's claims are obvious.  The district court found that azelaic acid was well known in the prior art; that azelaic acid *hydrogels* were known in the art and showed promising results; and that formulations containing *identical excipients* were known in the art.  The court further found a strong motivation to make a hydrogel version of Skinoren cream.  And even Bayer's expert agreed that making a hydrogel was not just known, but routine in the art.

3

Nothing about *this* hydrogel, using known ingredients, saves the claim from obviousness. The district court's findings thus dictate a legal conclusion that the asserted claims are obvious.

## STATEMENT OF ISSUES ON APPEAL

1.     To prove infringement under the doctrine of equivalents, patentees must show, among other things, that the accused product performs the function taught by the patent for each element of the claims.  Here, the district court found that Bayer's specification nowhere taught a function for the lecithin or triglycerides elements; rejected Bayer's expert's attempt to read such a teaching into the specification, because the testimony "lack[ed] . . . scientific rigor"; and found that before this litigation, including in seeking FDA approval, Bayer had uniformly described lecithin as a moisturizer/emulsifier and triglycerides as emollients—not as penetration enhancers.  In light of these findings and the undisputed facts, did the district court commit legal error by nonetheless concluding that Bayer's claimed excipients perform the same penetration-enhancement function as the different excipient in Glenmark's ANDA product?

2.     Patentees may not reclaim through the doctrine of equivalents what they surrendered during prosecution.  When the PTO read Bayer's claims to encompass a formulation with zero lecithin, Bayer told the PTO that it was not claiming such a formulation containing zero lecithin and amended its claims to rule

out the PTO's reading.  Glenmark's formulation contains zero lecithin.  Did the district court commit legal error in refusing to hold Bayer to its concession?

3.    The doctrine of equivalents may not be used to ensnare the prior art. Bayer alleged that Glenmark's azelaic acid product is equivalent because it contains a penetration enhancer.  The prior art already taught azelaic acid formulations containing penetration enhancers.  Did the district court commit legal error in holding that Bayer's asserted range of equivalents did not ensnare the prior art?

4.    The prior art included azelaic acid in a hydrogel formulation; all of the claimed excipients; and combinations of those claimed excipients just like the claimed combination.  The district court found that a skilled artisan would have been motivated to develop a hydrogel version of the prior-art azelaic acid cream, and the undisputed evidence showed that making these excipients into a hydrogel dosage form is straightforward.  Did the district court err as a matter of law in concluding that the patent was not invalid for obviousness despite these findings?

## STATEMENT OF THE CASE

### I.    BACKGROUND

#### A.    Azelaic Acid

Azelaic acid has been used for decades to treat various skin disorders.  A3; A3879(1:24-26); A2517; A2757-58; A2981-82; A3152-53; A6285.  Years before it applied for the '070 patent, Bayer marketed azelaic acid in cream form under the

5

name Skinoren.  A4.  As of 1998, Skinoren cream was known to be an effective

and well-tolerated treatment.  A2603-04; A3477-78; A6285.

The product at issue in this case, Finacea, is azelaic acid in hydrogel form.

A2289-90.  A hydrogel is a semisolid dosage form that combines water and a

gelling agent to form a gel.  A22.  Finacea was based on a "framework [gel

formulation] recipe," A4895; *see* A2539-41; A3213, and was developed as a "line

extension" for Skinoren cream, *i.e.*, "a second formulation . . . to increase sales" of

products containing the same active ingredient, A3217-18.

## B.    The '070 Patent

The '070 patent claims priority to an application filed in 1998.  A12.  The

claims of the '070 patent are narrowly directed to a specific azelaic acid hydrogel

formulation.  Only claim 1 is independent:

> 1.   A composition that comprises:
>     (i)   azelaic acid as a therapeutically active ingredient
>           in a concentration of 5 to 20% by weight,
>     (iii) at least one triacylglyceride[1] in a concentration of
>           0.5 to 5% by weight,
>     (iv)  propylene glycol, and
>     (v)   at least one polysorbate, in an aqueous phase that
>           further comprises water and salts, and the
>           composition further comprises
>     (ii)  at least one polyacrylic acid,[2] and

---

[1] The parties stipulated that the term "triacylglyceride," as used in the asserted
claims, means "triglyceride."  A101; A2288.  These terms are used
interchangeably.

[2] Polyacrylic acid, a gelling agent, is often referred to by the brand name Carbopol.
These terms are used interchangeably.

(vi) lecithin, wherein the composition is in the form of
a hydrogel.

A3881(6:27-39). Claims 2-12 depend from claim 1 and specify the method of

administration (claims 2, 8, and 9), narrower percentage ranges for the components

of the formulation (claims 4-6 and 10-11), or additional or more specific excipients

(claims 3, 7, and 12). A3881-82(6:40-8:8).

Neither the specification (which spans only a few columns) nor the

prosecution history explains what function the claimed excipients are supposed to

perform in the claimed formulation, except for a single sentence explaining the role

of polyacrylic acid—the gelling agent that produces the hydrogel. A3879(2:51-

52). The patent says nothing about the role that either lecithin or triglycerides are

to play, although it implies that lecithin functions as an emulsifier.

*See* A3879(2:53-64); pp. 8-9, *infra*.

During prosecution, in a notice of rejection, the examiner noted that certain

dependent claims recited a range of lecithin with zero at its lower end (*e.g.*, "up to

1%"); the examiner therefore pointed out that these claims could be read to claim a

formulation with zero lecithin. A1247; A1270. The applicants promptly

disavowed any attempt to claim a formulation with zero lecithin and amended the

claim language to exclude formulations with zero lecithin. A1254-55; A1270.

The claims were allowed.

### C.     Glenmark's ANDA Product

Glenmark sought to develop an ANDA product that would not infringe the '070 patent. *See* A48; A3000; A2836-37. Glenmark's development report set forth its objective "to develop a formulation to non-infringing [*sic*] [the '070 patent]." A5928; *see* A2674-75; A2682; A2704. Glenmark's efforts to avoid infringement led to the azelaic acid hydrogel formulation described in its ANDA, which does not contain two of the excipients required by the asserted claims, lecithin and triglycerides. A2292; *see also* A5865-66. Glenmark's formulation also includes one excipient not claimed by the '070 patent, isopropyl myristate. A3881-82(6:27-8:8); A2292.

## II.     BAYER DID NOT DISCLOSE LECITHIN AND TRIGLYCERIDES AS PENETRATION ENHANCERS

Glenmark's formulation uses isopropyl myristate, which is a chemical penetration enhancer. A major issue at trial, therefore, was whether isopropyl myristate is equivalent to lecithin and triglycerides, the two excipients that appear in the claims but not in Glenmark's formulation.

### A.     The '070 Patent Does Not Identify the Functions of Lecithin or Triglycerides in the Claimed Formulation

The specification of the '070 patent does not identify the function of either lecithin or triglycerides in the claimed formulation. A32; A2825; A3012-13. The specification makes only one relevant statement: it explains that decreasing the

amount of lecithin makes the hydrogel "no longer present as a nanoemulsion," suggesting that lecithin was being used as an emulsifier.  A3879(2:53-64).

Example 2 of the specification, from which Bayer's expert tried to infer the function of lecithin and triglycerides, does not refer to either lecithin or triglycerides.  Example 2 describes the results of Franz cell testing comparing the claimed hydrogel with Skinoren cream.  A3881(5:40-6:22); A2627; *see* A4836-72; A2599-602.  Franz cell testing is an *in vitro* model that tests diffusion of a formulation into cadaver skin or a substitute.  A2967-69; A2971-73; A2638.  The patent reports that more azelaic acid penetrated into and remained in the skin with the hydrogel than with the cream.  A3879(2:29-40); A3881(5:40-6:22).  As explained below, *in vivo* testing did not confirm that result; it found no significant difference in any parameter.  *See* pp. 16-17, *infra*.

Reading Example 2, Bayer's expert Dr. Weiner attempted to attribute the difference in penetration to lecithin and triglycerides:  if they were the only two ingredients present in the gel but not the cream, they could be making the difference by acting as penetration enhancers.  A28-29; A32; A2779-80; A2910-13.  But Dr. Weiner's theory depended on the notion that Skinoren cream did not contain lecithin or triglycerides.  A32; A2910-13; A2779-80.  While Dr. Weiner held to that notion until trial, it was wrong:  as the district court found, Skinoren

contains triglycerides. A32; A2910-13. And Dr. Weiner never even considered whether lecithin *alone* could be functioning as a penetration enhancer. A2850-51.

Dr. Weiner admitted that there was an alternative explanation for why the hydrogel delivered more azelaic acid to the skin than the cream: the hydrogel contains more dissolved azelaic acid. A32; A2914-15. Greater dissolution allows more of an active ingredient to penetrate the skin *without* using a chemical penetration enhancer. A3045-46 (explaining that increasing solubility and using a chemical penetration enhancer are two distinct methods of improving penetration).

Before this litigation, the evidence showed, Bayer itself credited that explanation of Example 2. Bayer's "scientific representatives" (including inventor Dr. Franke) had twice reported that the increased percentage of dissolved azelaic acid (25%, versus 3% in the cream) caused the increased delivery of azelaic acid. A30-32 (citing A6246-47; A4624); *see also, e.g.*, A6247 (the gel "contains a higher dissolved fraction of azelaic acid than the cream, leading to improved drug release and bioavailability"). Bayer even marketed the drug by emphasizing that this higher fraction of dissolved azelaic acid "[c]ontributes toward higher drug release and improved skin bioavailability." A4885. *No* documents espoused the theory dependent on lecithin and triglycerides that Dr. Weiner posited, or offered any other possible explanation for increased penetration. A2545-46; A2826.

10

As Dr. Weiner conceded, if the "increased dissolution" explanation is correct, Example 2 would not shed any light on the function of lecithin and triglycerides in the formulation.  A2914-15.  Dr. Weiner admitted that, in that case, he "would certainly have to reconsider" his opinion that lecithin and triglycerides function as penetration enhancers.  A30 n.26; A2915.

Accordingly, the district court was "troubled by Dr. Weiner's method of deduction" and concluded that it "lack[ed] . . . scientific rigor," "especially given that Dr. Weiner did not realize that Skinoren® cream also contains triglycerides and given that plaintiffs' scientific representatives twice reported an increased percentage of dissolved azelaic acid in Finacea® as compared to Skinoren® cream."  A32.  The district court did not rely on his opinions.  *See id.*

### B.    Bayer Told FDA That Lecithin and Triglycerides Function as Emollients and Emulsifiers in the Claimed Formulation

Evidence outside the patent confirmed that Bayer did not believe lecithin and triglycerides were acting as chemical penetration enhancers in the claimed formulation.  Not a single Bayer document mentions their performing that function.  A2545-46; A2826.  To the contrary, the Finacea NDA that Bayer submitted to FDA specifically identifies the functions of lecithin and triglycerides as "emulsifier" and "emollient," respectively, and refers to the combination of the two (with another excipient) as "an emulsified moisturizer complex."   A6293; A6069; A2824-25; *see* A4925; A4763; A2646-47; A6261.

11

In its internal documents, including the Finacea formulation development report and documents authored by inventor Dr. Franke, Bayer likewise "affirmatively describe[d] the function of lecithins and triglycerides as either moisturizers, emollients, or emulsifiers." A31 (citing A4897; A6069; A4763); *see* A2824-25; A4925 ("The formulation also contains a moisturizer (lecithin) [and] an emollient (medium chain triglycerides) . . ."); A4763; A2646-47; A6261; A6293; A4623; A2534-35.

### C.     Skilled Artisans Do Not Regard Lecithin and Triglycerides as Penetration Enhancers

In the art, a "chemical penetration enhancer" is a member of a specific class of excipients that affect the skin in a way that allows more drug to penetrate. A2954-55. As the district court recognized, skilled artisans do not consider lecithin and triglycerides to be chemical penetration enhancers, A44, and none of the prior art in evidence at trial identified lecithin or triglycerides to be members of that class. A31; A34; A2885-87; A5578-83; A2791; A3030; A2864-65. Indeed, Dr. Weiner conceded that he could not cite a single scientific reference that identified either lecithin or triglycerides as a penetration enhancer. A2853. And in fact, Dr. Weiner was impeached with *his own article* in which he wrote that "phospholipids [*e.g.*, lecithin[3]] do not function as permeation enhancers." A31.

---

[3] Lecithin is a "complex mixture of phospholipids." A5814.

## III.    BAYER'S FORMULATION CONSISTS ENTIRELY OF ELEMENTS ALREADY WELL KNOWN IN THE ART

### A.    Skinoren Cream Contains the Same Active Ingredient and Nearly All the Same Excipients

Skinoren cream is prior art to the '070 patent.  A3879(1:27-35).  It contains 20% azelaic acid by weight, triglycerides and diacylglycerides, propylene glycol, polysorbate, and water and salts.  A3879(1:27-35).  Skinoren cream was known to be well-tolerated and effective.  A2600; A2603-04; A3476-78; A6285.  The only excipients claimed by the '070 patent that were not present in the Skinoren cream formulation are lecithin and the gelling agent polyacrylic acid (or Carbopol).  A4763; A2910-13; *see also* A3879(1:15-2:7).

### B.    The Prior Art Disclosed Hydrogel Formulations with All of the Claimed Excipients

The prior art disclosed platform formulations for topical drug products that consisted of virtually the same combinations of excipients as claimed.  These platforms could be used to deliver a variety of active ingredients, and the prior art specifically identified "[i]nsoluble drugs"—a category that includes azelaic acid— as suitable for delivery using these platforms.  A53 (citing A6121; A3084).

One of these platforms was disclosed in the '752 PCT application, which the district court found discloses "a large number of highly similar or identical excipients to the claimed composition."  A55; *see* A52-53.  The only claimed excipient not specifically identified in the '752 PCT was propylene glycol.  The

13

'752 PCT did, however, identify glycerol, and the district court credited undisputed testimony that propylene glycol and glycerol are interchangeable.  A53 n.43.  The '163 PCT disclosed the same formulation.  A52-53; A3093-94; A6156-58.

The formulations of both the '752 PCT and the '163 PCT contain water and the gelling agent Carbopol.  A53; *see also* A6139-40 (Example 30); A3093; A6168-69.  Both disclose neutralization of the formulations.  A54-55; A57; *see also* A6139-40; A6170.  Bayer's expert Dr. Weiner testified that neutralization of a Carbopol-containing formulation results in a gel.  *E.g.*, A2761-62; A2805-06.  The POSA would therefore have recognized that the '752 PCT and '163 PCT formulations are hydrogels.  A3086-87; A3093; A3107-08.  The district court, however, refused to consider whether a POSA would have understood that the '752 PCT and '163 PCT formulations necessarily include hydrogels, finding instead that the references do not disclose hydrogels because "hydrogel" does not appear in them *in haec verba*.  A55; A57.

### C.    The Prior Art Disclosed Gel Formulations of Azelaic Acid, Which Were Preferable to Cream Formulations

#### 1.    *Maru*

The district court gave considerable weight to the *Maru* reference, which, it found, discloses an azelaic acid hydrogel.  A58.  The district court also found that *Maru* reported increased permeability of azelaic acid with the hydrogel

formulation as compared to a cream formulation.  A57-58; A64; *see also* A6102-03; A3102-03; A3374.

Maru's results led the district court to make several critical findings.  The court "accept[ed]" that, in view of *Maru*, a skilled artisan would consider developing an alternative to Skinoren in a hydrogel formulation, and the court specifically rejected Bayer's assertion that supposed complications with using a hydrogel would have prevented "further development."  A63-64.  Indeed, the district court found that a skilled artisan's "decision to pursue a hydrogel formulation would be further reinforced by *Maru*'s report of increased permeability of azelaic acid with the gel formulation as compared to the cream."  A64.

### 2.    *Gasco*

*Gasco* disclosed an azelaic acid formulation containing the excipients propylene glycol, polysorbate (Tween 20), Carbopol, water, and DMSO, a well-known penetration enhancer.  A3380; A3196-97; A6085.  The formulation was an improvement of a prior-art azelaic acid formulation that was not viscous enough to be applied to the skin.  A6084.   By using the gelling agent Carbopol, *Gasco*'s formulation, which *Gasco* referred to as a "viscosized microemulsion," was viscous enough to be used topically.  A6084-85; *see also* A3056-57; A3127-28. Glenmark presented evidence that because of the presence of water and Carbopol,

the POSA would have understood *Gasco*'s formulations to be hydrogels.  A6084-

85; A2991; A3059-61; *see also* A5597 (Fig. 8).  Moreover, Dr. Weiner admitted

that a POSA would readily know how to convert any Carbopol-containing

formulation to a hydrogel.  A3401.  But because the word "hydrogel" does not

appear in the reference, the district court again refused to make that finding.  A60.

### D.    The '070 Patent Did Not Disclose Any Unexpected Breakthrough in Azelaic Acid Delivery

Given the prior art just discussed, the statements in Example 2 of the '070

patent—that the hydrogel delivered azelaic acid more effectively—were

unsurprising on their face.  Example 2 used *in vitro* testing (the Franz cell

experiment) to compare the claimed formulation with Skinoren cream, and found

the hydrogel superior.  A3881(5:40-6:22).  That would have been a result

consistent with, for example, what *Maru* had already found fifteen years before—*if*

the Franz cell results had been borne out.  *See* A58-59.  In fact, the Franz cell

results could not be replicated in the clinic.  A11-12; A67.

As the district court recognized, clinical results did not show any benefit of

the claimed formulation over the prior art.  A67.  Bayer's witnesses knew of only

one clinical trial that directly compared the absorption of azelaic acid from

Skinoren and Finacea.  A4747-49; A3460; A2650-51.  This study showed *no*

significant difference in efficacy or systemic absorption between Skinoren cream

and Finacea gel, and the progression of efficacy over time was the same for both

16

treatments.  A11-12; A67; A3460; A2645-51.  Bayer's expert admitted that this

clinical study did not confirm the results of the Franz cell experiment.  A3460.

*Before* conducting this clinical trial, Bayer had conducted a "scarification

test" to examine a different issue, the tolerability of its two test formulations.

Bayer found that Finacea gel was more irritating to the skin than Skinoren cream.

A6247; A6250; A3496-97.  Bayer hypothesized that these results were due to the

gel formulation delivering more azelaic acid to the skin than Skinoren cream.

A6247; A6277.  But the study did not examine that hypothesis:  it was only an

irritation study and did not measure the pharmacokinetics of the formulations or

the extent of absorption.  A6276.

## IV.    THE DISTRICT COURT'S DECISION

Bayer filed suit against Glenmark, alleging that its ANDA infringed the '070

patent under the doctrine of equivalents, and Glenmark filed a counterclaim

alleging that the asserted claims were invalid.  The district court ruled for Bayer on

both points and entered a judgment directing FDA not to approve Glenmark's

ANDA until the '070 patent expires.

### A.    Infringement Under the Doctrine of Equivalents

Because it is undisputed that Glenmark's ANDA product does not literally

infringe any claim of the '070 patent, the district court based its infringement

determination on the doctrine of equivalents and the "function-way-result" test.

A28-41.  The district court accepted Bayer's account that lecithin and triglycerides in Bayer's formulation perform the same "function," in the same way and with the same result, that isopropyl myristate performs in Glenmark's.  A41.

In court, Bayer identified that function as "enhanc[ing] penetration of the skin."  A29-30.  The district court identified the same problems with that theory discussed above, *see* pp.8-12, *supra*:

- Bayer's function theory is not based on anything in the patent or any scientific literature in evidence, A31;

- Bayer previously had "affirmatively describe[d] the function of lecithins and triglycerides as either moisturizers, emollients, or emulsifiers," A31;

- Bayer had never referred to lecithin and triglycerides as penetration enhancers in any written document, A30-31; and

- Bayer's expert had made factually and scientifically incorrect assumptions in reading Example 2 as supporting the penetration-enhancer theory, A29; A32.

But despite finding that Bayer's "position lack[ed] scientific rigor," the district court sided with Bayer.  A32-34.  Although Bayer bore the burden of proof, the court reasoned that the record did not show that "lecithin and triglycerides cannot act as penetration enhancers."  A32; *see also* A33 (stating that the evidence

"does not exclude th[is] possibility"). And the district court was "swayed" to Bayer's side by Glenmark's statements in its ANDA, describing lecithin, triglyceride, and isopropyl myristate as functioning as penetration enhancers. A33-34.

## B.     Defenses to the Doctrine of Equivalents

Turning to Glenmark's ensnarement and estoppel defenses, the district court first held that Bayer's doctrine-of-equivalents theory would not ensnare the prior art. The court had to construct a "hypothetical claim" embodying Bayer's equivalence theory; the court agreed with Bayer that the hypothetical claim should comprise only "lecithin, triglycerides, and isopropyl myristate" rather than any "penetration enhancer," even though Bayer "strenuously argued that all three compounds are penetration enhancers in the context of infringement." A42-43. The court then concluded that Bayer's hypothetical claim would not ensnare the prior art. A43-46.

The district court next concluded that prosecution history estoppel did not apply. Even though the applicants had disavowed, through both argument and an amendment, any attempt to claim a formulation with zero amounts of lecithin, the court held that the amendment was made "for the purpose of clarifying that zero amounts of lecithin are not included, not to disclaim formulations with zero lecithin." A46-47 (internal quotation marks and alterations omitted).

19

## C.    Obviousness

The district court rejected Glenmark's argument that the asserted claims are obvious in light of Skinoren cream in combination with (1) references disclosing hydrogel formulations containing the claimed excipients and (2) references disclosing hydrogel formulations containing azelaic acid. The court concluded that a POSA would have been motivated to pursue a hydrogel formulation of azelaic acid. A63-64. It also recognized that the '752 PCT and '163 PCT disclose formulations containing the claimed excipients. A52-53. But the court nevertheless concluded that Glenmark had introduced insufficient evidence to establish motivation to combine either the '752 PCT or the '163 PCT with one specific prior-art reference disclosing azelaic acid hydrogel—*Maru*—and reasoned that all other prior-art references were irrelevant because they supposedly did not disclose hydrogels. A63-65. The court also concluded that Glenmark had not established a reasonable expectation of success in making the combination using *Maru*. A65-66. And the district court indicated that two secondary considerations—unexpected results and commercial success—further supported a determination that the asserted claims were not obvious. A66-70.

## SUMMARY OF ARGUMENT

1.    Bayer failed to prove that lecithin and triglycerides are penetration enhancers in the claimed formulation, and hence perform the same function as

isopropyl myristate. An element's function must be disclosed in the patent claims and specification. *E.g.*, *AquaTex*, 479 F.3d at 1327-28. A patentee cannot assign functions after the fact, during doctrine-of-equivalents litigation, where the intrinsic record is silent; allowing such a tactic would "frustrate the important 'definitional and public-notice functions of the statutory claiming requirement.'" *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1429-30 (Fed. Cir. 1997) (quoting *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 29 (1997)). As the district court recognized, Bayer failed to prove through "particularized testimony" that the '070 patent treated lecithin and triglycerides as chemical penetration enhancers. *AquaTex*, 479 F.3d at 1328-29. That alone compels reversal.

In addition, evidence beyond the patent makes even clearer that lecithin and triglycerides do not function as penetration enhancers. Bayer told the FDA that they had entirely different functions—as an emollient and emulsifier—and never described them as penetration enhancers in any document, *ever*. Even Bayer's expert, Dr. Weiner, had stated in an article that phospholipids like lecithin "do not function as permeation enhancers." A2887.

In the face of this evidence, the district court relied largely on statements in a table in Glenmark's ANDA addressing bioequivalence. A33-34. But as this Court has squarely held, because "bioequivalency and equivalent infringement are

21

different inquiries," the "bioequivalency of an accused product with a product produced from the patent at issue is not sufficient to establish infringement by equivalents." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009). The remaining snippets of testimony that the district court cited did not prove the excipients' function in the claimed formulation, and the district court did not suggest they did.

Thus, no legally cognizable evidence supported Bayer's litigation theory that lecithin and triglycerides function as chemical penetration enhancers in the claimed formulation. Yet the district court ruled for Bayer because it could "discern nothing in the record that indicates that lecithin and triglycerides *cannot* act as penetration enhancers." A32 (emphasis added). But Bayer—not Glenmark—bears the burden of proving what function the patent claims and why the excipient in Glenmark's formulation is equivalent. Bayer's failure to adduce competent evidence compels judgment of noninfringement.

2.    Bayer's doctrine-of-equivalents argument is in any event barred by prosecution history estoppel. The PTO rejected an earlier version of the patent in part because the claims could be read to cover "even zero amounts" of lecithin. In response, the applicants *both* argued that "the meaning is clear that zero amounts are not included" *and* amended the relevant claims to claim only formulations with

22

"more than 0" lecithin.  This argument and amendment unambiguously disclaimed formulations that, like Glenmark's, contain no lecithin.

3.      Bayer's doctrine-of-equivalents argument is also legally impermissible because the "range of equivalents" asserted by Bayer would ensnare the prior art.  Bayer claims that Glenmark's formulation infringes the asserted claims because it includes a penetration enhancer—any penetration enhancer—in place of lecithin and triglycerides.  Thus, the "range of equivalents" Bayer claims extends to all penetration enhancers.  *See Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684-85 (Fed. Cir. 1990).  The district court analyzed the ensnarement question too narrowly:  it asked only whether a patent claiming either Bayer's formulation *or* Glenmark's formulation would be patentable over the prior art.  The correct legal question is whether a patent that claimed *any* penetration enhancer, not just lecithin, triglycerides, or isopropyl myristate would have been patentable.  Bayer failed to show that it would.

4.      The district court found that every element of the claimed formulations was in the prior art and that there would have been a strong incentive to make a hydrogel version of Skinoren cream.  These findings, along with undisputed evidence concerning the prior art, demonstrate that the asserted claims were obvious as a matter of law.  In ruling to the contrary, the district court focused only on whether Glenmark had demonstrated that a skilled artisan would

combine one particular reference disclosing azelaic acid in a hydrogel formulation with two references that contained essentially all the claimed excipients.  But the obviousness analysis is not so limited, because the law recognizes that the "person of ordinary skill is also a person of ordinary creativity, not an automaton," who will often "be able to fit the teachings of [prior art] together like pieces of a puzzle."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).  Two prior-art references contained essentially all the claimed excipients.  Whether or not particular prior-art references, including these two, *disclosed* a hydrogel, the undisputed evidence made clear that they could easily be *made into* a hydrogel using basic knowledge that was well-established in the art.  Given the district court's finding of a strong motivation to make an azelaic acid hydrogel, making *the claimed* azelaic acid hydrogel was obvious.

## STANDARD OF REVIEW

In reviewing a district court decision applying the doctrine of equivalents, this Court reviews *de novo* whether the factual findings rest on legal error.  A finding of infringement infected by legal error must be reversed.  *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982).  Factual findings made under the correct legal standard are reviewed for clear error.  Fed. R. Civ. P. 52(a)(6).

24

This Court reviews *de novo* whether a patentee is barred from relying on the doctrine of equivalents by prosecution history estoppel or the ensnarement doctrine. *Wilson Sporting Goods*, 904 F.2d at 683.

The Court reviews the ultimate conclusion of obviousness *de novo* and any underlying factual findings for clear error. *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 972-73 (Fed. Cir. 2014).

## ARGUMENT

## I.   THE DISTRICT COURT ERRED AS A MATTER OF LAW IN ITS APPLICATION OF THE "FUNCTION" PRONG OF THE TEST FOR INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

The foundation of Bayer's doctrine-of-equivalents theory is the notion that lecithin and triglycerides function as penetration enhancers in the claimed formulation, as isopropyl myristate functions in Glenmark's. That notion had no basis in the '070 patent itself and was completely unsupported by any credible evidence—as the district court recognized in several findings. By nevertheless ruling for Bayer, the district court erred as a matter of law.

The district court noted that Bayer itself had never described lecithin or triglycerides that way in the patent, in its New Drug Application, or for that matter in *any* written document. In fact, when Bayer sought approval for Finacea and had to explain to FDA what those excipients did, it unambiguously identified them as emollients and emulsifiers, *not* penetration enhancers. None of the published

literature submitted into evidence gave Bayer any support; the literature catalogued more than 100 different penetration enhancers, but *not* lecithin or triglycerides. And, as the district court found, the opinion of the sole witness Bayer presented in support of its new theory rested on two obvious errors. That is why the district court found a "lack[ of] scientific rigor" in Bayer's argument that the lecithin and triglycerides in the claimed formulation function as penetration enhancers. A32.

These findings and the discrediting of Bayer's only witness supporting its litigation-driven recharacterization of lecithin's and triglycerides' "function" should have ended this case. As the patentee, Bayer bears the burden of proving all three prongs of the function-way-result test, with "particularized testimony." *E.g.*, *AquaTex*, 479 F.3d at 1328-29; *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1426 (Fed. Cir. 1989). While the district court ruled for Bayer because it stated it could "discern[] nothing in the record that indicates that lecithin and triglycerides *cannot* act as penetration enhancers" or "*exclude*[*s*] the possibility that they function" as penetration enhancers, A32-33 (emphases added), Glenmark was not required as the accused infringer *to disprove* that the excipients claimed by the '070 patent could theoretically function as penetration enhancers. Under the correct legal standard, only one conclusion is possible: Bayer has never proved that those excipients *do* act as penetration enhancers in the formulation claimed by its patent.

## A.     Bayer's "Function" Theory Has No Basis in the Patent

The fatal deficiency in Bayer's "function" case is the complete absence of

support *in the patent itself* for the notion that lecithin and triglycerides function as

penetration enhancers in this invention.  The function-way-result test "focuses on

'an examination of the claim and the explanation of it found in the written

description of the patent.'"  *AquaTex*, 479 F.3d at 1328 (quoting *Vehicular Techs.*

*Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1090 (Fed. Cir. 1998)); *see also*

*Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1567-68 (Fed. Cir. 1994)

(concluding no reasonable jury could have found equivalency based on function

that was inconsistent with the specification).   Focusing on evidence intrinsic to the

patent prevents the patentee from "frustrat[ing] the important 'definitional and

public-notice functions of the statutory claiming requirement.'"  *Sage Prods.*, 126

F.3d at 1429-30 (quoting *Warner-Jenkinson*, 520 U.S. at 29); *see also Festo Corp.*

*v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002) ("If the range

of equivalents is unclear, competitors may be unable to determine what is a

permitted alternative to a patented invention and what is an infringing

equivalent.").

In this case, the district court found that "[t]he '070 patent itself is silent on

the question of whether lecithin and triglycerides function as penetration

enhancers." A31; *see* A2825; A3012-13.  Indeed, to the extent the specification

provides any guidance as to the function of these components, it indicates that

lecithin was being used as an emulsifier (just as Bayer later told the FDA it was,

*see* p.11, *supra*).  For example, the specification discloses that when more than 1%

of the formulation is lecithin, the formulations are nanoemulsions, but when less

than 1% is lecithin, the formulations are not nanoemulsions.  A3879(2:53-64).

Bayer's argument that lecithin and triglycerides function as penetration

enhancers hinged on its expert's interpretation of the results of Example 2.

According to Dr. Weiner, there were two possible explanations for why the

hydrogel produced higher azelaic acid concentration in the skin than the cream did.

First, lecithin and triglycerides could be acting as chemical penetration enhancers

because, Dr. Weiner thought, they were present in the hydrogel but not in the

cream.  Second, the hydrogel could simply contain a greater fraction of dissolved

azelaic acid than the cream; as Dr. Weiner conceded, if more azelaic acid in the

skin resulted from more dissolved azelaic acid in the hydrogel, then the example

would not show that lecithin and triglycerides were acting as chemical penetration

enhancers.  A2914-15.  Dr. Weiner rejected the second explanation, but admitted

that if it were correct he "would certainly have to reconsider" his opinion that

lecithin and triglycerides function as penetration enhancers.  A30 n.26; A2915.

Dr. Weiner was wrong, and the district court rejected his opinions.  A32.  As

the court found, although the absence of lecithin and triglycerides in the cream was

the lynchpin of his opinion, Dr. Weiner did not realize until trial that the cream does in fact contain triglycerides.  A32; A2910-13.  Lecithin alone could not sustain Dr. Weiner's theory; he never even considered whether lecithin alone would act as a penetration enhancer.  A2849-51.

Moreover, Bayer itself had repeatedly explained the results of Example 2 on grounds that have nothing to do with a chemical penetration enhancer.  The court found that Bayer's "scientific representatives" (including inventor Dr. Franke) had "twice reported" that the increased penetration of azelaic acid from the hydrogel resulted from the increased percentage of dissolved azelaic acid.  A32.  No document discussed at trial provided any alternative explanation.  A6247; A4874; A4885; A2917-18; A2926-28; A3257.  When confronted with this evidence, Dr. Weiner's response was simply that Bayer's own scientists were "wrong."  A2920; A2924; A2928-29.

The district court was correct to discredit Dr. Weiner, A32, and it should have stopped there.  Bayer had no other evidence grounded in the intrinsic record that the function of lecithin and triglycerides was to enhance penetration.  And without such evidence, the court had no basis to conclude that isopropyl myristate

performed the same function as the excipients claimed by the '070 patent.

*See AquaTex*, 479 F.3d at 1327-28.[4]

### B. Evidence from Outside the Patent Also Refuted Bayer's Function Theory

Even if it were appropriate to look beyond the intrinsic evidence in this case, none of the extrinsic evidence helped Bayer's newfound theory of function; quite the opposite, Bayer's own documents devastated its theory. Indeed, in another section of its opinion, the district court found—crediting Bayer's argument—that lecithin and triglycerides had no known "penetration capabilities" in 1998, the '070 patent's priority date. A45.

In the years-long paper trail of Finacea, Bayer's scientists and other personnel never once identified penetration enhancement as the function of lecithin and triglycerides in Finacea. To the contrary, Bayer told the FDA that lecithin was an emulsifier and triglycerides an emollient. In the Finacea development report and elsewhere, Bayer stated that these excipients' function was as a moisturizing complex. A4897; A4906; A2543-44; A2553-54; A6069; A2824-25; A4763; A2646-47; A6261; A6293; A4925.

---

[4] The district court emphasized the intrinsic record in other portions of its doctrine-of-equivalents analysis: *e.g.*, in discussing the "way" prong, the district court refused to distinguish between what it called "sub-mechanisms" because "[t]he '070 patent does not specify a mechanism for penetration enhancement." A38. But the reason that is true is that the '070 patent does not mention penetration enhancement *at all*. Thus, the court's reasoning on "way" undermines its reasoning on "function."

Nor did a single literature reference in evidence identify either lecithin or triglycerides as penetration enhancers. A31; A34; A2864-65; A2867-68; A5814; A5816; A3011; A5578-83; A2852-53; A2791. In fact, Dr. Weiner was impeached with his own definitive statement, in a published article, that "phospholipids [*e.g.*, lecithin] *do not* function as permeation enhancers." A31; A2887 (emphasis added).

Given that Dr. Weiner's opinion was rejected by the district court, Bayer had no expert testimony to support its claim that lecithin and triglycerides function as penetration enhancers in the claimed formulation, as necessary to show that the isopropyl myristate in Glenmark's product was their equivalent. Bayer certainly could not satisfy the requirement that it provide "particularized testimony" demonstrating the equivalence between Bayer's two excipients and Glenmark's isopropyl myristate. *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996). As a matter of law, Bayer's infringement claim should have been dismissed for failure of proof.

### C. The District Court Erred by Accepting Bayer's Function Theory on the Ground that the Evidence "Did Not Exclude" the Possibility that Lecithin and Triglycerides Could Function as Penetration Enhancers

Thus, the district court *agreed with Glenmark* on the key points: neither evidence intrinsic to the patent, nor extrinsic evidence from Bayer's own files, nor the scientific literature in evidence supported Bayer's argument that lecithin and triglycerides function as penetration enhancers. In nonetheless ruling for Bayer,

the district court reasoned that the record did not "exclude the possibility" that the claimed excipients *could* perform this function.  A33.  But the relevant legal question is not whether Glenmark as the defendant conclusively ruled out the possibility that lecithin and triglycerides might enhance penetration in some chemical formulation.  Rather, it is whether Bayer satisfied its burden to show that the function was taught by the '070 patent in the formulation it claimed.

Under the correct approach, the only possible answer is no.  The district court placed primary reliance on Glenmark's ANDA, but that is legally irrelevant.  And while it cited a few other snippets of evidence (and made various errors in doing so), it did so only for the proposition that "nothing in the record indicates that lecithin and triglycerides cannot act as penetration enhancers," A32—which the court tacitly acknowledged was a different and more general question than whether those excipients "function as such in the claimed composition."  A33.

1.     The district court indicated it was "swayed" by the statements in the table in Glenmark's ANDA, and it emphasized that excipients "may perform more than one function."  A33.  But the "function" analysis asks what function the claimed element performs *in the context of the claimed invention*, not in other products.  "The fact that, in other contexts, [the claim limitation] can perform other functions in different ways to yield a different result is not relevant."  *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed.

Cir. 2003); *accord Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001).  Thus, the issue here is not how *Glenmark* hypothesized lecithin or triglycerides might work in Finacea, but how the inventors thought lecithin and triglycerides function in the formulation Bayer claimed.  The ANDA cannot answer that question; to the extent anything outside the patent can, it would be Bayer's NDA.  And the answer is clear from that document.  As the court found, Bayer's NDA "affirmatively describe[d] the function of lecithins and triglycerides as either moisturizers, emollients or emulsifiers."  A31 (citing, *e.g.*, A6069).

In explaining its focus on *Glenmark's* ANDA, the district court relied on an inapposite case involving *literal* infringement, not the doctrine of equivalents. The court cited, A33, the statement in *Abbott Laboratories v. TorPharm, Inc.*, that "an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry."  300 F.3d 1367, 1373 (Fed. Cir. 2002).  But as this Court recognized, the ANDA can define only the "proposed generic drug," *id.*, not the brand drug.  Here, no one disputes that Glenmark will use isopropyl myristate, *not* lecithin and triglycerides, and thus will not literally infringe.  By contrast, in *Abbott* the ANDA showed that the generic product "would [literally infringe] the 1:1 molar ratio limitation of the patents in suit."  *Id.* at 1375.

33

Glenmark's use of isopropyl myristate as a penetration enhancer may well be relevant to FDA, which must decide whether Glenmark's product will be bioequivalent to Bayer's. But the district court erred in insisting that "such a comparison" must also have "consequences . . . for purposes of infringement." A34. As this Court has explained, "[d]ifferent attributes of a given product may . . . be relevant to bioequivalency but not equivalent infringement, and vice versa." *Abbott v. Sandoz*, 566 F.3d at 1298.[5] And even if that were not the case, the district court was mistaken in assuming that Glenmark's discussion of penetration enhancers "support[ed its] bid for FDA approval." A34. The agency knew what Glenmark did not then know: that Bayer had described lecithin and triglycerides in its NDA as emulsifier and emollients, *not* as penetration enhancers. Glenmark thus could not have gained any regulatory advantage.

2.    The district court cited three additional snippets for a general proposition: that lecithin and triglycerides *can* sometimes act as penetration enhancers. A32-33. That brief citation bears no material weight.

The cited testimony from Dr. Michniak-Kohn, Glenmark's expert, did not address triglycerides, nor did it address whether lecithin functioned as a penetration enhancer, and the court did not find that it did. Dr. Michniak-Kohn

---

[5] "While bioequivalency may be relevant to the function prong" in some cases, *Abbott v. Sandoz*, 566 F.3d at 1298, the bioequivalency of two products with respect to the *active ingredient* does not establish that various different *inactive* ingredients are performing the same function.

simply testified that Bayer's claimed formulation must contain some amount of lecithin, and that the lecithin contributed to the formulation's properties. A32. Dr. Michniak-Kohn was clear, however, that the lecithin contributed *as an emulsifier*, not as a penetration enhancer. A3010-11. She later elaborated on that point, explaining that lecithin's contribution had nothing to do with its being a chemical penetration enhancer. A3045-46.

For his part, Dr. Mehta, another Glenmark witness, merely stated at deposition that his recollection of a literature review from years earlier was that lecithin and triglycerides could potentially function as penetration enhancers. A2689-90. That unelaborated recollection of unspecified literature from an unspecified time, never introduced at trial, does not prove how lecithin or triglycerides function in the claimed formulation. It cannot sustain the district court's finding.

Finally, the district court asserted that Dr. Franke had "testified that he initially selected lecithin for its 'penetration enhancement' properties.'" A33. But his actual testimony was far more ambiguous. A2526.[6] He retreated to "it's possible," A2549, and at his deposition, he would go no further than "I don't

---

[6] His full answer on the cited page was: "Well, at that point, still thinking of release and penetration characteristics of our product, we found lecithin to be an interesting candidate as it had the chemistry and may interact in the skin layers, skin layers also double membrane structures with a similar chemistry. So that was one interesting aspect in the sense of having a penetration enhancement principle." A2526.

know.  I'm not sure."  A2549-50.  His own pre-litigation statements, and Bayer's,

unambiguously attributed different functions—*not* penetration enhancement—to

the claimed excipients.  *See, e.g.*, A2540-42; A2555-56.  In internal Bayer

documents, Dr. Franke described the function of lecithin and triglycerides as an

"emulsified re-fattening complex."  A4623; *see* A2532; A2534-35; A2578-79.

And as he admitted, he could not point to a single Bayer document, among

hundreds of thousands produced, that described the function of lecithin and

triglycerides in the claimed formulation as penetration enhancers.  A2545-46.  If

Dr. Franke or Bayer had actually considered lecithin and triglycerides to be

penetration enhancers, there would have been at least one page that identified them

as such.  Not one exists.  Given this record, it is unsurprising that even Dr. Franke

could not bring himself to testify that he knew for certain that lecithin was acting

as a penetration enhancer.  Taken as a whole, his "inconsistent" and "conclusory"

testimony cannot support a finding of equivalence.  *Eastcott v. Hasselblad USA,*

*Inc.*, 564 F. App'x 590, 596 (Fed. Cir. 2014).

\* \* \*

Under the proper function analysis—which places the burden on Bayer and

looks to the claims and specification as written—the record supports only one legal

conclusion:  Bayer failed to prove that lecithin and triglycerides function as

penetration enhancers in the claimed formulation.

36

## II.    BAYER'S ATTEMPT TO CAPTURE FORMULATIONS WITHOUT LECITHIN IS BARRED BY PROSECUTION HISTORY ESTOPPEL BECAUSE BAYER EXPRESSLY DISAVOWED AND DISCLAIMED A FORMULATION WITHOUT LECITHIN

Prosecution history estoppel prevents a patentee from asserting infringement based on the doctrine of equivalents when the accused subject matter was considered, and disclaimed, by the patentee during patent prosecution.  The doctrine of equivalents is designed to capture "insubstantial alterations" of the asserted claims that were "unforeseen" at the time of the patent application.  *Festo*, 535 U.S. at 733-34.  But because the doctrine of equivalents focuses on subject matter that was "unforeseen," it is limited by prosecution history estoppel when "the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the latter."  *Id.* at 734-35.  Prosecution history estoppel thus "bars a patentee from asserting as an equivalent subject matter surrendered during prosecution of the patent application."  *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002).  "Either amendments or arguments made by an applicant may be the basis for this conclusion."  *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1298 (Fed. Cir. 1999) (internal quotation marks omitted).

Here, the prosecution history unmistakably establishes that a POSA "would reasonably conclude that [the] applicant[s'] prosecution conduct had surrendered

the disputed subject matter," *i.e.*, a formulation containing no lecithin. *Id.* Claims

5 and 13 originally claimed a composition in which "lecithin is present at a

concentration of up to 1% by weight" for claim 5 and "3% by weight" for claim

15. A4402. The PTO's rejection of that version of the claims relied in part on the

fact that "the amended claims now recite 'up to' for lecithin amounts. The term

'up to' includes even zero amounts." A4379. Thus, the PTO squarely raised the

possibility that the applicants might be claiming a formulation containing no

lecithin at all.

In response, the applicants unambiguously surrendered any claim to a

composition without lecithin. *First*, the applicants argued that the patent *already*

disclaimed any composition without lecithin because claims 5 and 13 depend from

claim 1, which unambiguously requires lecithin: "Since the dependent claims must

limit the independent claims, *the meaning is clear that zero amounts are not

included*." A4387 (emphasis added). *Second*, in case the examiner rejected that

argument, the applicants amended their claims to specifically disclaim

formulations that contained no lecithin, changing the phrase "up to 1%" (or 3% in

claim 13) to "from more than 0 to 1%" (or 3% in claim 13). A4402. Through both

its argument that it was "clear" that "zero amounts [of lecithin] are not included,"

and its amendment specifying that zero amounts of lecithin are not included, the

applicants unambiguously "turned [their] attention to" whether the patent claimed

38

formulations without any lecithin, and "affirmatively chose" to disclaim such formulations. *Festo*, 535 U.S. at 734-35. Bayer is therefore estopped from now asserting infringement based on Glenmark's product that admittedly contains no lecithin.

Indeed, the applicants made clear that *multiple* elements of the claimed formulation, not just lecithin, were critical. The examiner rejected the claims as obvious over a prior-art reference, *Kaleta*. A4380. *Kaleta* disclosed (hydrogenated) lecithin as one of 23 preferred emulsifiers for the aqueous phase; other elements of applicants' claims were also on long lists of embodiments. A4210(9:31-44). The applicants protested that *Kaleta* disclosed only "large generically encompassing groups," whereas "arriv[ing] at applicants' compositions" would require "choos[ing] *particular components*." A4385-86 (emphasis added). They maintained that "the distinct components contained in the compositions" were a basis for overcoming *Kaleta*. A4385-86. That argument estops Bayer from now seeking to dispense with lecithin as a "particular" component of the formulation, and to claim instead a "generically encompassing group" of emulsifiers—much less a generic group of *penetration enhancers*.

The district court concluded that estoppel did not apply because "the applicants' amendment was made for the purpose of clarifying that 'zero amounts [of lecithin] are not included,' not to disclaim formulations with zero lecithin."

A46-47 (internal citations omitted). But in "clarifying," through both argument and amendment, that formulations without lecithin are not included, the applicants specifically *did* disclaim formulations with zero lecithin. The examiner rejected these claims in part because the examiner believed the claims recited formulations that "include[] even zero amounts" of lecithin, A4379, and the applicants responded by both arguing that their claims did *not* recite formulations with zero amounts of lecithin, and resolving any lingering doubt by amending their claims to disclaim such formulations. Any reasonable observer would "conclude that [the] applicant[s'] prosecution conduct had surrendered" a formulation containing no lecithin. *Augustine Med.*, 181 F.3d at 1298.

The district court's contrary holding relied entirely on this Court's decision in *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008), but that decision actually supports estoppel here. In *Cordis*, the examiner had relied on the "Ersek sleeve" to reject certain claims in a patent related to vascular stents. *Id.* at 1176. In response, Cordis distinguished Ersek by arguing that while the "wall surface" of the Ersek sleeve "is comprised of twisted, inclined strands," Cordis's patent claimed a stent with a "common cylindrical plane." *Id.* The patent issued, and in litigation between Cordis and Medtronic, Medtronic argued that Cordis was estopped from making *any* doctrine-of-equivalents arguments based on the "wall surface" limitation. *Id.* at 1176. As the district court noted, this Court rejected that

40

argument to the extent it applied estoppel to equivalents arguments unrelated to the Ersek sleeve, because much of Cordis's argument concerning the "wall surface" limitation simply "explained, in more explicit terms, what the claims already covered." *Id.* at 1177.  But the Court *did* recognize Cordis's "clear and unequivocal disclaimer" of any "wall surface" similar to the "Ersek sleeve, which Cordis made clear did not fall within the scope of its definition of 'wall surface.'" *Id.* at 1178.  This was true even though, according to Cordis, the difference between the Ersek sleeve and its claims was "evident" from its patent specification even before the PTO rejection.  *Id.* at 1176.

*Cordis* supports estoppel here.  This Court held that when Cordis clarified that its wall surface was dissimilar to the Ersek sleeve, Cordis made a "clear and unequivocal disclaimer" of the wall surface in the Ersek sleeve, even though Cordis had argued that it was "evident" before the PTO's rejection that Cordis did not claim Ersek's wall surface.  *Id.* at 1177-78.  Similarly here, when the applicants argued that claims 5 and 13 "clear[ly]" did not include formulations with "zero amounts [of lecithin]," A4387, and then amended their claims to explicitly exclude formulations without lecithin, A4402, the applicants made a "clear and unequivocal disclaimer" of such formulations.  No reasonable person reading the prosecution history could conclude that the applicants intended to claim a formulation without any lecithin.

## III.  BAYER'S DOCTRINE-OF-EQUIVALENTS ARGUMENT IS LEGALLY IMPERMISSIBLE BECAUSE IT ENSNARES PRIOR-ART FORMULATIONS CONTAINING PENETRATION ENHANCERS

Even if Bayer were not estopped from asserting infringement against a product with no lecithin, the function Bayer assigns to lecithin for doctrine-of-equivalents purposes sweeps in an impermissibly broad range of equivalents. "[T]his [C]ourt has consistently limited the doctrine of equivalents to prevent its application to ensnare prior art," in line with "the fundamental principle that no one deserves an exclusive right to technology already in the public domain." *Marquip, Inc. v. Fosber Am., Inc.*, 198 F.3d 1363, 1367 (Fed. Cir. 1999). The Court employs "hypothetical claim analysis" as a practical way to determine whether the prior art prevents the patentee from establishing infringement by equivalents. *Ultra-Tex Surfaces, Inc. v. Hill Bros. v. Chem. Co.*, 204 F.3d 1360, 1364 (Fed. Cir. 2000). A proper hypothetical-claim analysis shows how Bayer's theory impermissibly ensnares the prior art.

Under this framework, the Court first considers a "hypothetical claim" that "literally recites the range of equivalents asserted to infringe." *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1105 (Fed. Cir. 2002) (internal quotation marks omitted). Then the Court asks whether the PTO "would have allowed that hypothetical claim over the prior art at the time of the invention." *Marquip*, 198 F.3d at 1367. The *patentee*—not the accused infringer—has the burden of

42

showing that the hypothetical claim would have been neither anticipated nor obvious. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323-24 (Fed. Cir. 2009). Failure to carry that burden "bars a finding of infringement." *Marquip*, 198 F.3d at 1367.

The district court committed legal error at the first step by accepting Bayer's artificially narrow hypothetical claim, which just tacks isopropyl myristate onto the list of excipients the '070 patent claims. A42. The hypothetical claim must reflect the "range of equivalents" that Bayer sought to capture. *See Wilson Sporting Goods*, 904 F.2d at 684. Here Bayer's theory sought to capture any excipient that is a penetration enhancer. A hypothetical claim matching that infringement theory unquestionably would ensnare the prior art. Bayer's infringement theory therefore cannot succeed as a matter of law.

### A. The District Court's Hypothetical Claim Is Inexplicably Narrower Than Bayer's Range of Equivalents

#### 1. A Proper Hypothetical Claim Matches the Scope of Bayer's Theory of Infringement by Equivalents and Extends to All "Penetration Enhancers"

When determining the proper hypothetical claim, courts should be guided by the ensnarement doctrine's "fundamental purpose": "to prevent the patentee from 'obtain[ing], under the doctrine of equivalents, coverage which [the patentee] could not lawfully have obtained from the [PTO] by literal claims." *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1577 (Fed. Cir. 1994) (internal quotation marks

omitted; first two alterations in original).  As this Court put it in *Wilson Sporting Goods*, "there can be no infringement if the asserted *scope of equivalency* of what is literally claimed would encompass the prior art."  904 F.2d at 683 (emphasis added).

The Court developed the "hypothetical claim approach" as a check on whether "the asserted scope of equivalency" went too far.  *Id.* at 683-84.  This Court has repeatedly described the appropriate hypothetical claim as starting with the literal claim and then extending outward until it embraces the patentee's "range of equivalents."  *See, e.g.*, *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1375 (Fed. Cir. 2014) ("range of permissible equivalents"); *Abbott v. Dey*, 287 F.3d at 1105 ("range of equivalents"); *Marquip*, 198 F.3d at 1367 ("range of permissible equivalents").

The patentee's theory of infringement by equivalents is what determines the "range of equivalents" or the "scope of equivalency" that a hypothetical claim must cover.  For example, in *Gemalto*, the patentee alleged that claims for an integrated circuit board were infringed by accused devices that relied on off-chip memory temporarily loaded into cache memory, even though the literal claims disclosed a chip with permanent memory storage.  *Id.* at 1368-69, 1373.  The Court held that the doctrine of equivalents was not available due to ensnarement because "the cache memory functionality *that is the basis for* [*plaintiff's*] *theory* was

employed by microprocessor-based systems at the time of the invention." *Id.* at 1374 (emphasis added). Similarly, in *Streamfeeder LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974 (Fed Cir. 1999), the patentee alleged that the accused device—a bottom-sheet feeder using an *elliptical* gate with two surfaces—infringed its patent claim disclosing a *circular* gate with two surfaces, *id.* at 978-80. The patentee argued that the devices were equivalent because "both gates prevent double-feeding in the same way via surfaces with different *frictional force values*." *Id.* at 980 (emphasis in original). After rejecting the patentee's effort to narrow the construction of the hypothetical claim, the Court concluded that "a permissible hypothetical claim"—*i.e.*, a claim "broadened to recite two different frictional force values," not simply to disclose an elliptical gate—ensnared the prior art. *Id.* at 982, 983-94.

Under that reasoning, the hypothetical claim should have encompassed all penetration enhancers. Bayer has repeatedly argued that penetration enhancement is the single characteristic that establishes the equivalence of the excipients claimed by the '070 patent (lecithin and triglycerides) and the accused product (isopropyl myristate). *E.g.*, A2464. Adopting Bayer's argument, the district court found that isopropyl myristate is equivalent to the claimed lecithin and triglycerides because it is a penetration enhancer. A32-34; A38-39; A41. Indeed, the district court expressly refused to consider the possibility that these excipients

enhance penetration *differently* when applying the "way" part of the function-way-result test.  A38-39.  The court was satisfied once it found that isopropyl myristate, lecithin, and triglycerides all enhance penetration by disrupting lipids in the stratum corneum.  A38-39.

That is what *all* chemical penetration enhancers do, and the "range of equivalents" asserted under Bayer's infringement theory thus extends to the hundreds of excipients that are chemical penetration enhancers.  Bayer's "function-way-result" analysis does not exclude any one of those enhancers.  The following hypothetical version of the independent claim should guide the Court's ensnarement analysis:

| CLAIM 1 OF '070 PATENT |
|---|
| 5-20% AZELAIC ACID |
| PROPYLENE GLYCOL |
| POLYSORBATE |
| WATER AND SALTS |
| POLYACRYLIC ACID |
| ~~0.5-5% TRIACYLGLYCERIDE AND LECITHIN~~ PENETRATION ENHANCER |
| IN THE FORM OF A HYDROGEL |

**2.    The District Court's Narrow Hypothetical Claim Is Legally Flawed Because It Fails To Reflect Bayer's "Range of Equivalents"**

The district court's alternative hypothetical claim is legally flawed because it focuses on the wrong issue.  By using a hypothetical claim that adds only the

specific excipient used by Glenmark's ANDA product, the district court failed to ask the crucial question:  whether the "*scope of equivalency*" asserted by the patentee ensnares the prior art.  *Wilson Sporting Goods*, 904 F.2d at 683-84 (emphasis added).  Under Bayer's infringement theory, there is nothing special about isopropyl myristate that distinguishes it from other penetration enhancers. As a result, there is no principled ground for constructing a hypothetical claim that adds isopropyl myristate as the single acceptable "alternative penetration enhancer to lecithin and triglycerides."  A43.  If Bayer's equivalents theory is correct, then *any* penetration enhancer will do.

The mismatch between Bayer's broad infringement theory and the district court's narrow hypothetical claim would allow patentees to ensnare the prior art one suit at a time.  Nothing would stop Bayer from, for example, suing other ANDA applicants that use different penetration-enhancing excipients based on *exactly* the same infringement theory it relied on in this case.  Each time, Bayer could insist that, despite the breadth of its theory, the hypothetical claim should only cover the specific excipient at issue.  Proceeding in this way, Bayer could stretch its patent to cover numerous different penetration enhancers even if the PTO never would have accepted a limitation broad enough to claim them all.

The district court's reasoning fails to account for this problem and in fact rewards gamesmanship by patentees.  The district court noted (erroneously, *see*

Part I, *supra*) that the '070 patent claims "two very specific penetration enhancers." A42.  And it reasoned from there that "although plaintiffs strenuously argued that all three compounds are penetration enhancers in the context of infringement," it would be "inconsistent with the careful and limited language of the claim[s]" to broaden the hypothetical claim to "include all penetration enhancers."  A42-43.  This mode of analysis improperly allows patentees to take the sweet without the bitter—to assert the broadest possible equivalency theory while retreating back to the narrow claim language to avoid ensnarement.

This Court has previously rejected similar strategic attempts by patentees to "'expand[] here, and narrow[] there'" in order "to arrive at a claim that encompasses an accused device, but avoids the prior art." *Ultra-Tex*, 204 F.3d at 1366 (quoting *Streamfeeder*, 175 F.3d at 983).  In accordance with that principle, courts in other Hatch-Waxman cases have expressly rejected patentees' efforts to avoid the prior art by narrowly defining the hypothetical claim to encompass only the precise chemical formulation used by the accused ANDA product.  Instead, courts have correctly insisted that the hypothetical claim incorporate the full range of equivalents implicated by the patentee's theory.

For example, in *Merck & Co., Inc. v. Mylan Pharmaceuticals, Inc.*, 19 F. Supp. 2d 334 (E.D. Pa. 1998), *aff'd*, 190 F.3d 1335 (Fed. Cir. 1999), the accused ANDA product did not literally infringe because the patent claimed a formulation

comprising 5-25 mg of one polymer, HPC, while the accused ANDA product

contained 29.3 mg of HPC and 12.8 mg of another polymer, HPMC. *Id.* at 338-39.

Trying to avoid ensnarement, the patentee argued that the prior art did not disclose

the precise 29.3 mg/12.8 mg combination in the accused product. *Id.* at 345-46.

But the court rejected the patentee's premise, holding that "under the hypothetical

claim analysis, the appropriate comparison is between the prior art and the

hypothetical claim, *not between the prior art and the accused product*." *Id.* at 346

(emphasis added). Accordingly, the court analyzed a hypothetical claim that

encompassed the full HPC range dictated by the patentee's theory (5 mg to 29.3

mg) and concluded that the hypothetical claim ensnared the prior art. *See id.* at

343, 346.

Similarly, in *A.H. Robins Co. v. Erbamont, Inc.*, No. C2-89-864, 1991 WL

229150 (S.D. Ohio Apr. 18, 1991), *vacated due to settlement*, 1991 WL 191144

(Fed. Cir. Aug. 12, 1991), the court rejected a patentee's attempt to limit the

hypothetical claim to "the specific materials contained in the [accused ANDA]

product." *Id.* at *12-13. In that case, the ANDA product used excipients that

lacked properties claimed by the patent. The patentee argued that the excipients

were nonetheless equivalent to the claimed excipients because they all functioned

as "surfactants." *Id.* at *12. Relying on this theory, the court applied a

hypothetical claim that extended to all "surfactant[s]"—not just to the particular

surfactant used by the accused product—and determined that the hypothetical claim was anticipated. *Id.* at *12-13. As the court explained, the patentee's narrower proposed construction ignored the "breadth of the arguments [it] ha[d] advanced in support of its claim of infringement." *Id.* at *13.

The district court's hypothetical-claim analysis here was flawed for precisely the same reason. Because Bayer's equivalence theory extends to all penetration enhancers, so should its hypothetical claim.

### B.    The Proper Hypothetical Claims Are Anticipated By or Obvious Over the Prior Art

The district court did not address whether the *correct* hypothetical independent claim 1 would be anticipated or obvious. But there is no real doubt that such a claim ensnares the prior art.[7]

*Gasco* discloses an azelaic acid formulation with all of the claimed excipients as well as the penetration enhancer required by the correct hypothetical claim**.** *See* pp.15-16, *supra*. More specifically, *Gasco* discloses a microemulsion containing azelaic acid as the active ingredient with the penetration enhancer DMSO, as well as the other claimed excipients. A6085. Bayer conceded that DMSO is a penetration enhancer and thus anticipates that limitation of the

---

[7] The district court also did not address whether its (incorrect) hypothetical claim would be anticipated by or obvious over the prior art. A44-45. It never considered whether a POSA would have known to use isopropyl myristate in place of DMSO in the prior-art *Gasco* formulation, given that both are well-known penetration enhancers.

hypothetical independent claim.  A2858.  Bayer nevertheless insisted that *Gasco* did not anticipate (or render obvious) the hypothetical independent claim because *Gasco* did not disclose a hydrogel formulation.  A2794-95; A2857; A59-60.

The formulation disclosed by *Gasco* contains both water and the gelling agent Carbopol (or polyacrylic acid).  A6085.  Bayer admitted below that water and Carbopol may form a hydrogel.  *See* A2760-62.  It nonetheless objected that Carbopol would not actually form a gel unless it is "neutralized"—*i.e.*, its pH level is increased.  A2761-62; A2805; A2807.  But Bayer's argument is legally irrelevant because its own expert (Dr. Weiner) admitted that neutralizing a formulation containing water and Carbopol to form a hydrogel would have been an obvious step to a POSA.  A3401.

Moreover, as the district court found, a POSA would have been motivated to "pursue a hydrogel formulation" based on prior art disclosing "a successful azelaic acid-containing hydrogel formulation."  A64; *see* p.15, *supra* (discussing key findings based on *Maru*).  Thus, even assuming *Gasco* does not disclose a hydrogel and does not anticipate the hypothetical independent claim, it would have at least been obvious to a POSA to create a hydrogel formulation.  As a result,

hypothetical independent claim 1 is at least obvious in view of *Gasco*, legally

barring Bayer's asserted scope of equivalents.[8]

The dependent hypothetical claims are also ensnared by the prior art and for

essentially the same reasons. Bayer defended several of its dependent claims based

solely on the fact that they disclosed a hydrogel formulation while *Gasco*

(supposedly) did not. A3623-25; A3832-34. But that argument is flawed for the

reasons discussed above. Similarly, Bayer suggested that dependent claims

disclosing specific types or concentrations of lecithin (or other excipients) were not

anticipated "absent any suggestion in the art to swap lecithin and triglyceride for

DMSO." A3836. That contention, of course, depends entirely on Bayer's

improperly narrow hypothetical claim. *See* p.50, *supra*. Beyond reprising these

two arguments, Bayer suggested that claims 10 and 12 might survive apart from

independent claim 1, but claim 10 merely discloses a concentration range for

azelaic acid that also is disclosed by the prior art, A3070-73; A6108-109, and

claim 12 simply adds a well-known and commonly used preservative in topical

formulations, A3074-75; A5805. Bayer thus failed to satisfy its burden to show

that any of the limitations added by the dependent claims save the hypothetical

claims from ensnarement.

---

[8] Bayer argued in passing that *Gasco* did not disclose "salts," which is a limitation
in the hypothetical patent claim. A3624-25; A3832. But that argument fails for
the same reason as Bayer's hydrogel argument: "adjusting pH"—an obvious step
to form a hydrogel—"would have introduced salts into the formulation." A3061.

## IV.  THE DISTRICT COURT'S CONCLUSION THAT THE ASSERTED CLAIMS WERE NON-OBVIOUS WAS LEGAL ERROR

A claimed combination of known elements performing their known functions and yielding predictable results is invalid as obvious under 35 U.S.C. § 103. *KSR*, 550 U.S. at 416; *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007) (predictable combination of prior art elements is obvious if the results are merely verified through "routine testing").  In this case, the district court found that every element of the claimed formulations was known as of the priority date.  The active ingredient azelaic acid was already being marketed in cream form; azelaic acid hydrogels were known in the prior art; and the excipients in the claimed hydrogel formulation were standard and were used in the conventional way.  A4; A52-53; A57-59.  In fact, the claimed excipients actually appear together in prior-art formulations.  *See* A3881-82(6:27-8:8); A3087-90; A3092-93; A6139-40 (Example 30); A6170-72 (Examples 4, 8, and 10).  And the evidence showed that forming a hydrogel with these excipients (to the extent they were not already in hydrogel form) would have been routine.  A3401.

These factual findings should have led the district court to conclude as a matter of law that the asserted claims were obvious.  The court's failure to take that final step resulted from a "constricted analysis," *KSR*, 550 U.S. at 420, of the prior art formulations that a motivated POSA would have tried and expected to succeed. While the district court discounted prior-art references that (according to the court)

53

did not disclose hydrogel formulations, there is no reason to believe a POSA would ignore references that required minimal adjustments to become hydrogels. Indeed, Bayer's own expert admitted that these prior-art references could be converted to hydrogels through the simple and well-known step of neutralization. *See* pp.14, 51, *supra*; p.55, *infra*.

Moreover, none of the secondary considerations identified by the district court are sufficient to overcome Glenmark's strong *prima facie* showing of obviousness. In particular, the district court's conclusion that Bayer's patent reported unexpected results ignored the subsequent *in vivo* testing and attributed significance to the scarification testing that *neither* side's expert was willing to give it.

### A. The Asserted Patent Claims Were Obvious Because the Prior Art Taught Azelaic Acid Hydrogels and the Claimed Excipients and a Skilled Artisan Would Have Known How To Combine Them Successfully

As discussed above, pp.13-16, *supra*, every element of the claimed formulations was in the prior art. The case for *prima facie* obviousness thus turned on whether it would have been obvious for a skilled artisan to combine the claimed excipients with azelaic acid to develop a hydrogel formulation. Several of the district court's key findings strongly supported a conclusion that the claimed combination was obvious. The district court found that the motivation to pursue a hydrogel formulation of azelaic acid was clear, and it rejected Bayer's notion that

54

perceived difficulties with the hydrogel formulation would have caused the skilled artisan not to pursue it, in light of real-world evidence that scientists such as Maru made azelaic acid hydrogels before the inventors.  A64.

But the district court erred in concluding that the skilled artisan would not have known *how* to pursue that goal, where the evidentiary record showed the relative ease of combining prior-art teachings.  Despite finding that a POSA would have been motivated to reformulate Skinoren cream into a hydrogel, A63-64, the court restricted its review to whether the testimony demonstrated that a POSA would have been motivated to combine the '752 PCT or the '163 PCT references—both of which "disclose a large number of highly similar or identical excipients to the claimed chemical composition"—with one particular reference disclosing azelaic acid:  *Maru*.  A64-65.  The district court focused on these two possible combinations in isolation because it found that *Maru* was the only azelaic acid reference to disclose a hydrogel.  Even accepting that factual determination, the district court's narrow approach to motivation was legally flawed.  Turning the prior-art ingredients into a hydrogel would have involved only a well-known and relatively simple step—neutralization.  Indeed, Bayer's expert Dr. Weiner admitted that it would have been obvious to a POSA to use that simple step to turn any formulation containing both Carbopol and water—such as the prior-art references

the district court set aside—into a hydrogel.  A3401.  Thus, excluding those prior-art references from the motivation analysis was error.

As this Court has instructed, motivation "need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Dynastar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006); *see also KSR*, 550 U.S. at 418 ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim.").  The Court can also look to the "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art."  *Id.*

Here, extensive evidence showed that a skilled artisan seeking to "pursue a hydrogel formulation" as "an alternative product to Skinoren cream," A63-64, would have been motivated to use the claimed excipients in an azelaic acid hydrogel formulation.  As Dr. Michniak-Kohn testified, the formulations in the '752 PCT—a reference that was not before the PTO during prosecution—would have been of particular interest to the POSA, because they are specifically geared toward treating dermatological conditions using active ingredients that, like azelaic acid, are "insoluble drugs."  A3084; A6121.  The skilled artisan would have been further motivated to use the '752 PCT formulations because of their "significantly

56

enhanced dermal penetration." A6121. Dr. Michniak-Kohn's unrebutted testimony was that the skilled artisan would have used lecithin, triglycerides, and polysorbate as emollients and to increase the solubility of azelaic acid. A3110.

The evidence thus unequivocally established that the claimed excipients were well known as good options to use in a hydrogel, and a skilled artisan would have been motivated to use them. A POSA would not ignore the options simply because they did not come prepackaged in an existing hydrogel formulation. "A person of ordinary skill is also a person of ordinary creativity, not an automaton," *KSR*, 550 U.S. at 420. It would have taken minimal "creativity" to convert existing formulations containing Carbopol and water to hydrogels using the well-known neutralization step. And where, as here, "there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a skilled artisan has good reasons to pursue the known options within his or her technical grasp." *Id.* at 421.

The district court's conclusion concerning reasonable expectation of success suffers from the same legal flaw as its approach to motivation. The court required testimony about the "specific combination(s) at issue," again focusing exclusively on the combination of *Maru* with either the '752 PCT or the '163 PCT. A65-66. But Glenmark's obviousness case did not depend on proving a POSA would have expected that particular combination of references to succeed. Dr. Michniak-

57

Kohn's testimony covered the reasonable expectation of success in making an azelaic acid hydrogel formulation with the claimed excipients, *regardless* of whether it was disclosed in *Maru* or somewhere else.

As Dr. Michniak-Kohn testified, the POSA in 1998 would have expected success due to the volume of information available regarding azelaic acid and hydrogel formulations, and the routine nature of optimizing a formulation. A3110-12; A3114; A3116-17; A3121-23; A3125. And even Dr. Weiner agreed that the POSA would have had access to numerous formulation handbooks for guidance on optimizing a hydrogel formulation. All of the claimed ingredients in the '070 patent claims are standard excipients commonly used in topical formulations, and are all identified in pharmaceutical formulation texts. Indeed, Dr. Weiner testified that the POSA "wouldn't even need" those texts, which would usually be used only by "someone just starting out in the field." A3442-44.

This evidence amply demonstrated that a skilled artisan would have expected an azelaic acid hydrogel formulation with the claimed excipients to succeed. At the very least, the prior art provided "direction as to what parameters are critical and which of many possible choices might be successful." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 965 (Fed. Cir. 2014). Moreover, Glenmark's supposed "substantial efforts to swap ingredients to create a bioequivalent formula," A65, do not support a different conclusion. An ANDA applicant

58

designing around a patent and attempting to establish bioequivalence to a marketed product for FDA purposes faces a very different task than a skilled artisan who is concerned only with whether modification of a formulation would produce the intended result.

**B. Secondary Considerations Do Not Overcome Glenmark's Strong Case of *Prima Facie* Obviousness**

**1. The District Court's Unexpected-Results Finding Was Clear Error**

Bayer based its claim of unexpected results solely on the Franz cell diffusion test reported in Example 2 of the '070 patent. A66. That flawed test cannot sustain Bayer's claim. The district court acknowledged concerns that the *in vitro* Franz cell test was flawed on its own terms and could not be considered without verification. A67. Bayer's clinical trial did not provide that verification. *Id.*; *see also* A3460. Nor did the two references describing the scarification testing; the district court seized upon those references, but plainly misread them. They did not report any unexpected result concerning azelaic acid *retention* but rather duplicated what *Maru* had reported fifteen years before concerning hydrogel formulations' for azelaic acid *release*. A57-58; A64.

a. The Franz cell testing in the patent suffered from two serious flaws that call into question the reliability of the results: half of the data points were simply discarded because they were "not in agreement," and no statistical analysis

was performed on the results. A9. Even Bayer's witness Dr. Günther admitted that without the statistical analysis, he could not say for sure whether the results for Finacea actually differed from those of Skinoren. A2632-24.

b.    Even absent such obvious and acknowledged flaws, relying on *in vitro* data without verification is understood to be dubious. As a result, laboratory data cannot show unexpected results, and make an otherwise obvious formulation patentable, if clinical testing renders that data irrelevant. *See In re Mayne*, 104 F.3d 1339, 1344 (Fed. Cir. 1997) (dismissing *in vitro* data allegedly supporting unexpected results where the patentee failed to show the "significance [and] applicability" of the results beyond the *in vitro* test). As the district court recognized, Franz cell testing is "'just a model'" that has significant limitations because it does not use living skin. A8. All witnesses agreed that data from Franz cell experiments must be confirmed with clinical trials. A2641-42; A3222; A2974-77; A3458-59. As Dr. Weiner testified, the differences between *in vitro* results and the clinical situation "can be immense." A3455-56.

Here, the only clinical study that directly compared Skinoren to Finacea, A4747-49; A3460; A2645-46, did *not* confirm the results of the Franz cell experiments. Bayer's AU36 clinical study showed no significant difference in efficacy or systemic absorption between Skinoren and Finacea, and the progression of efficacy over time was the same for both treatments. A11-12; A3460.

60

c.      These undisputed negative findings should have been decisive.

Instead, the district court ventured beyond the expert testimony and came up with

its own verification theory that relied on the scarification test, finding that it

"adequately confirmed the in vitro results."  A67-68.[9]  This was clear error.  The

court acknowledged that Bayer produced no expert testimony regarding the

scarification test.  A67 n.55.  That was because the test was performed to assess a

different issue (the potential for irritation) and "did not gather data about

absorption of azelaic acid."  A67.[10]

The district court relied solely on its own interpretation of two scientific

references.  But even if that were appropriate, the district court misread the

references.  As the court itself found, the supposed unexpected result was not the

superior release of azelaic acid from the medication into the skin, but the retention

---

[9] The court also cited Glenmark's use of Franz cell experiments.  A66-67.  That, too, was error.  Glenmark used Franz cells to show bioequivalence, not to predict clinical efficacy or to compare Finacea to the prior-art Skinoren cream, as Example 2 did. A5647-48.  Glenmark therefore could not confirm the results of Example 2, as the district court suggested.  *Id*.  And a second *in vitro* test, subject to the same limitations, does not provide adequate verification in any event.  Significantly, Glenmark followed its Franz cell testing with clinical testing.  A6989.

[10] The district court incorrectly stated that "Defendants do not dispute . . . that the penetration profile, as reported, shows an unexpected relationship between penetration and retention."  A67.  In fact, Dr. Weiner himself admitted in one of his publications that "no relationship is to be expected between topical effectiveness and the systemic levels of the drug which arise as the result of topical care."  A3452-53.

of azelaic acid in the skin once it got there.  A66.  The superior release of azelaic acid by the hydrogel form was not unexpected; it was exactly what *Maru* and other references had predicted.  Yet the two references the court seized upon were limited to this latter point.  Dr. Draelos (a physician associated with Bayer) was quite specific:  she inferred from the scarification testing that the hydrogel *released* more azelaic acid.  A4818.  That does absolutely nothing to confirm the supposed finding of unexpected *retention*, and leaves the district court's finding of unexpected results supported by nothing except the concededly flawed Franz test—and refuted by the clinical trial.  *See* A4749, A4775, A4782-4784, A4787-4788; A2830-2831; A2900-2903; A3460; A3051-3052.  That finding therefore cannot stand.

### 2.    Bayer's Equivocal Evidence Concerning Commercial Success Provides No Meaningful Support for the District Court's Non-Obviousness Determination

Bayer's evidence of commercial success also provides no basis for overcoming obviousness in this case.  *See Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed Cir. 2010) (reversing the district court's holding that patent claims were nonobvious and explaining that "secondary considerations of nonobviousness . . . simply cannot overcome a strong prima facie case of obviousness").  Bayer presented no competent evidence that sales of Finacea are driven by or are attributable to the novel claimed features of the '070 patent, rather than, for

example, Bayer's heavy investments in marketing.  Instead, the district court found commercial success because "defendants have not *negated* the possibility that the merits of the claimed composition"—in addition to frequent sampling, a heavy marketing campaign, and discounts—"also drive prescriptions and sales." A70 (emphasis added).  The mere "possibility" that genuine innovation was behind Bayer's ability to move customers from Skinoren to its "line extension" Finacea, A3217-18, provides no meaningful support for a nonobviousness conclusion, particularly once the proper understanding of the *prima facie* case is applied.

### CONCLUSION

The judgment of the district court should be reversed, and judgment of noninfringement and invalidity should be entered in Glenmark's favor.

Respectfully submitted,

*/s/Elizabeth J. Holland*
Elizabeth J. Holland
Huiya Wu
Linnea P. Cipriano
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY  10018
(212) 813-8800

William M. Jay
Brian T. Burgess
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, DC  20001
(202) 346-4000

David J. Zimmer
GOODWIN PROCTER LLP
Three Embarcadero Center
San Francisco, CA  94111
(415) 733-6000

September 4, 2015

*Counsel for Appellants*

**ADDENDUM**

## TABLE OF CONTENTS

**Pages**

Memorandum Opinion ..................................................................................... A1-71

Order ....................................................................................................................A72

Amended Judgment......................................................................................... A73-74

Patent-in-Suit:  U.S. Patent No. 6,534,070 ................................................ A3877-84

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTENDIS GMBH, INTRASERV GMBH<br>& CO. KG and BAYER HEALTHCARE<br>PHARMACEUTICALS INC., ) ) ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 13-421 (SLR) |
| ) | |
| GLENMARK PHARMACEUTICALS ) | |
| LIMITED and GLENMARK ) | |
| PHARMACEUTICALS INC., USA., ) | |
| ) | |
| Defendants. ) | |

_____

Rodger Dallery Smith, II, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel for Plaintiffs: Bradford J. Badke, Esquire, Sona De, Esquire, Crystal L Parker, Esquire, and Michael P. Kahn, Esquire of Ropes & Gray, LLP.

Jeffrey Thomas Castellano, Esquire, David M. Fry, Esquire, and Karen Elizabeth Keller, Esquire of Shaw Keller LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel for Defendants: Linnea P. Cipriano, Esquire, Wyatt J. Delfino, Esquire, and Huiya Wu, Esquire of Goodwin Proctor LLP.

_____

## MEMORANDUM OPINION

Dated: July 31, 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This action arises out of the filing of an Abbreviated New Drug Application

("ANDA") by defendant Glenmark Pharmaceuticals Limited[1] ("Glenmark

Pharmaceuticals") seeking to market a generic azelaic acid hydrogel. Plaintiff Bayer

Healthcare Pharmaceuticals Inc. ("Bayer") is the holder of approved New Drug

Application ("NDA") No. 21-470 for Finacea® Gel, 15%, indicated for topical treatment

of inflammatory papules and pustules of mild to moderate rosacea. Plaintiff Intraserv

GmbH & Co., KG ("Intraserv") is the assignee of U.S. Patent No. 6,534,070 ("the '070

patent") ("the patent-in-suit") entitled "Composition with Azelaic Acid." (D.I. 118, ex. 1 at

¶ 13) The '070 patent is listed in the Food and Drug Administration's ("FDA's")

publication titled "Approved Drug Products with Therapeutic Equivalence Evaluations"

(known as the "Orange Book") for Finacea®.[2] (Id. at ¶ 16) Plaintiff Intendis GmbH

("Intendis") (together with Bayer and Intraserv, "plaintiffs") holds an exclusive license

under the '070 patent. (Id. at ¶ 14) Bayer is the exclusive distributor of Finacea®. (Id.

at ¶ 22)

On July 27, 2012, pursuant to 21 U.S.C. § 355(j), Glenmark Pharmaceuticals

submitted ANDA No. 204637, seeking approval to commercially manufacture, use, sell,

offer for sale and/or import a generic Azelaic Acid Gel, 15% formulation with a

paragraph IV certification stating that the '070 patent is not infringed and is invalid. (D.I.

---

[1] Formerly Glenmark Generics Limited.

[2] The expiration date of the '070 patent, as listed in the Orange Book, is November 18, 2018. (D.I. 118, ex. 1 at ¶ 17)

1 at ¶¶ 18-20)  On January 30, 2013, defendant Glenmark Pharmaceuticals Inc.,

U.S.A.[3] (together with Glenmark Pharmaceuticals, "defendants") informed plaintiffs that

an ANDA had been filed and alleged that the ANDA product would not infringe the '070

patent.  (D.I. 118, ex. 1 at ¶ 39)  Plaintiffs responded on March 14, 2013 by filing this

suit for infringement of the '070 patent.  The court held a Markman hearing and a final

pretrial conference on January 21, 2015.  The court held a five-day bench trial from

February 5 - 11, 2015 on the issues of infringement and validity, and the parties have

since completed their post-trial briefing.  The 30-month stay of FDA final approval on

Glenmark Pharmaceutical's ANDA expires on July 31, 2015.  The court has jurisdiction

over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1400(b).  Having

considered the documentary evidence and testimony, the court makes the following

findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure

52(a).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Technology at Issue

#### 1. Azelaic acid

Azelaic acid has the following chemical structure:



By the year 1998, azelaic acid formulations were being used as topical treatments for

various skin disorders, including acne vulgaris, melisma, and rosacea. (D.I. 126 at

---

[3] Glenmark Pharmaceuticals, formerly named Glenmark Generics Inc., U.S.A., is a
wholly-owned subsidiary of Glenmark Generics.  (D.I. 118, ex. 1 at ¶ 6)

2

300:17-301:4; D.I. 127 at 524:18-20, 525:1-8; D.I. 128 at 695:23-696:1; D.I. 125 at 60:5-
13; '070 patent, col. 1:24-26) Prior to Finacea®, Bayer marketed and sold a topical
20% azelaic acid cream, marketed abroad as Skinoren®[4] and in the United States as
Azelex. (D.I. 125 at 60:2-10; D.I. 127 at 525:1-8; D.I. 128 at 761:7-18)

### 2. Bayer's Finacea® Gel

Finacea® Gel is a composition that contains azelaic acid as the therapeutically
active ingredient as well as at least one triacylglyceride, propylene glycol, at least one
polysorbate,[5] at least one polyacrylic acid,[6] lecithin, purified water, edetate disodium
and benzoic acid. (D.I. 118, ex. 1 at ¶¶ 24-37) Bayer's development of Finacea® Gel
unfolded as follows:

#### a. Skinoren® Cream

Prior to developing Finacea® Gel, Schering[7] marketed and sold azelaic acid in
the form of Skinoren®, a facial cream containing 20% azelaic acid. [8] (D.I. 125 at 59:20-
60:13) Dr. Patrick Franke ("Dr. Franke"), one of the named inventors on the '070
patent, testified that Skinoren® cream suffered from unwanted agglomeration and
phase separation. (D.I. 125 at 60:22-25) Because the "cream formulation has a pretty

---

[4] Skinoren®, Azelex, and Fenevin creams all have the same formulation. (D.I. 127 at 466:19-23)

[5] The azelaic acid, triacylglyceride, propylene glycol, and polysorbate are in an aqueous phase that further comprises water and salts. (D.I. 118, ex. 1 at ¶ 28)

[6] Carbopol® 980, which acts as a gelling agent. (D.I. 118, ex. 1 at ¶¶ 29, 33)

[7] Schering is a "German-based international pharma company that was [later] taken over by Bayer." (D.I. 125 at 57:14-16)

[8] Skinoren® cream is a topical formulation containing: (1) 20% azelaic acid; (2) triacylglycerides; (3) propylene glycol; (4) polysorbates; and (5) water and salts. ('070 patent, col. 1:16-26)

3

high load of azelaic acid, 20 percent, there was a risk and a problem that certain particles concentrated in so-called agglomerates, so there was . . . an inhomogeneity within th[e] cream emulsion" that caused a patient to "feel particles or agglomerates on the skin." (D.I. 125 at 61:4-18) Dr. Franke testified that the agglomeration "caused some stability problems due to . . . liquid separation . . . so we had to reject batches." (D.I. 125 at 61:14-18) As for phase separation, Dr. Franke explained that it "may occur when you have an emulsion and one of the phases separates, so liquid may not disperse anymore and it's what we saw partly connected with the agglomeration." (D.I. 125 at 62:5-8)

### b. Formulation of Finacea® Gel

Dr. Karin Hoffman ("Dr. Hoffman"), defendants' non-infringement and invalidity expert, testified that Schering opted to develop a gel formulation because it "had Skinoren® cream on the market and a gel formulation was a line extension." (D.I. 128 at 760:24-761:4) Dr. Hoffman explained that "[t]o develop the brand further [through a line extension], it's usual to come up with a second formulation on the market" in order "to increase sales." (D.I. 128 at 761:3-6) In contrast, Dr. Franke opined that the decision to reformulate Skinoren® was based on a desire to solve the "agglomerate instability problem" and to cure "disadvantages of the cream regarding the . . . application properties and cosmetic properties" such as a whitening effect, while still "maintain[ing] the same efficacy of the cream." (D.I. 125 at 63:8-15, 77:4-10)

Because an azelaic acid concentration of 20 percent carried a risk of agglomeration, Dr. Franke and his colleagues first "thought of reducing the azelaic acid in content" to 15 percent. (Id. at 61:4-7, 63:19-64:6) Dr. Franke testified that the

4

researchers "discussed on the one hand to keep close to the cream emulsion, Skinoren® cream, and reformulate the cream in terms of thinking of how we can modify ingredients in quantity or quality, and on the other side we also thought about a hydrogel formulation type." (*Id.* at 64:18-22) Between the cream emulsion and the hydrogel, "[t]here was certainly preference towards the cream formulation." (*Id.* at 65:13-17) The clinicians on the team "were afraid . . . that reformulated or new formulation would lose efficacy," and the team "thought that we might have to cope with an efficacy problem." (*Id.* at 66:2-9) Specifically, "there [was] the possibility that active ingredients are held back through this [hydrogel] matrix and interact." (D.I. 125 at 66:12-18) Dr. Franke testified that the team ultimately selected the hydrogel formulation for further testing because the hydrogel solved the "agglomeration problem and phase separation" and it also offered "an improvement of the cosmetic properties" regarding the "whitening effect and spreadability problems with the cream." (*Id.* at 66:19-21)

After settling on a hydrogel formulation, the researchers initially "concentrated on being very similar to the cream" and later "switched to other ingredients and left out ingredients from the cream composition." (*Id.* at 68:4-21) In order to narrow down the list of potential formulations, the team began "characterizing and analyzing the stability of the compounds . . . also taking care of the rheological behavior" and additionally "assess[ing] the [cosmetic] application properties." (*Id.* at 70:21-71:5) According to Schering's formulation development report, "[a] framework recipe based on a polyacrylate gel was available from an earlier acne therapeutic development using a related active ingredient," and "[t]he gel has already been clinically tested as placebo control in the indication acne and should be changed as little as possible . . . because of

5

its high acceptance and tolerance." (JTX 20 at BAYER0434130) The report stated that "[f]urther development work concentrated on the choice and optimization of the moisture-retaining/regreasing complex." (*Id.*) Dr. Franke explained that after "we saw that we [were] successfully on the track of solving the problems," the question remained of whether "there [was] still efficacy having now reduced azelaic acid and taken care of all other formulation parameters." (D.I. 125 at 71:8-12) Eventually, the researchers selected two 15% azelaic acid hydrogels, hydrogel A and hydrogel B, for further testing "[b]ased on the results in our lab." (*Id.* at 71:13-20, 72:17-22)

Dr. Franke agreed that the two gel formulations "were based on the same formulation concept" and they differed only in the kind of moisture-retaining/regreasing complex that was used. (D.I. 125 at 97:2-7; JTX 20 at BAYER0434141) Dr. Franke further agreed that hydrogel A "took . . . ingredients from the cream formulation but made it into a gel." (D.I. 125 at 97:2-5) Specifically, the moisture-retaining/regreasing complex of the hydrogel A formulation included arlatone and cetearyl octonoate while the hydrogel B formulation – which would later become Finacea® – contained lecithin, triglycerides and polysorbate 80. (*Id.* at 95:11-17, 153:2-3; D.I. 128 at 757:4-10; JTX 20 at 9) Dr. Franke testified that lecithin was chosen for the hydrogel B formulation because of its "amphiphilic structure" that allowed it to "interact in the skin layers," and because it "fit in" with "oils and active ingredients." (D.I. 125 at 69:3-23) Triglycerides were selected because they have "a caring effect on the skin" and "in terms of its polarity as an oil, [it is] very suitable being together with lecithin." (*Id.* at 70:4-10)

### c. Franz diffusion cell test

6

In the next phase of Finacea® development, Dr. Clemens Günther ("Dr.
Günther), a named inventor on the '070 patent, "performed in vitro percutaneous
penetration studies," otherwise referred to as Franz diffusion cell tests or Franz cell
tests. (D.I. 125 at 142:16-21; D.I. 127 at 518:2-519:18; JTX 16 at BAYER0384907)
Defendants' expert, Dr. Bozena Michniak-Kohn ("Dr. Michniak-Kohn"), testified that
Franz cell tests are popular for ethical reasons as well as for the reason that
researchers "don't want a complicated screening method" in the initial stages of testing.
(D.I. 127 at 518:21-519:16)  Insofar as the goal is to ultimately use the product on living
human skin, Franz cell testing is "just a model" that is "used to predict what might
happen when a drug is given to humans." (D.I. 125 at 183:20-25; *see also id.* at
184:24-185:5; D.I. 127 at 516:18-518:19; D.I. 128 at 764:22-765:10)  The ability to use
Franz cell testing to predict the efficacy in vivo on human skin is limited by the fact that
in vitro skin is dead, it is "treated in some way" such as cutting the fat layer, and "there's
no blood supply." (D.I. 127 at 517:13-518:8; *see also* D.I. 129 at 998:25-999:5)

The goal of the Franz cell test was to assess the "distribution of azelaic acid in
the skin and the absorption across the skin" after treatment with the two hydrogel
formulations and Skinoren® cream.   (D.I. 125 at 142:24-143:1, 143:17-20)  To measure
absorption, Dr. Günther used a "Franz diffusion cell consist[ing] of a donor chamber and
a receptor chamber, which both are separated by the [mouse] skin sample acting as a
membrane." (*Id.* at 145:17-20)  Mouse skin was the "established routine skin" used in
the laboratory, and they "did not have access at that time to human skin vivo," the "gold
standard" for Franz cell testing. (D.I. 125 at 146:1-8, 156:20-24; D.I. 127 at 515:14)
Because "hairless mouse skin is much thinner than human skin . . . [it] overexaggerates

7

the numbers you see when you use chemical penetration enhancers." (D.I. 127 at 516:18-517:9; *see also* D.I. 125 at 146:9-13)

After selecting skin type and assembling the apparatus, "a thin layer of formulation [is] placed on the skin" and "the drug enters the stratum corneum[9] and diffuses across the skin" then "partitions . . . into the receptor chamber" and "excess flow-through" is captured and studied.[10] (D.I. 125 at 148:1-149:4) Dr. Günther explained that "[t]he concentrations in the receptor fluid resembled systemic absorption and thus might correlate or indicate systemic side effects." (*Id.* at 156:20-24) At the end of the 24-hour period, Dr. Günther measured "the distribution of azelaic acid in various skin layers" including the stratum corneum and the underlying layers. (D.I. 125 at 151:10-16; JTX 16 at BAYER384907, -23)

Dr. Günther performed two experiments for the Skinoren® cream and two experiments for each of the hydrogel formulations, with four samples apiece for a total of eight data points per formulation. (D.I. 125 at 178:9-17; JTX 16 at BAYER0384916) However, Dr. Günther decided to only "use the results of the second [hydrogel] experiment" as the "results of both experiments were not in agreement." (D.I. 125 at 179:1-25) Dr. Günther "did not perform any statistical analysis of the results of [the] study," although he testified that it is not "standard practice in this type of pharmacokinetic investigation" to perform statistical analysis. (D.I. 125 at 174:25-175:2; D.I. 126 at 371:5-372:21)

_____

[9] Skin consists of three layers: the stratum corneum, the epidermis and the dermis. (D.I. 126 at 290:10-292:4)  The site of action for the active ingredient is "somewhere in the living skin past the stratum corneum." (D.I. 126 at 292:2-11)

[10] The diffusion test was run for 24 hours, with sampling of the flow-through taken at 2-hour time intervals. (D.I. 125 at 149:12-29)

8

Dr. Franke was "surprised to see such a good penetration behavior into living skin tissue with one of our gel candidates" containing lecithin and triglycerides (hydrogel B). (D.I. 125 at 73:2-21) Dr. Franke testified that they did not "see similar results with the hydrogel formulation containing the arlatone and cetearyl octonoate ingredients [hydrogel A] that had been carried over from the cream." (D.I. 125 and 73:22-5, 95:1-17, 152:9-153:4; JTX 16 at BAYER384923) More specifically, Dr. Günther explained that, "after account[ing] for the fact that there was only 15 percent azelaic acid in the hydrogels and 20 percent in the cream to begin with," the azelaic acid remaining in the skin after treatment with hydrogel B was five times higher than compared to Skinoren® cream. (D.I. 125 at 154:16-155:16; 174:15-22) Dr. Günther "expected that the concentration in the skin and receptor fluid would point in the same . . . direction," but "[i]n this case, it appeared to be vice-versa, meaning that the fraction of dose present at the end of experiment in the skin was lower for Skinoren® cream versus the hydrogel B." (D.I. 125 at 158:14-19) In the words of plaintiffs' expert, Dr. Norman Weiner ("Dr. Weiner"), "the inventive formulation had more of the . . . azelaic acid going into the skin, but the prior art had more formulation going out of the skin." (D.I. 128 at 917:23-918:13)

Dr. Franke testified that, following the Franz diffusion cell test, "we again collected our data from the pharmaceutical technology lab and took the results of Dr. Günther, and . . . proposed this new candidate" for clinical trials. (D.I. 125 at 74:3-7) Defendants propose that finances were the true motivator behind the decision to pursue hydrogel B, citing Schering's formulation development report which stated that the "decisive" difference leading to a preference for hydrogel B over hydrogel A was that "[t]he components of the moisture-retaining/regreasing complex in [hydrogel B] can be

9

processed cold, melting is unnecessary and makes large-scale production cheaper."
(JTX 20 at BAYER0434146)

### d. Clinical tests

Next, a double-blind scarification test was performed "to detect small differences
in irritation potential," wherein hydrogel A and hydrogel B and Skinoren® cream "were
applied once daily for 4 days in 20 [healthy human] subjects" and skin reactions were
assessed (hereinafter "the scarification test"). (DTX 92; DTX 111 at BAYER0384619)
Prior to application, the subject's skin is "predamaged" by scarification to "mimic[] the
situation found in lesional skin." (DTX 111 at BAYER0384630) The reaction score for
hydrogel B was significantly higher than that for Skinoren® (DTX 111 at BAYER384644;
DTX 93; D.I. 129 at 1037:17-1039:8), thus "confirm[ing] the results of the hairless
mouse Franz flow-through diffusion cell study" (D.I. 129 at 1038:23-1039:3).

Following the scarification test, an 8-week double-blind pilot study measuring
percutaneous absorption was conducted to directly compare the initial clinical effect of
hydrogel B to Skinoren®. (D.I. 125 at 162:22-25; D.I. 129 at 1003:14-17; JTX 11 at
BAYER154358) According to the Schering clinical study report, "[t]he aim of this
exploratory pilot study was to investigate the effect of [hydrogel B] on acne lesions
during an 8-week treatment period, as compared with that of [Skinoren®]." (JTX 11 at
BAYER0154358) The study looked at "the relative decrease in the sum of facial
papules and pustules," as well as "the amounts of [azelaic acid] excreted with the urine."
(JTX 11 at BAYER0154358) Dr. Günther testified that "there was no significant
treatment difference between the Skinoren® cream and Finacea® or later on Finacea®
hydrogel with regard to the efficacy in reducing the number of acne lesions." (D.I. 125

10

at 167:19-22; D.I. 126 at 193:19-24, 373:23-374:1; JTX 11 at BAYER154393)

Additionally, Dr. Weiner admitted that "the progression of the efficacy over time was

similar for both treatments." (D.I. 127 at 443:23-444:4)  According to Dr. Günther, there

was also "no statistical significance in urinary excretion of azelaic acid . . . and this is

certainly positive in terms of the point that this does not give rise to concerns related to

systemic safety." (D.I. 125 at 166:2-6; JTX 11 at BAYER0154360)  Dr. Günther opined

that a study with only 30 patients (15 per treatment group) means it is "likely that such

[a] study does not bring statistical power." (D.I. 125 at 165:4-7; JTX 11 at

BAYER0154370)

The company proceeded with full-scale clinical trials comparing Finacea® to

placebo formulations as "required by regulator purpose for submission." (D.I. 126 at

206:3-8)  In 2002, Dr. Franke gave a presentation to the marketing and management

members of the project team detailing the benefits of Finacea® over Skinoren®.  (JTX

3)  In the presentation, Dr. Franke identified three benefits of hydrogel B:  (1) no

agglomeration or phase separation; (2) good results in the clinics and maintenance of

efficacy; and (3) cosmetic benefits.  (D.I. 125 at 76:2-22; JTX 3 at BAYER6527-530)

Eventually, FDA approval was sought and Finacea® gel was approved and indicated for

treating rosacea.  (D.I. 125 at 74:8-15, 168:18-25)

### 3. The asserted patent

The '070 patent issued on March 18, 2003, and claims priority to U.S. Provisional

Application No. 60/074,850 ("the '850 provisional"), filed on February 12, 1998.

Plaintiffs assert independent claim 1 and dependent claims 2-12.  The '070 patent

11

claims azelaic hydrogel compositions, including Finacea®, as well as methods for

treating rosacea and other skin conditions.  ('070 patent, cols. 6:27-8:9)

> Independent claim 1 reads:

>> 1.  A composition that comprises:

>> (i) azelaic acid as a therapeutically active ingredient in a concentration of 5 to 20% by weight,

>> (iii) at least one triacylglyceride[11] in a concentration of 0.5 to 5% by weight,

>> (iv) propylene glycol, and

>> (v) at least one polysorbate, in an aqueous phase that further comprises water and salts, and the composition further comprises

>> (ii) at least one polyacrylic acid, and

>> (vi) lecithin,

>> wherein the composition is in the form of a hydrogel.

(*Id.* at col. 6:28-38)

The specification of the '070 patent identifies Skinoren® cream and EP 0 336

880 as relevant prior art cream formulations that contain azelaic acid.  ('007 patent, col.

1 at 16-36)  Skinoren® cream is described as "the closest prior art."  (*Id.* at col. 1:36)

The specification also identifies non-azelaic acid prior art "emulsions" or

"nanoemulsions" such as the composition disclosed in International Application WO

96/11700.  ('070 patent, col. 1:37-49)

---

[11] The term "triacylglyceride" means "triglyceride."  (D.I. 118, ex. 1 at ¶ 18)

12

Example 1 describes the formulation and processing steps for producing the claimed hydrogel.[12] ('070 patent, col. 5:20-39) Specifically, a "pre-emulsion" is formed from a mixture of benzoic acid, EDTA, triglycerides, polysorbate 80, lecithin, and propylene glycol. (*Id.* at col. 5:20-32) The "pre-emulsion" is homogenized, and then polyacrylic acid and azelaic acid are added. ('070 patent, col. 5:32-34) Finally, a gel is formed by adding sodium hydroxide, which raises the pH of the solution. (*Id.* at col. 5:34-36) The specification emphasizes that "[t]he presence of polyacrylic acid[13] is essential" and "decisive for the production of the hydrogel." (*Id.* at col. 2:51:52) The specification defines polyacrylic acid as "an anion-active polymerizate of acrylic acid, which is only partially water-soluble" where "[t]he one-percent aqueous suspension has a pH of 3 and approximately the same viscosity as water." (*Id.* at col. 3:42-45) The specification states that "gel formation and the production of highly viscous products" only occurs during neutralization (raising the pH) of polyacrylic acid. (*Id.* at col. 3:46-48)

One named advantage of the claimed composition is that it "allows a larger amount of pharmaceutical active ingredient to penetrate into living skin layers and/or cutaneous organs." (*Id.* at col. 2:29-40) Dr. Weiner, Dr. Michniak-Kohn and Dr. Günther all testified that the claim of "increased bioavailability" is solely supported by the results from the Franz diffusion cell test, as described in example 2 of the specification.[14] (D.I. 125 at 170:21-717:8; D.I. 128 at 932:2-8; D.I. 129 at 1013:4-6; '070 patent, 5:40-6:26)

---

[12] The same processing steps are used to make Finacea®. (JTX 25 at BAYER536793-95; D.I. 126 at 303:2-305:5)

[13] The trade name for polyacrylic acid is Carbopol®.

[14] The advantage of increased bioavailability was referenced by the patent examiner in the "reasons for allowance," in which the examiner wrote that "[t]he prior art of record

13

Another named advantage of the claimed composition is that when lecithin is 1% or less by weight, the composition "does not form any standard nanoemulsion" but rather forms a gel "that comprises a homogenous mass with virtually no vesicles" as detected by a scanning electron microscope. ('070 patent, cols. 2:61-3:3) Dr. Franke testified that the electron microscopy was performed on Finacea® by Dr. Rolf Schubert ("Dr. Schubert") at the Albert Ludwig Universitat. (D.I. 125 at 111:1-19) In a report submitted to Dr. Hoffman, Dr. Schubert wrote that "the examinations have proven to be particularly difficult" as "the processing methods you recommended for us were not optimally suited to separate and identify structures to a sufficient extent." (D.I. 125 at 112:22-113:3; DTX 16 at BAYER0524392) Dr. Schubert stated that "[f]urther examinations will have to be performed," although no further examinations were conducted following the initial report. (D.I. 125 at 113:7-114:4; DTX 16 at BAYER0524392) Dr. Schubert concluded that, given the heterogeneity of the samples, "more images must be used for interpretation." (D.I. 125 at 115:5-9; DTX 16 at BAYER0524404)

### 4. The accused ANDA product

#### a. Overview

Defendants' ANDA product ("the accused product" or "the accused formulation") is a composition for topical administration to treat rosacea that contains azelaic acid as the therapeutically active ingredient at a concentration of 15% by weight, isopropyl

---

neither teaches nor suggests an azelaic acid hydrogel composition containing instant amount of azelaic acid in the form of a hydrogel and said hydrogel enabling over four times higher bioavailability and penetration of azelaic acid . . . compared to conventional creams/emulsions of the prior art." (JTX 2.2 at BAYER 547)

14

myristate at a concentration of 2% by weight, propylene glycol at a concentration of

12% by weight, at least one polysorbate,[15, 16] at least one polyacrylic acid[17] at a

concentration of 0.85% by weight, purified water, benzoic acid at a concentration of

0.10% by weight, and edetate disodium at a concentration of 0.10% by weight. (D.I.

118, ex. 1 at ¶¶ 44-59)

### b. Formulation of the accused product

Mr. Kamal Mehta ("Mehta"), defendants' corporate witness, testified that

defendants used, *inter alia*, "details about Finacea® [that] are available in the public

domain" such as the Finacea® label to develop the accused formulation. (D.I. 126 at

214:11-16; PTX 214 at GMG_710) For the first experimental batch, Mehta agreed that

defendants used "the formulation that was listed in the patent." (D.I. 126 at 220:12-19;

*see also* JTX 54 at GMG_VP1266-67) Like the procedure described in example 1 of

the '070 patent, defendants' manufacturing process involved dissolving EDTA and

benzoic acid in water, adding additional excipients to create a homogenized "pre-

emulsion," adding polyacrylic acid and azelaic acid, and finally neutralizing with sodium

hydroxide to achieve "orientation of the gel." (JTX 39 at GMG_0014878; JTX 53 at

GMG_VP798-800; '070 patent, col. 5:22-39)

In their original ANDA submission, defendants detailed experimental trials in

which triglyceride and lecithin were swapped for alternate excipients, with the goal of

"match[ing] the appearance . . . and chemical stability of the [experimental] gel with the

---

[15] Polysorbate 80.

[16] The azelaic acid, propylene glycol, and polysorbate are in an aqueous phase that
further comprises water and salts. (D.I. 118, ex. 1 at ¶ 51)

[17] Carbopol® 980, which acts as a gelling agent. (D.I. 118, ex. 1 at ¶¶ 52, 56)

15

reference-listed drug Finacea® Gel 15%." (JTX 53 at GMG_VP000776; D.I. 126 at 220:21-227:10) Defendants' overall "[o]bjective was to develop a formulation which doesn't fall in the [scope of] the patent claims." (D.I. 126 at 217:14-23) Defendants determined that batch 540/03-08/036 ("batch 036") and batch 540/03-08/041 ("batch 041") were "satisfactory" formulations. (JTX 53 at GMG_VP000776) In batch 036, PPG-20-Methyl glucose ether distearate was substituted for triglyceride and lecithin. (Id.) In batch 041 – which would later become the accused formulation – isopropyl myristate was substituted for triglyceride and lecithin "to improve the penetration." (Id.; JTX 54 at GMG_VP001272; D.I. 126 at 225:14-226:13) In their original ANDA submission, defendants listed the "function" of isopropyl myristate, lecithin and medium chain triglyceride as "penetration enhancer." (JTX 53 at GMG_VP000775) With the exception of the substitution of isopropyl myristate for triglyceride and lecithin, all other excipients in the accused product remained "exactly the same" as those in Finacea®. (D.I. 126 at 313:18-21; JTX 53 at GMG_VP000775; JTX 54 at GMG_VP001266)

### c. Franz diffusion cell and clinical testing

Defendants performed Franz diffusion cell tests with human cadaver skin, comparing the rate of penetration of azelaic acid across the skin layers between batch 036, batch 041 and Finacea® gel. (D.I. 126 at 233:18-235:12; JTX 54 at GMG_VP1271-73; JTX 38 at GMG_12942-45, -949) In the Franz diffusion cell test, defendants applied a finite dose of product, then measured penetration and absorption of azelaic acid over a period of 48 hours. (JTX 38 at GMG_12942, 44-49) For both batch 041 and Finacea®, "more azelaic acid stayed in the epidermis skin layer than what went through to the reservoir." (D.I. 128 at 720:9-12; JTX 38 at GMG_0012948)

16

Compared to one another, nearly twice as much azelaic acid remained in the epidermis following treatment with Finacea® than following treatment with batch 041.  (JTX 38 at BMB_0012947)  Both batch 041 and Finacea® reached a peak flux between 1 to 5 hours after application, although the absorption levels declined more rapidly for batch 041 than for Finacea®.  (JTX 38 at BMB_0012947; D.I. 127 at 581:9-17)  Mehta admitted that defendants selected batch 041 over batch 036 because it was "close[r] to the reference product, Finacea®."  (D.I. 126 at 214:8-11, 241:8-10))  The study concluded that "there were no statistically significant differences" across the parameters, and "the flux profiles suggest that the test formulations are similar to, but not identical to, the Finacea® reference formulation."  (JTX 38 at GMG_0012949) Mehta agreed that "once [defendants] got the results from the cadaver study with the isopropyl-myristate containing formulation, [they] didn't investigate . . . any other alternative formulations."  (D.I. 126 at 227:6-11)  Defendants then performed a large-scale clinical trial comparing batch 041 to Finacea®, and concluded that "the test product was bioequivalent" to Finacea® and superior to placebo.  (*Id.* at 259:13-20, 261:7-11; PTX 219 at GMG_002365-68, 2412)

### B. Claim Construction

#### 1. Standard

Claim construction is a matter of law.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc).  Claim construction focuses on intrinsic evidence – the claims, specification, and prosecution history – because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v.*

17

*Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370,116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claims must be interpreted from the perspective of one of ordinary skill in the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1313.

Claim construction starts with the claims, *id.* at 1312, and remains centered on the words of the claims throughout. *Interactive Gift Express, Inc. v. Compuserve,Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the absence of an express intent to impart different meaning to claim terms, the terms are presumed to have their ordinary meaning. *Id.* Claims, however, must be read in view of the specification and prosecution history. Indeed, the specification is often "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

### 2. Issues at bar

The parties agree that a "hydrogel" is a semi-solid dosage form wherein the gel structure contains water and a gelling agent to form a gel, which may contain dispersed particles such as undissolved azelaic acid.[18] The crux of the parties' disagreement is whether, as defendants propose, hydrogels may also contain insoluble liquids. Regarding the term "lecithin," the parties dispute whether construction of the term is necessary given that the construction may not alter the outcome of the court's validity or infringement analysis. Substantively, the parties dispute whether lecithin is equivalent to phosphatidylcholine or whether lecithin is a complex mixture of compounds that is characterized by the presence of phosphatidylcholine.

---

[18] Azelaic acid is poorly soluble in water at 20º Celsius (0.24%). (D.I. 118, ex. 1 at ¶ 21)

18

### 3. "Hydrogel"[19]

Plaintiffs admit that claim 1 calls for the addition of a small amount of oil –
triacylglyceride in a concentration of 0.5 to 5% by weight – which is insoluble in liquid
water. ('070 patent, claim 1) Plaintiffs also recognize that example 1 of the '070 patent
describes a homogenized mixture containing liquid water and triacylglycerides as a
"pre-emulsion." (*Id.* at col. 5:20-32) Plaintiffs contend, however, that no more than a
trace amount of triacylglyceride would remain in the solution following addition of
polyacrylic acid and neutralization of the solution to form a gel, arguing that droplets of
triacylglyceride would be adsorbed[20] onto the surface of any solid azelaic acid particles.
Although the issue is most narrowly framed as whether the claimed hydrogel contains
insoluble liquid vesicles, the parties somewhat confusingly present the issue as whether
the claimed hydrogel "contains" a nanoemulsion. Plaintiffs argue that defendants blur
the line between a gel and an emulsion in order to advance their invalidity position,
while defendants respond that they do not blur any lines insofar as they do not argue
that gels are equivalent to emulsions. As such, the parties appear to accept the
premise that a gel differs from an emulsion in that, at least on the macro level, a gel is a
single-phase semisolid and an emulsion is a mixture of two liquids. With this framework
in mind, the court considers the following intrinsic evidence:

> Under the heading of "advantages," the specification states that
>
> > [i]t has unexpectedly proven that the composition according
> > to the invention in the case of concentrations in lecithin of
> > 1% by weight and less does not form any standard

---

[19] The term "hydrogel" appears in independent claim 1 of the '070 patent.

[20] According to Hawley's Condensed Chemical Dictionary, "adsorption" is the
"[a]dherence of the atoms, ions, or molecules of a gas or liquid to the surface of another
substance, called the adsorbent." (D.I. 91, ex. 13 at 25)

19

> nanoemulsions according to the prior art.  Rather a gel is
> present that comprises a homogenous mass with virtually no
> vesicles, but does have membrane fragments.  The fact that
> azelaic acid and the remainder of the solution do not form
> any nanoemulsions was not expected.  Only with the aid of
> scanning electron microscope recordings was it possible to
> provide clarity.  It turned out that no nanoemulsions could be
> identified in microscopic examination.

('070 patent, cols. 2:61-3:7)  By stating that the claimed hydrogel "unexpectedly" fails to

form a "standard nanoemulsions" as in the prior art, the drafters belie an expectation

that gel compositions will typically form nanoemulsions.  Moreover, in using the word

"nanoemulsion," it is evident that the drafters envisaged a "gel" present as a

"homogenous mass" that contains vesicles.  Indeed, as explained in the final two

sentences of the passage, the inventors imaged samples of the claimed composition[21]

with a scanning electron microscope for the purpose of verifying the absence of a

nanoemulsion (a.k.a. vesicles).

Importantly, the absence of a nanoemulsion was only observed in formulations

containing less than 1% lecithin by weight.[22]  Although the embodiment disclosed in

example 1 and claimed in dependent claim 4 contains lecithin in the vesicle-free range

of 0-1%, independent claim 1 does not specify a concentration and dependent claim 11

claims a concentration in the range of 0-3%.  Interpreting claim 1 as being limited to the

vesicle-free embodiment would run afoul of the doctrine of claim differentiation and

---

[21] Dr. Franke's testimony confirms that electron microscopy was indeed performed on Finacea® gel, not on the "pre-emulsion" intermediate.  (D.I. 125 at 111:1-19)

[22] The court is skeptical of this observation given the heterogeneity of the samples submitted for electron microscopy and the lack of follow-up imaging.  (D.I. 125 at 113:7-115:9)

would improperly read a single embodiment from the specification into the claims. *See Phillips*, 415 F.3d at 1323.

The court's construction is further bolstered by the prosecution history. The '850 provisional application, to which the '070 patent claims priority, describes a method of making a "nanoemulsion gel" wherein the gel is made in the same manner as the method disclosed in example 1 of the '070 patent. (DTX 15 at 11-14)  The concentrations disclosed in the two methods are not identical, but are overlapping. (DTX 15 at 11; '070 patent, col. 5:26-40)  For example, the '850 application calls for 1-5 parts lecithin, whereas the '070 patent calls for 1 part lecithin. (DTX 15 at 11; '070 patent, col. 5:30-31)  The '850 application goes on to state that "detection of the nanoemulsion" is achieved by measuring "vesical [sic] sizes using zeta sizers."  (DTX 15 at 11)  The issued '070 patent substitutes the phrase "nanoemulsion gel" with "gel," and omits the language regarding detection of vesicles, presumably because at a lecithin concentration of less than 1%, no vesicles were detected.  Nonetheless, the example provided by the '850 application reinforces the concept that, when lecithin is in a range of 1-5%, a "nanoemulsion gel" will form that contains measurable nanovesicles. For the foregoing reasons, the court construes "hydrogel" as "a semisolid dosage form that contains water and a gelling agent to form a gel, which may contain dispersed particles and/or insoluble liquids."

### 4. "Lecithin"[23]

---

[23] The term "lecithin" appears in independent claim 1 and dependent claims 3, 4 and 11 of the '070 patent.

Case: 15-1902    Document: 20    Page: 98    Filed: 09/04/2015

Case 1:13-cv-00421-SLR   Document 143   Filed 07/27/15   Page 23 of 71 PageID #: 5904

The parties do not dispute the meaning of the term lecithin in the context of literal infringement, nor do plaintiffs allege that defendants' generic product contains lecithin. (D.I. 91, ex. 15 at 230:15-232:23) Moreover, defendants do not allege that the construction of lecithin impacts the court's analysis regarding validity. (*See* D.I. 97 at 18-28) Rather, defendants propose that the construction of lecithin is relevant to the court's analysis of infringement under the doctrine of equivalents. Specifically, defendants object to the portion of plaintiffs' proposed construction[24] equating lecithin with phosphatidylcholine. Defendants' counsel argues that limiting what is allegedly a mixture of compounds to a single pure compound makes lecithin appear more like isopropyl myristate, the compound allegedly substituted for lecithin and triglycerides in the generic compound. However, this non-infringement posture is not adopted by defendants' expert, who stated that the difference between the two proposed constructions "doesn't make any difference to my opinion" as to whether the accused composition meets the limitations of the claims. (D.I. 91, ex. 15 at 236:17-237:7) Because construing "lecithin" will not impact the court's analysis, the court declines to issue a construction. *See Jang v. Boston Sci. Corp.*, 532 F.3d 1330, 1336-37 (Fed. Cir. 2008) (cautioning that "[t]he Supreme Court has explicitly held that Article III does not permit the courts to resolve issues when it is not clear that the resolution of the question will resolve a concrete controversy between interested parties.").

### C. Infringement

#### 1. Standard

---

[24] "Phosphatidylcholine, or a mixture, extracted from biological material, characterized by the presence of phosphatidylcholine."

22

A00023

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). To prove direct infringement, the patentee must establish, by a preponderance of the evidence, that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). A two-step analysis is employed in making an infringement determination. *See Markman*, 52 F.3d at 976. First, the court must construe the asserted claims to ascertain their meaning and scope. *See id.* Construction of the claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. *See Markman*, 5 2 F.3d at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform each and every step or element of a claimed method or product." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009) (internal quotation marks omitted). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas*, 870 F.2d at 1552)

23

(internal quotations omitted). A product that does not literally infringe a patent claim

may still infringe under the doctrine of equivalents if the differences between an

individual limitation of the claimed invention and an element of the accused product are

insubstantial. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24

(1997). One test used to determine "insubstantiality" is whether the element performs

substantially the same function in substantially the same way to obtain substantially the

same result as the claim limitation. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*,

339 U.S. 605, 608 (1950). This test is commonly referred to as the "function-way-result"

test. The mere showing that an accused device is equivalent overall to the claimed

invention is insufficient to establish infringement under the doctrine of equivalents. The

patent owner has the burden of proving literal infringement and/or infringement under

the doctrine of equivalents by a preponderance of the evidence. *See SmithKline*

*Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations

omitted).

The doctrine of equivalents is limited by the doctrine of prosecution history

estoppel. In *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722

(2002) ("*Festo I*"), the Supreme Court stated:

> Prosecution history estoppel ensures that the doctrine of
> equivalents remains tied to its underlying purpose. Where
> the original application once embraced the purported
> equivalent but the patentee narrowed his claims to obtain the
> patent or to protect its validity, the patentee cannot assert
> that he lacked the words to describe the subject matter in
> question. The doctrine of equivalents is premised on
> language's inability to capture the essence of innovation, but
> a prior application describing the precise element at issue
> undercuts that premise. In that instance the prosecution
> history has established that the inventor turned his attention
> to the subject matter in question, knew the words for both

24

> the broader and narrower claim, and affirmatively chose the
> latter.

*Id.* at 734–735. In other words, the prosecution history of a patent, as the public record

of the patent proceedings, serves the important function of identifying the boundaries of

the patentee's property rights. Once a patentee has narrowed the scope of a patent

claim as a condition of receiving a patent, the patentee may not recapture the subject

matter surrendered. In order for prosecution history estoppel to apply, however, there

must be a deliberate and express surrender of subject matter. *See Southwall Techs.,

Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1580 (Fed. Cir. 1995).

Once a court has determined that prosecution history estoppel applies, it must

determine the scope of the estoppel. *See id.* at 1580. This requires an objective

examination into the reason for and nature of the surrendered subject matter. *Id.; see

also Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1299 (Fed. Cir. 1999).

If one of ordinary skill in the art would consider the accused product to be surrendered

subject matter, then the doctrine of equivalents cannot be used to claim infringement by

the accused product; i.e., prosecution history estoppel necessarily applies. *Augustine

Med.*, 181 F.3d at 1298. In addition, a "patentee may not assert coverage of a 'trivial'

variation of the distinguished prior art feature as an equivalent." *Id.* at 1299 (quoting

*Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998)).

"[A] narrowing amendment made to satisfy any requirement of the Patent Act"

creates a presumption that "the patentee surrendered all subject matter between the

broader and the narrower language" and bars any equivalents. *Festo I,* 535 U.S. 722,

736, 740 (2002); *see also Honeywell Int'l, Inc. v. Hamilton Sundstrand,* 370 F.3d 1131,

1139 (Fed. Cir. 2004) (prosecution history estoppel "bar[s] the patentee from asserting

25

equivalents if the scope of the claims has been narrowed by an amendment during prosecution."). Thus, a presumption of prosecution history estoppel is established by showing that the patentee made a narrowing amendment and that "the reason for that amendment was a substantial one relating to patentability." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) (en banc) ("*Festo II*"). There are three exceptions to this presumption: (1) the equivalent was "unforeseeable at the time of the narrowing amendment"; (2) the rationale for the amendment "bore no more than a tangential relation to the equivalent in question"; or (3) "some other reason suggested that the patentee could not reasonably have been expected to describe the alleged equivalent." *Festo I.*, 535 U.S. at 740–41.

To establish indirect infringement, a patent owner has available two theories: active inducement of infringement and contributory infringement. *See* 35 U.S.C. § 271(b) & (c). To establish active inducement of infringement, a patent owner must show that an accused infringer "knew or should have known [their] actions would induce actual infringements." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). To establish contributory infringement, a patent owner must show that an accused infringer sells "a component of a patented machine ... knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (quoting 35 U.S.C. § 271(c)). Liability under either theory, however, depends on the patent owner having first shown direct infringement. *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993).

26

## 2. Doctrine of equivalents[25]

Plaintiffs allege that defendants infringe claims 1-12 of the '070 patent ("the

asserted claims") under the doctrine of equivalents. Defendants do not dispute that the

accused product meets the azelaic acid, propylene glycol, polysorbate, aqueous phase

with water and salts, and polyacrylic acid limitations, as well as the concentration

ranges specified in claims 1, 5, 6 and 10. Defendants also do not dispute that the

accused product meets the additional limitations recited in dependent claims 2, 7, 8, 9

and 12. (D.I. 118, ex. 1 at ¶¶ 53, 57, 58) Defendants contend, however, that the

accused product does not fully satisfy the limitations of the asserted claims insofar as

the accused product does not physically contain triacylglycerides, lecithin or soybean

lecithin. (*Id.* at ¶¶ 46-47) Plaintiffs argue that defendants' substitution of isopropyl

myristate for triglycerides and lecithin raises a question of legal equivalency under the

"function-way-result" test.

### a. Function

#### (1) Evidence

Dr. Weiner testified that lecithin and triglycerides function as penetration

enhancers in the claimed formulation. (D.I. 126 at 320:15-323:16) In support of this

conclusion, Dr. Weiner examined the results of the Franz diffusion study and found that

"the inventive formulation was much more effective than the prior art in allowing the

---

[25] Defendants also argue that, "[t]o the extent 'hydrogel' is construed to exclude the presence of emulsions, [defendants'] ANDA product does not infringe the asserted claims." (D.I. 134 at 33) Because the court adopted defendants' construction – which allows for the presence of insoluble liquids in the hydrogel – the court does not address defendants' argument as to whether the accused product literally meets the 'hydrogel' limitation.

27

A00028

penetration of the azelaic acid into . . . the skin." (D.I. 126 at 321:19-21) Dr. Weiner explained that, because "the amount of propylene glycol in [Skinoren® cream and Finacea®] were [sic] essentially the same," the increased penetration could not be explained by differing amounts of azelaic acid and, therefore, must be explained by the addition of lecithin and triglycerides. (*Id.* at 323:4-17) Dr. Michniak-Kohn agreed that "a person of ordinary skill in the art [would] understand that lecithin contributed to the reportedly better results for the claimed gel function." (D.I. 127 at 563:9-12) Indeed, Dr. Franke testified that he originally selected lecithin for its "penetration enhancement" qualities in that it could "interact in the skin layers" which are "also double membrane structures with a similar chemistry" to lecithin. (D.I. 126 at 69:11-19) Dr. Franke testified that he selected triglycerides due, in part, to their "polarity as an oil" which makes them "suitable being together with lecithin." (*Id.* at 70:2-10)

Defendants argue that Dr. Weiner's analysis should be disregarded because he was mistaken in concluding that Skinoren® cream does not contain triglycerides (D.I. 127 at 453:22-455:20), and he did not offer an opinion as to whether lecithin alone could act as a penetration enhancer. Defendants also argue that the Franz diffusion test is unreliable because one of the experimental data sets was discarded (JTX 16 at BAYER0384920; D.I. 125 at 178:9-179:17) and because Dr. Günther "did not perform any statistical analysis of the results of [the] study" (D.I. 125 at 174:25-175:2; D.I. 126 at 371:5-372:21).

Plaintiffs argue that in defendants' ANDA filings and formulation development report, defendants repeatedly stated that the function of lecithin and triglyceride in the claimed formulation and isopropyl myristate in the accused formulation is identical; to

28

wit, all three excipients enhance penetration of the skin. (JTX 53 at GMG_VP765, -774-76; JTX 54 at GMG_VP1241, -252, -253, -272; PTX 312 at GMG_137769; D.I. 126 at 217:1-10, 226:2-5, 228:19-229:4, 323:25-325:22) As detailed *supra*, defendants performed Franz cell diffusion tests comparing the accused product to Finacea® and found that the two formulations have statistically similar penetration profiles in terms of the amount and rate of skin penetration. (JTX 38 at GMG_0012947-49) In response to a query by the FDA regarding defendants' selection of penetration enhancer in the accused product, defendants wrote that the penetration studies "demonstrate the equivalence" between Finacea® and the accused product. (PTX 312 at GMG_0137769)

Defendants respond that plaintiffs are in the best position to understand the function of lecithin and triglycerides in the claimed formulation. (*See* D.I. 126 at 369:24-370:5) In this vein, defendants cite several documents from plaintiffs suggesting that an increased percentage of dissolved azelaic acid, not the presence of lecithin and triglycerides, is responsible for the increased penetration observed in the claimed hydrogel.[26] (JTX 3 at BAYER0006537 (a marketing presentation by Dr. Franke reports the percentage of dissolved azelaic acid as ~25% for Finacea® and ~3% for Skinoren® cream); DTX 92 (a poster from two scientists involved in clinical development of Finacea® states that the hydrogel "contains a higher dissolved fraction of azelaic acid

_____

[26] Dr. Weiner testified that the documents cited by defendants, including the Finacea® promotional materials, were all incorrect in attributing increased penetration to increased dissolution of azelaic acid. (D.I. 127 at 463:3-5, 467:18-20, 471:23-472:1) However, Dr. Weiner agreed that "if the solubility explanation were correct," he would "certainly have to reconsider" his position that lecithin and triglycerides function as penetration enhancers. (D.I. 127 at 458:3-8)

29

than the cream, leading to improved drug release and bioavailability")) Indeed, Dr.

Franke admitted that none of plaintiffs' documents describes the function of lecithin and

triglycerides as penetration enhancers. (D.I. 125 at 88:23-89:10; see also D.I. 126 at

369:7-11) Instead, plaintiffs' development reports and NDA submissions affirmatively

describe the function of lecithins and triglycerides as either moisturizers, emollients or

emulsifiers. (See JTX 20 at BAYER0434132; DTX 19 at BAYER0157202; JTX 11 at

BAYER0154373) Defendants also cite various publications to support the conclusion

that lecithin or triglycerides are not penetration enhancers, including a publication by Dr.

Weiner[27] in which he wrote that "when phospholipid based liposomes are incorporated

in an emulsion, the delivery of the drug is greatly diminished because phospholipids do

not function as permeation enhancers." (D.I. 126 at 430:9-19; see also JTX 49 (the

Handbook of Pharmaceutical Excipients does not identify either lecithin or triglycerides

as being a penetration enhancer);[28] JTX 29 at BAYER0544905; D.I. 126 at 395:14-

396:1) The '070 patent itself is silent on the question of whether lecithins or

triglycerides function as penetration enhancers. (D.I. 126 at 368:3-6)

Plaintiffs offer that their failure to include "penetration enhancer" as a potential

function of lecithin and triglycerides is not fatal given that an excipient may have multiple

relevant functions. In support of this position, plaintiffs cite Dr. Weiner's testimony that

"lecithin can be an emollient . . . and the triglyceride can act as a humectant or emollient

[skin softener]" in addition to acting as penetration enhancers. (D.I. 126 at 320:7-18)

_____

[27] Not admitted into evidence.

[28] Plaintiffs note that the Handbook of Pharmaceutical Excipients states that triglycerides have "good penetration properties." (JTX 49 at GMG_136959; D.I. 128 at 707:23-708:19)

30

Additionally, Dr. Michniak-Kohn testified that isopropyl myristate may act as an emollient or as a penetration enhancer. (D.I. 127 at 552:15-553:4) Plaintiffs also cite Mehta's testimony that isopropyl myristate, lecithin and triglycerides each perform multiple functions, and that they share at least the qualities of penetration enhancer and emulsifying agent. (D.I. 126 at 229:24-230:4, 232:24-233:10)

### (2) Discussion

The parties agree that two factors could contribute to the increased penetration observed in plaintiffs' Franz cell study: (1) increased dissolution of azelaic acid; or (2) the presence of chemical penetration enhancers. The '070 patent does not specify the role of lecithin and triglycerides in the claimed composition, and plaintiffs' Franz cell test was not designed to control for the potential contribution of either factor. As such, Dr. Weiner artificially held one variable constant by assuming that the amount of dissolved azelaic acid did not differ between samples, and he was then able to attribute the observed increase in penetration to the presence of lecithin and triglycerides. (D.I. 126 at 323:4-17) The court is troubled by Dr. Weiner's method of deduction, especially given that Dr. Weiner did not realize that Skinoren® cream also contains triglycerides and given that plaintiffs' scientific representatives twice reported an increased percentage of dissolved azelaic acid in Finacea® as compared to Skinoren® cream. (JTX 3 at BAYER0006537; DTX 92) Nonetheless, although plaintiffs' position lacks scientific rigor, the court discerns nothing in the record that indicates that lecithin and triglycerides cannot act as penetration enhancers. Indeed, Dr. Michaniak-Kohn admitted that a person of ordinary skill in the art would understand that lecithin contributed to the better results of the claimed gel (D.I. 127 at 563:9-12), and Mehta

31

acknowledged that lecithin and triglycerides could function as penetration enhancers (D.I. 126 at 232:24-233:10). Additionally, Dr. Franke testified that he initially selected lecithin for its "penetration enhancement" properties and triglyceride for its compatibility with lecithin. (*Id.* at 70:2-10)

Similarly, the fact that plaintiffs did not identify lecithin and triglycerides as penetration enhancers in their own filings and internal documents does not exclude the possibility that they function as such in the claimed composition. Plaintiffs provided testimony from both sides' witnesses to support the common-sense proposition that a given excipient may perform more than one function. (D.I. 126 at 320:7-18; D.I. 127 at 552:15-553:4) It logically follows that listing the function of lecithin and triglyceride as "moisturizer" or "emollient" does not mean that the excipients cannot also act as penetration enhancers.

The court is also swayed by defendants' repeated statements in their ANDA filings that lecithin, triglyceride and isopropyl myristate function as penetration enhancers. (*See, e.g.*, JTX 53 at GMG_VP765, -774-76) The Federal Circuit has held that, "[b]ecause drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the ANDA's description of the drug, an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry." *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002). Moreover, "[i]f an ANDA specification defines a property of a compound such that it must meet a limitation of an asserted claim, then there will almost never be a genuine dispute of material fact that the claim is infringed with respect to that limitation." *Id.* Here, the infringement inquiry hinges on the

32

question of whether the claimed[29] and accused excipients both act as penetration enhancers. Throughout their ANDA filings, defendants repeatedly answered that question in the affirmative. Defendants should not be permitted to liken their product to the claimed composition to support their bid for FDA approval, yet avoid the consequences of such a comparison for purposes of infringement.

### b. Way

#### (1) Evidence

At trial, Dr. Weiner opined that lecithin, triglyceride, and isopropyl myristate enhance penetration by "temporarily altering the structural properties of the lipid bilayers in the stratum corneum." (D.I. 126 at 332:7-336:25) For support, Dr. Weiner relied on a 1987 article entitled "Mode of Action of Penetration Enhancers in Human Skin" by B.W. Barry ("Barry"). (JTX 29) Barry proposed that penetration enhancers "interact[] in some way with the stratum corneum lipid structure, disrupting its organization and increasing its fluidity." (D.I. 126 at 334:12-21; JTX 29) Barry reported that non-polar materials, such as oleic acids, "enter the lipid regions . . . where they disrupt the structure." (JTX 29 at BAYER0544916) Dr. Weiner admitted that Barry discloses a "general theory of skin accelerant activity" in which it does not directly "identify lecithin or triglyceride as penetration enhancers." [30] (D.I. 126 at 395:15-396:1) Dr. Weiner opined that Barry is

---

[29] The claimed composition in the '070 patent is identical to the commercialized embodiment insofar as they both contain triglycerides and lecithin. (D.I. 126 at 303:2-305:5)

[30] Defendants argue that Dr. Weiner's testimony should be rejected because he did not personally test the relevant excipients, but Dr. Weiner is not obligated to perform such tests where the law provides that "[d]irect infringement can be proven by circumstantial evidence." *Molecular Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed. Cir. 1986).

33

nonetheless applicable to the instant case because – like oleic acid – lecithin, triglycerides, and ispropyl myristate[31] are large non-polar materials.  (D.I. 127 at 481:19-23)  Dr. Weiner explained that lecithin, triglycerides, isopropyl myristate, and the lipids in the stratum corneum are all hydrophobic and, as such, are "very soluble in oils."  (D.I. 126 at 335:5-17)  Like the lipids in the stratum corneum, lecithin and isopropyl myristate are amphiphilic[32] and, therefore, are likely to "enter into the lipid portion of the . . . stratum corneum."  (D.I. 128 at 715:23-716:2)  Triglycerides are compatible with the lipids in the stratum corneum by virtue of being insoluble and "extremely compatible with lecithin."  (D.I. 126 at 335:22-335:20)  Plaintiffs argue that the exact location of integration is irrelevant as Dr. Michniak Kohn agreed that a disruptive "interaction of a penetration enhancer can be with the polar heads of the lipid, in between those lipid heads, or between the hydrophobic tails of the lipids in the stratum corneum."  (D.I. 128 at 715:23-716:2)

Although Dr. Weiner did not opine on the relationship between chemical class and penetration ability, defendants' expert acknowledged that lecithin, triglyceride, and isopropyl myristate contain a fatty ester group (*id.* at 705:2-706:1), a feature that defendants linked to absorption capacity in their ANDA submission.  (JTX 53 at GMG_VP774 (isopropyl myristate was selected "as [a] penetration enhancer instead of lecithin and medium chain triglyceride because isopropyl myristate has a good absorption capacity due to [its] fatty ester group . . . .); D.I. 126 at 275:9-276:20; D.I. 128

_____

[31] Dr. Michniak-Kohn does not dispute that isopropyl myristate causes "fluidization of the stratum corneum lipids."  (D.I. 127 at 567:20-568:23)

[32] The parties agree that "amphiphilic" is defined as containing both hydrophilic and lipophilic groups.  (D.I. 128 at 714:11-25; D.I. 126 at 335:9-11)

34

at 706:2-23)  Moreover, defendants do not dispute that an article cited by Dr. Michniak-Kohn[33] categorizes chemical penetration enhancers and their mechanism of action by class.  (DTX 83 at GMG_137198 (listing isopropyl myristate under the category of "fatty acid esters")

Although Dr. Michniak-Kohn relied on several publications to support her opinions at trial,[34] defendants' post-trial briefing focuses on a single article entitled "An Attempt to Clarify the Mechanism of the Penetration Enhancing Effects of Lipophilic Vehicles with Differential Scanning Calorimetry (DSC)" by Claudia S. Leopold et al. ("Leopold").  (DTX 84)  Leopold used DSC to test the ability of various excipients to "alter the structure of the stratum corneum," including caprylic/capric acid triglycerides and phospholipids[35] and isopropyl myristate.  (DTX 84 at GMG_0136577-78)  Leopold concluded that "the observed decrease of only the phase-transition enthalpy by the . . . caprylic/capric acid triglycerides with phospholipids is due to dissolution or extraction of the stratum corneum lipids."  (DTX 84 at GMG_0136581)  However, "[v]ehicles which cause both a reduction of the enthalpy and a decrease of the phase-transition temperatures" such as isopropyl myristate, "are thought to fluidize the lamellar-gel phase of the stratum corneum lipids, and possibly also partially dissolve the lipids."  (*Id.*; D.I. 127 at 568:19-23)  Defendants argue that fluidization of the stratum corneum lipids

---

[33] "Skin penetration enhancers" by Majella E. Lane ("Lane").

[34] *Inter alia*, Lane, and a 2004 article titled "An attempt to clarify the influence of glycerol, propylene glycol, isopropyl myristate and a combination of propylene glycol and isopropyl myristate on human stratum corneum," by I. Brinkmann and C.C. Muller-Goymann.

[35] Dr. Michniak-Kohn testified that the combination of caprylic/capric acid triglycerides and phospholipids is equivalent to the claimed combination of triglycerides and lecithin.  (D.I. 127 at 567:20-568:23)

35

is materially different from dissolution of the stratum corneum lipids.  The court

disagrees, given that Leopold itself concedes that "[t]he observed enthalpy decrease

caused by dissolution or extraction of the intercellular lipids cannot be distinguished

from enthalpy changes caused by fluidization of the lipid bilayers."  (DTX 84 at

GMG_0136580)  Plaintiffs argue that, even if DSC could distinguish between fluidization

and dissolution, such a difference is insignificant where Dr. Michniak-Kohn agreed that

both types of penetration enhancers are "lipophilic liquids" that may enhance drug

penetration by causing a "specific alteration of the stratum corneum lipids."  (D.I. 128 at

709:9-710:2; DTX 84 at GMG-136577)

    The parties agree that defendants' Franz cell study demonstrated no statistically

significant differences in the flux profiles between batch 041, batch 036 and Finacea®.

(JTX 38 at GMG_0012949)  The parties also agree that batch 041 was selected for

further development because its flux profile was "more similar to Finacea®."  (Id.; JTX

38 at BMB_0012949; JTX 41 at GMG_0015047)  Defendants propose two somewhat

incongruous interpretations of the data:  (1) lecithin and triglyceride enhance penetration

differently than isopropyl myristate because the flux curves are not "very, very close or

overlapping" (D.I. 127 at 581:18-582:2); and (2) a penetration enhancer cannot be

responsible for increased absorption because the flux curve for batch 036, which

defendants allege does not contain a penetration enhancer, [36] is statistically similar to

the flux curves for batch 041 and Finacea®.  (D.I. 134 at 22-23)

---

[36] Dr. Weiner agreed that the Handbook of Pharmaceutical Excipients does not list
PPG-20 methyl glucose ether distearate, the substituted ingredient in batch 036, as a
penetration enhancer.  (D.I. 126 at 418:13-16)  On cross, Dr. Weiner opined that PPG
20 might be acting as a penetration enhancer or a combination enhancer.  (D.I. 126 at
418:24-419:8)

36

### (2) Discussion

As discussed, *supra*, the '070 patent does not directly attribute enhanced penetration to a specific excipient, nor does it discuss the "way" in which enhanced penetration is achieved.  Having determined that isopropyl myristate, lecithin, and triglycerides all function as penetration enhancers, the court is charged with determining whether isopropyl myristate enhances penetration in substantially the same way as lecithin and triglycerides.  Defendants rely primarily on Leopold to support the proposition that the excipients-at-issue increase penetration differently; to wit, lecithin and triglycerides increase penetration through dissolution of the stratum corneum lipids, while isopropyl myristate increases penetration through fluidization of the stratum corneum lipids.  For the reasons stated above, the court does not find that Leopold adequately supports drawing such a distinction.  Even if the court were to accept the conclusions in Leopold as fact, distinguishing between dissolution and fluidization of the stratum corneum lipids would not impact the court's ultimate conclusion.  The '070 patent does not specify a mechanism for penetration enhancement, and requiring a particular sub-mechanism is unnecessary where the parties accept that disruption of stratum corneum lipids is sufficient to enhance penetration. *See Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1380 (Fed. Cir. 2006) (holding that "the district court properly assessed the 'way' [the claimed ingredient] works by referring to the patent and the evidence presented at trial," despite infringer's argument that "way" should be interpreted more narrowly).

Moreover, requiring a high degree of mechanistic similarity would not comport with the court's duty to determine whether the accused product "performs substantially

37

the same function in substantially the same way" as the claimed limitation. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 399 U.S. 605, 508 (1950). The court was presented with ample evidence to support the conclusion that all of the excipients-at-issue increase penetration in a substantially similar way; namely, disruption of the stratum corneum lipids. The court found Dr. Weiner's testimony regarding the applicability of Barry to the claimed excipients to be credible and well-supported, and the court is also influenced by defendants' admission that all three excipients contain a fatty acid ester group, a feature associated with increased absorption. Regarding defendants' Franz cell study results, the court is unpersuaded that the flux profiles from batch 041 and Finacea® must overlap exactly where there is no statistically significant difference between the curves. Defendants' final theory regarding the flux curve for batch 036 was unsupported by expert testimony and weakened by uncertainty over the true function of substituted excipient, PPG-20. Altogether, the court concludes that the excipients-at-issue enhance penetration in a substantially similar way.

### c. Result

#### (1) Evidence

Plaintiffs propose that the proper articulation of the "results" prong is "to have a therapeutically effective azelaic acid composition able to penetrate the stratum corneum so as to deliver the active ingredient, which is azelaic acid." (D.I. 126 at 340:21-341:8) For support, plaintiffs cite the '070 patent, which claims a composition that "allows a larger amount of pharmaceutical active ingredient to penetrate into living skin layers and/or cutaneous organs" as demonstrated by Franz cell diffusion tests. ('070 patent, col. 2:29-37) The '070 patent specifies that "the living skin layers and/or cutaneous

38

organs are the desired target sites for azelaic acid." (*Id.* at col. 2:37-40) Finally, the specification describes "[t]he composition of the invention [as being] suitable for the treatment of various indications" including rosacea. (*Id.* at col. 4:46-51)

Plaintiffs also reference defendants' Franz cell study and clinical trial comparing the penetration and efficacy of the accused product and Finacea®. As detailed, *supra*, defendants' Franz study reported slight differences in flux profiles between batch 041 and Finacea®, including differing rates of decline in absorption levels and differences in the amount of azelaic acid remaining in the epidermis following treatment. (JTX 38 at BMB_0012947) However, "there were no statistically significant differences" across the parameters (JTX 38 at GMG_0012949), and defendants admittedly selected batch 041 over batch 036 due to its similarity to Finacea® (D.I. 126 at 214:8-11). Defendants' subsequent large-scale clinical trial comparing batch 041 to Finacea® prompted the conclusion that "the test product was bioequivalent" to Finacea® and superior to placebo. (PTX 219 at GMG_002365-68, 002412)

Finally, defendants filed a patent application in which the drafters stated that "the composition according to the invention has the advantage that it allows a larger amount of pharmaceutical active ingredient to penetrate into living skin layers and/or cutaneous organs." (JTX 42 at ¶ 23, GMG_0111203; D.I. 126 at 340:21-342:15) The patent application also stated that "[t]he resulting gel has approximately about four times higher availability of azelaic acid in living skin layers and/or cutaneous organs." (JTX 42 at ¶ 35, GMG_0111204) Plaintiffs point out that the language used in defendants' patent application copies or closely mirrors the language used in the '070 patent. (Compare JTX 42 at ¶ 23, 35 to '070 patent, cols. 2:29-32, 5:36-38)

### (2) Discussion

The court agrees that the proper "result" by which to evaluate the evidence is "to have a therapeutically effective azelaic acid composition able to penetrate the stratum corneum so as to deliver the active ingredient." Unlike the "function" and "way" prongs, the '070 patent directly addresses the "result" of treatment with the claimed composition. Specifically, the '070 patent claims increased penetration of azelaic acid into the skin, resulting in treatment of various skin conditions such as rosacea. Defendants do not deny that their own patent application attributes an identical result to the accused product. Defendants' Franz cell study and clinical trial provide further evidence of the similar penetration and treatment results of the claimed and accused compositions.

Defendants' sole response is to criticize plaintiffs' attempt to attribute enhanced penetration to the presence of lecithin and triglycerides, arguing that only an element-by-element comparison is appropriate. However, because the court has already concluded that enhanced penetration may be properly attributed to lecithin and triglycerides, defendants' argument must fail. Accordingly, the court finds that plaintiffs have demonstrated that the claimed and accused products have substantially similar results. As a whole, the court finds that plaintiffs have carried their burden of proving infringement under the doctrine of equivalents by a preponderance of the evidence. Because defendants do not dispute any particular limitation present in any of the dependent claims (other than the physical absence of lecithin and triglycerides), the court's finding of infringement extends to all of the asserted claims.[37]

---

[37] Defendants do not dispute that method claims 8 and 9 are infringed under 35 U.S.C. § 271(b). Claim 8 recites "[a] method for treating rosacea, presbyderma, melisma, acne and/or skin irritations in a patient, comprising administering to the patient

40

### 3. Defenses to Doctrine of Equivalents

#### a. Ensnarement

Ensnarement is a legal limitation on the doctrine of equivalents that "bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009). The Federal Circuit has cautioned that "[t]he ensnarement inquiry is separate and distinct from the . . . element-by-element equivalence analysis, and has no bearing on the validity of the actual claims." *Id.* at 1323. When conducting an ensnarement analysis, the court is first charged with "construct[ing] a hypothetical claim that literally covers the accused device." *Id.* at 1324. Here, the parties disagree on the proper construction of the hypothetical claim: Defendants argue that the triglyceride and lecithin limitations of claim 1 of the '070 patent should be substituted with "penetration enhancer," and plaintiffs argue that isopropyl myristate should be added as an alternative ingredient to triglyceride and lecithin. Mindful of the Federal Circuit's guidance to construct a hypothetical claim that "literally" covers the accused product, the court declines to adopt defendants' broad construction. Instead of claiming a class of compounds with similar characteristics (for example, fatty acid esters), plaintiffs elected to claim two very specific penetration enhancers. Although plaintiffs strenuously argued that all three compounds are penetration enhancers in the context of infringement, broadening the scope of the claim to include all penetration enhancers – a

---

in need thereof a therapeutically effective amount of the composition according to claim 1." Claim 9 recites "[t]he method of claim 8, wherein the composition is administered topically." Plaintiffs presented unrebutted evidence that defendants' proposed label instructs patients to apply the accused product to affected areas "topically to treat rosacea." (D.I. 118, ex. 1 at ¶ 53; PTX 213 at GMG_677)

group which the court understands to include numerous compounds with varying characteristics – would be inconsistent with the careful and limited language of the claim. Accordingly, the court adopts plaintiffs' hypothetical claim in which isopropyl myristate is added as an alternative penetration enhancer to lecithin and triglycerides.

The next step in the court's ensnarement analysis is to "assess the prior art introduced by the accused infringer and determine whether the patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art." *DePuy Spine*, 567 F.3d at 1325. The court considers patentability under 35 U.S.C. §§ 102 and 103. *Id.* Defendants argue that the hypothetical claim is anticipated and rendered obvious by a prior art article entitled "In vitro permeation of azelaic acid from viscosized microemulsions" by M.R. Gasco et al. ("Gasco"). (DTX 59) Gasco discloses a microemulsion containing azelaic acid as the active ingredient and DMSO as an "enhancer." (DTX 59 at GMG_0006360) The parties agree that Gasco does not disclose isopropyl myristate, lecithin or triglycerides. ('070 patent, claim 1; D.I. 126 at 339:5-7; D.I. 127 at 652:2-6; D.I. 128 at 731:22-24, 922:22-25) As the court's hypothetical claim requires, at a minimum, the presence of either triglycerides and lecithin or isopropyl myristate, the court need not consider the remaining limitations in order to conclude that Gasco does not anticipate either hypothetical claim[38] under 35 U.S.C. § 102.

Regarding 35 U.S.C. § 103, the Federal Circuit has held that "to make the hypothetical claim obvious, the court must find that 'the differences between the subject

---

[38] Because Gasco does not anticipate the hypothetical independent claim, any hypothetical dependent claims are also not anticipated.

42

matter sought to be patented [i.e., the hypothetical claim] and the prior art are such that
the subject matter as a whole would have been obvious at the time the invention was
made to a person having ordinary skill in the art to which said subject matter pertains.'"
*Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1106 (Fed. Cir. 2002) (emphasis omitted)
(quoting 35 U.S.C. § 103(a) (1994)).  Plaintiffs argue that a skilled artisan would not
substitute a different penetration enhancer for DMSO given that the DMSO
microemulsion tested in Gasco outperformed the non-DMSO microemulsion.  (DTX 59
at GMG_0006362)  Plaintiffs argue that, even if a skilled artisan desired to substitute
DMSO for another penetration enhancer, lecithin and triglyceride were not known
penetration enhancers in 1998, the priority date of the '070 patent.  (D.I. 127 at 556:15-
18)  Dr. Weiner added that, based on their chemical properties, a skilled artisan would
not substitute lecithin and triglycerides, which "hardly [have] any water solubility at all,"
with DMSO, which is "a very water-soluble chemical."[39]  (D.I. 126 at 338:18-339:1; D.I.
128 at 923:17-924:13)  Plaintiffs cite Dr. Weiner's testimony that "excipients [and] the
active ingredient interact with each other . . . differently from formulation to formulation"
to support the argument that a skilled artisan would not have an expectation of success
when swapping excipients.  (D.I. 126 at 296:9-14)  Finally, Dr. Weiner testified that
defendants did not, to his knowledge, "consider using DMSO in the ANDA formulation."
(D.I. 126 at 339:2-4)

In contrast, Dr. Michniak-Kohn testified that a skilled artisan would be motivated
to substitute a different chemical penetration enhancer for DMSO because DMSO is

---

[39] Plaintiffs also argue that a skilled artisan would not substitute penetration
enhancers of different classes for one another, but offers no expert testimony to support
this position.

43

"metabolized in the body, and when you used it topically, you didn't smell very nice."
(D.I. 127 at 575:7-17)  Defendants argue that plaintiffs did not provide adequate
testimony to explain why a skilled artisan would consider water solubility when
substituting excipients.  Finally, Dr. Michniak-Kohn testified that "[t]here would be no
reason to believe that the formulation [with a new penetration enhancer] would not be
successful."  (*Id.* at 605:12-18)

Although both sides present on-point expert testimony, the court finds that
plaintiffs have met their burden to prove that the range of equivalents does not ensnare
the prior art.  *See Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d
677, 685 (Fed. Cir. 1990) ("the burden is on [the patent owner] to prove that the range
of equivalents which it seeks would not ensnare the prior art.").  The parties dispute
whether a skilled artisan would attempt to substitute another penetration enhancer for
DMSO:  in particular, plaintiffs urge that efficacy would be the primary concern, and
defendants argue that cosmetic concerns would dominate.  Without further guidance,
the court is unable to assign greater weight to either seemingly legitimate priority.
However, the court is persuaded that a skilled artisan would not necessarily substitute a
large hydrophobic molecule with as-yet-unknown penetration capabilities with a known,
water soluble penetration enhancer.  In light of defendants' own substantial efforts to
develop a bioequivalent generic formulation (chronicled *supra*) and Dr. Weiner's
testimony that different excipients behave differently depending on the surrounding
milieu, the court is persuaded that a skilled artisan would not have a reasonable
expectation of success when swapping the penetration enhancers at issue.

44

Accordingly, the court finds that infringement under the doctrine of equivalents is not barred by ensnarement of the prior art.

### b. Estoppel

As set forth in greater detail *supra*, a presumption of prosecution history estoppel is established by showing that the patentee made a narrowing amendment and that "the reason for that amendment was a substantial one relating to patentability." *Festo II,* 344 F.3d at 1366. During prosecution, the applicant altered the language in two dependent claims from "lecithin . . . at a concentration of up to 1% [or 3%] by weight" to "more than 0 to 1% [or 3%] by weight." (JTX 2.2 at BAYER526; D.I. 127 at 562:7-24) Prior to making the amendment, the applicant stated that the examiner's criticism that the use of "up to" would include no lecithin was "not well taken" as "[t]hese recitations are only in claims dependent on independent claims, which clearly require the recited components. Since the dependent claims must limit the independent claims, the meaning is clear that zero amounts are not included." (JTX 2.2 at BAYER510-511) Defendants do not dispute that the independent claim from which both dependent claims depend included a "lecithin" limitation before and after this amendment. (JTX 2.1 at BAYER374; '070 patent, col. 6:27-39)

The court discerns no "clear and unmistakable surrender" of a lecithin-free compound through either claim amendment or attorney argument. *See Cordis Corp. v. Medtronic Ave. Inc.,* 511 F.3d 1157, 1177 (Fed. Cir. 2008). Neither party disputes that the independent claim at issue contains a "lecithin" limitation that is necessarily incorporated by reference into the dependent claims. *See* 35 U.S.C. § 112 ¶ 4 (2006). When taken in context, the court agrees that the applicant's amendment was made for

45

the purpose of clarifying that "zero amounts [of lecithin] are not included" (JTX 2.2 at

BAYER510-511), not to disclaim formulations with zero lecithin. *See Cordis Corp.*, 511

F.3d at 1177 (The disputed amendment did not "disclaim any subject matter that was

otherwise within the scope of the claim language, but merely explained, in more explicit

terms, what the claims already covered."). Accordingly, the court finds that infringement

under the doctrine of equivalents is not barred by prosecution history estoppel.

### 4. Exceptional case under 35 U.S.C. § 285

In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the Supreme Court

described § 285 as imposing "one and only one constraint on district courts' discretion

to award attorney's fees in patent litigation: The power is reserved for 'exceptional'

cases." 134 S.Ct. 1749, 1755-56 (2014). Because the Patent Act does not define

"exceptional," the Court construed it "'in accordance with [its] ordinary meaning.'" *Id.* at

1756 (citation omitted). "In 1952, when Congress used the word in § 285 (and today,

for that matter), '[e]xceptional' meant 'uncommon,' 'rare,' or 'not ordinary.'" *Id.* (citation

omitted). In support of its interpretation, the Court referred to an earlier interpretation of

the term "'exceptional' in the Lanham Act's identical fee-shifting provision, 15 U.S.C. §

1117(a), to mean 'uncommon' or 'not run-of-the-mill.'" *Id.* The Court concluded that

> an "exceptional" case is simply one that stands out from
> others with respect to the substantive strength of a party's
> litigating position (considering both the governing law and the
> facts of the case) or the unreasonable manner in which the
> case was litigated. District courts may determine whether a
> case is "exceptional" in the case-by-case exercise of their
> discretion, considering the totality of the circumstances. As in
> the comparable context of the Copyright Act, "'[t]here is no
> precise rule or formula for making these determinations,' but
> instead equitable discretion should be exercised 'in light of
> the considerations we have identified.'"

46

*Id*. at 1756 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)).  In addressing

Rule 11 of the Federal Rules of Civil Procedure, the Court expressly held that

"sanctionable conduct is not the appropriate benchmark" for § 285 cases.  Under the

standard announced in *Octane*, "a district court may award fees in the rare case in

which a party's unreasonable conduct – while not necessarily independently

sanctionable – is nonetheless so 'exceptional' as to justify an award of fees" or "a case

presenting either subjective bad faith or exceptionally meritless claims."  *Id*. at 1757.  A

party seeking attorney fees under § 285 must prove the merits of their contentions by a

preponderance of the evidence.  *Id*. at 1758.

Plaintiffs allege that fee-shifting is appropriate here because defendants copied

the '070 formulation and defendants repeatedly shifted positions on key issues

throughout litigation, thereby unnecessarily compounding the number of disputed

issues.  Regarding the copying of the '070 patent, plaintiffs argue that defendants could

have copied one of many generic non-azelaic acid formulations (PTX 299) or an off-

patent azelaic acid cream (*see* D.I. 129 at 1079:4-20), but they instead decided to

pursue a Finacea® generic without first asking its legal team about liability implications.

(D.I. 126 at 279:17-280:13)  Regarding defendants' "moving target" litigation practices,

plaintiffs allege that defendants repeatedly took positions that were contrary to expert

testimony and its own prior statements.

Regardless of whether defendants "cleared" the generic 15% azelaic acid

composition with their legal department, the court accepts that defendants

demonstrated an intent to develop a non-infringing substitute.  (*See* JTX 54 at

GMG_VP001238; D.I. 127 at 217:14-218:2)  Moreover, as evidenced by the

47

considerable efforts expended by the court in reaching its infringement determination, the court is not persuaded that defendants were so lacking a good faith belief of non-infringement as to merit awarding exceptional case status under § 285. To the extent that some of defendants' arguments were unsupported or contradictory, the court does not find that defendants' conduct in the case was so one-sided or unreasonable as to rise to the level of "exceptional." Accordingly, the court does not find that this is an exceptional case under 35 U.S.C. § 285.

### D. Obviousness

Defendants argue that the asserted claims are obvious in view of Skinoren® cream in combination with (1) references disclosing hydrogel formulations containing the claimed excipients and (2) references disclosing hydrogel formulations containing azelaic acid.[40]

#### 1. Standard

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on underlying factual inquiries.

---

[40] Plaintiffs do not rebut Dr. Michniak-Kohn's conclusions that a person of ordinary skill in the art (hereinafter, "POSITA") as of February 12, 1998 is a scientist with a Master's or Ph.D., or its equivalent, in pharmaceutical science or its equivalent, or a medical degree. (D.I. 127 at 528:3-14) A skilled artisan would additionally have been involved in the research and development of pharmaceutical formulations and would have several years of experience in the field of topical pharmaceutical formulations, with the amount of post-graduate level experience dependent upon the level of formal education. (*Id.*)

48

> Under § 103, the scope and content of the prior art are to be
> determined; differences between the prior art and the claims
> at issue are to be ascertained; and the level of ordinary skill
> in the pertinent art resolved. Against this background the
> obviousness or nonobviousness of the subject matter is
> determined. Such secondary considerations as commercial
> success, long felt but unsolved needs, failure of others, etc.,
> might be utilized to give light to the circumstances
> surrounding the origin of the subject matter sought to be
> patented.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. *Id.* at 418-19. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. *Id.* at 419-20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420. In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, a defendant must also demonstrate that "such a person would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

A combination of prior art elements may have been "obvious to try" where there existed "a design need or market pressure to solve a problem and there [were] a finite

49

number of identified, predictable solutions" to it, and the pursuit of the "known options within [a person of ordinary skill in the art's] technical grasp" leads to the anticipated success. *Id.* at 421. In this circumstance, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.*

A fact finder is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 383 U.S. at 17–18.

"Because patents are presumed to be valid, see 35 U.S.C. § 282, an alleged infringer seeking to invalidate a patent on obviousness grounds must establish its obviousness by facts supported by clear and convincing evidence." *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006) (citation omitted). In conjunction with this burden, the Federal Circuit has explained that,

> [w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

50

## 2. Disclosure of non-azelaic acid prior art references[41]

### a. '752 PCT

The '752 PCT is entitled "Topical and Transdermal Delivery System Utilizing Submicron Oil Spheres." (DTX 72)  The '752 PCT was published on September 30, 1993, and the parties agree that it is prior art to the '070 patent.  (D.I. 118, ex. 1 at ¶ 60)  Dr. Michniak-Kohn testified that the '752 PCT was not considered by the Patent Office when examining the '070 patent.  (D.I. 127 at 625:2-5)  The '752 PCT discloses a composition that may be used to "reduce or prevent dermatological conditions and diseases."  (DTX 72 at GMG_0006401; D.I. 127 at 627:2-10)  The following table compares the ingredients disclosed in the '752 PCT with those in the claimed composition:[42]

| '070 Claimed Formulation | '752 PCT Formulation | '163 PCT Formulation |
|---|---|---|
| Azelaic Acid | Insoluble drugs or cosmetically active substances.  (DTX 72 at GMG_0006402; D.I. 127 at 627:16-20) | A "wide variety" of drugs. (DTX 73 at BMB_006442) |
| Triacylglyceride (0.5 - 5%) | Medium chain triglycerides at a concentration of "0.5 to 30%."  (DTX 72 at GMG_0006399; D.I. 127 at 626:13-18) | Triglycerides (4.0 - 20%). (DTX 73 at GMG_0006451; '070 patent, col. 1:57-60) |

---

[41] PCT Application Pub. No. WO 93/18752 ("the '752 PCT") and PCT Application Pub. No. WO 95/05163 ("the '163 PCT").

[42] The various concentration ranges recited next to the claimed excipients were taken from the broadest range recited in the dependent claims.

51

| Propylene Glycol (5 to 15%) | Glycerol[43] | Glycerol (1%)[44] |
|---|---|---|
| Polysorbate (0.5 - 3%) | TWEEN (~0.2 – 5%). (DTX 73 at GMG_0006405; D.I. 127 at 627:25-628:6) | Polysorbate (1%). (DTX 73 at GMG_0006451-53; '070 patent, col. 1:58-60) |
| Aqueous phase containing salts | Aqueous phase containing salts. (DTX 72 at BMB_0006495-06; D.I. 127 at 628:20-25) | Aqueous phase containing salts. (DTX 73 at GMG_0006451-53; '070 patent, col. 1:61) |
| Polyacrylic acid (0.5 - 2%) | Carbopol® as a "gelling agent" (~0.2 - 15%). (DTX 72 at GMG_0006406; D.I. 127 at 629:7-630:4; D.I. 127 at 983:4-12) | Carbopol® (0.1%). (DTX 73 at GMG_0006451-53; '070 patent, col. 1:57) |
| Lecithin (>0 - 3%) | Lecithin (~0.2 - 5%). (DTX 72 at GMG_0006399-400; D.I. 127 at 626:21-627:1) | Lecithin (0.65 or 0.06%). (DTX 73 at GMG_0006451; '070 patent, col. 1:60-61) |
| Pharmacological adjuvant or vehicle[45] | Conventional additives and preservatives and EDTA. (DTX 72 at GMG_0006406, -18; D.I. 127 at 629:1-633:1) | Various suitable chelating agents. (DTX 73 at GMG_0006446) |
| Benzoic acid[46] | None. (D.I. 128 at 882:7-12) | None. (D.I. 128 at 894:22-23) |

In place of azelaic acid, the '752 PCT discloses "[i]nsoluble drugs or cosmetically active substances" such as antibacterial agents. (DTX 72 at GMG_0006402; D.I. 127 at 627:16-20) Dr. Michniak-Kohn testified that azelaic acid is an insoluble drug. (*Id.*) In

---

[43] Dr. Michniak-Kohn testified that a POSITA would have understood that propylene glycol and glycerol were interchangeable. (D.I. 127 at 631:5-13)

[44] The '070 patent credits the '163 PCT with the disclosure of propylene glycol, a disclosure that both experts agree was in error. (D.I. 128 at 894:24-896:6; D.I. 127 at 662:5-12)

[45] Recited only in dependent claim 7 of the '070 patent.

[46] Recited only in dependent claim 12 of the '070 patent.

A00053

contrast, Dr. Weiner opined that none of the active ingredients disclosed in the '752

patent are "structurally related to azelaic acid." (D.I. 128 at 882:7-12)

The critical dispute between the parties is whether the '752 PCT discloses a

hydrogel or an emulsion. Dr. Michniak-Kohn explained that the '752 PCT discloses two

ways to form a "viscous composition:" (1) "the oily liquid may be present in an amount

of about 20 to 30%;" or (2) "one or more adjuvants such as gelling agents or thickening

agents may be included." (DTX 72 at GMG_0006399; D.I. 127 at 629:7-630:4)

Example 30 of the '762 PCT describes adding Carbopol® and neutralizing the solution,

which defendants argue is consistent with gel formation. (DTX 72 at GMG_0006420-

21) Plaintiffs argue that the '752 PCT describes the composition as "oil spheres in an

aqueous suspension or emulsion," not a gel. (*Id.* at GMG_0006395) Additionally, the

'752 PCT describes the viscosized compositions as being "useful as creams or

ointments" (*id.* at GMG_0006409), and the neutralized solution in example 30 as a

"homogenous cream" (*id.* at GMG_0006421).

For all of the asserted prior art references, the parties' experts reach opposite

conclusions concerning the disclosure of a hydrogel. The parties appear to agree on

the fundamental concept that hydrogels (which have a three dimensional structure)[47]

and emulsions (which contain two liquid phases)[48] are different dosage forms. (D.I. 127

at 673:6-674:19; D.I. 128 at 937:19-938:8; D.I. 126 at 295:16-21) As mentioned in the

---

[47] Dr. Franke explained that, unlike emulsions, hydrogels are "basically a one phase aqueous system consisting of . . . a three-dimensional backbone system, which is made of polymers most of the time." (D.I. 125 at 64:24-65:9)

[48] Dr. Franke testified that an emulsion is "a minimum two-phase dispersed system consisting of a lipid, an oily phase and an aqueous phase, normally stabilized by modifiers" such as emulsifiers. (D.I. 125 at 62:9-17)

53

court's claim construction, *supra*, the oft-used description of a hydrogel "containing" an emulsion creates unnecessary confusion where the parties agree that an emulsion, by definition, does not have a three dimensional structure. The parties do accept that a low-viscosity liquid (potentially in the form of an emulsion) may be turned into a hydrogel. ('070 patent, col. 5:22-38; D.I. 129 at 1030:3-1031:7; D.I. 125 at 79:8-80:8) The parties disagree, however, as to how and when a hydrogel is formed given the excipients-at-issue. As set forth in a pharmaceutical bulletin for the properties of Lubrizol ("the Lubrizol Bulletin") (JTX 31), the concentration of the Carbopol® polymer, the type of Carbopol® polymer, and the pH of the solution all impact viscosity, with viscosity increasing along a parabolic curve in response to increased concentration or pH. (*See* JTX 31; D.I. 128 at 743:9-18) Neither expert was able to pinpoint the exact point at which the solution changes from merely "viscous" to a "hydrogel." (*See, e.g.*, D.I. 128 at 939:6-12; 951:4-7) Given the lack of a clear scientific threshold, the court considers the representation of the prior art authors to be the best authority regarding the "true" dosage form of the disclosed compositions.[49]

Here, although the '752 PCT discloses Carpobol® plus neutralization, the authors describe the resulting composition as an "emulsion," "cream" or "ointment," but never a "gel." Although the '752 PCT does disclose a large number of highly similar or identical excipients to the claimed composition, the court finds that it does not disclose a "hydrogel." Moreover, there is no dispute that the '752 PCT does not literally disclose

---

[49] The court is unpersuaded by defendants' arguments that a POSITA might refer to a gel as an emulsion given that gels can "contain" emulsions, as the parties agree on a fundamental level that gels and emulsions are different dosage forms.

54

azelaic acid, so court addresses, *infra*, whether a POSITA would modify the disclosure
in the '752 PCT to include azelaic acid in a hydrogel form.

### b. '163 PCT

The '163 PCT is entitled "Bioadhesive Emulsion Preparations for Enhanced Drug
Delivery." (DTX 73) The '163 PCT was published on February 23, 1995, and is
identified as prior art in the specification of the '070 patent. ('070 patent, col. 1:50-62)
The '070 patent states that the '163 PCT discloses all of the limitations of the '070
claimed formulation, with the exception that it is in the form of an emulsion and does not
contain azelaic acid. (*See* table, *supra*) The '163 PCT provides a list of potentially
suitable drugs, stating that "[t]he pharmacological activity of a wide variety of drugs
render them suitable for use in bioadhesive emulsion formulations, to treat a number of
conditions." (DTX 73 at GMG_006442) Just as with the '752 PCT, Dr. Weiner opined
that none of the disclosed drugs is structurally related to azelaic acid. (D.I. 128 at
893:15-22) The '163 PCT states that "[m]any of the drugs listed above are poorly
soluble in water" and "[l]ow bioavailability of such drugs severely limits their applicability,
usage and effectiveness. Incorporation of such drugs into mucoadhesive emulsions of
the present invention increase their bioavailability." (*Id.*) Specifically, the '163 PCT
reports more effective drug delivery into the eye using the Carbopol®-containing
emulsion as compared to a Carbopol®-free emulsion. (DTX 73 at GMG_0006456) Dr.
Weiner questioned the applicability of experiments done in mucus membranes such as
the cornea of the eye to the stratum corneum, which is more difficult for drugs to
penetrate. (D.I. 128 at 892:17-895:12)

55

Dr. Michniak-Kohn testified that the '163 PCT discloses a hydrogel because the composition combines water and the gelling agent Carbopol® along with a neutralization step. (D.I. 127 at 636:7-14; DTX 73 at GMG_0006432-33, 51 (example 4)) Plaintiffs respond that, by its very title, the '163 PCT characterizes the composition as an emulsion, not a gel. (DTX 73 at GMG_0006430; D.I. 128 at 896:16-897:19) Plaintiffs point out that in one example, addition of Carbopol® resulted in a drop in viscosity. (DTX 73 at GMG_6460-62; D.I. 128 at 897:13-22) Just as in the '752 PCT, the authors of the '163 PCT describe combining Carbopol® with neutralization, but characterize the resulting composition as an "emulsion," not a "gel." Accordingly, the court finds that the '163 PCT discloses a large number of highly similar or identical excipients to the claimed composition, but does not disclose such ingredients in "hydrogel" form.

### 3. Disclosure of azelaic acid prior art references

#### a. Maru

Defendants identify an article titled (in translation) "In Vitro Diffusion and Cutaneous Permeation of Azelaic Acid from Dermic Preparations: Research of Correlations" by U. Maru et al. ("Maru") as relevant prior art that discloses a hydrogel formulation containing azelaic acid. (DTX 64) Maru was published in 1982, and the parties agree that it is prior art to the '070 patent. (DTX 64 at GMG_0136983; D.I. 118, ex. 1 at ¶ 64) Maru discloses three azelaic acid formulations, including a "gel ointment" containing azelaic acid, Carbopol® 934, propylene glycol, ethyl alcohol and water. (DTX 64 at GMG_0136983) Maru compared the skin permeation of azelaic acid in the three compounds and concluded that "the gel formulation was revealed to be the most

56

active" in terms of permeability of azelaic acid as compared to the cream and the anhydrous ointment. (*Id.* at GMG_0136987; D.I. 127 at 645:22-646:10) Dr. Weiner opined that these results differ from the '070 penetration results in that the '070 patent reported both enhanced penetration and less flow-through as compared to the reference product. (D.I. 128 at 917:23-918:13)

Defendants argue that Maru discloses a hydrogel because it contains a gelling agent at a concentration of 5% and water, although defendants concede that no neutralization step is described. (D.I. 127 at 534:6-17; 645:8-14) Dr. Michniack-Kohn testified that "[b]y the broad definition of a three-dimensional structure being a gel, you do not need neutralization" of a polymer such as Carbopol® to form a gel.[50] (D.I. 128 at 743:15-20) Defendants argue that, by comparing figure 8 to figure 1 of the Lubrizol Bulletin, it is evident that a 5% Carbopol® 934 solution has a higher viscosity than is required for gel formation. (JTX 31 at BAYER0544944) Although Dr. Weiner maintained that neutralization of Carbopol® is required for gel formation, he agreed that Carbopol® 934 at 5% would yield "an extremely viscous product . . . [e]ven without neutralizing." (D.I. 126 at 304:20-305:5; D.I. 129 at 979:3-21; JTX 31 at BAYER0544944)

The court agrees with defendants that Maru discloses a hydrogel formulation containing azelaic acid. As explained, *supra*, the court gives weight to the authors' description of the disclosed composition. Here, the authors describe the composition as a "gel ointment," and even contrast the gel with the cream and anhydrous ointment.

---

[50] Plaintiffs argue that Dr. Michniak-Kohn was impeached with her own deposition testimony in which she admitted that Carbopol® "certainly isn't gelling until you neutralize it." (D.I. 127 at 680:1-14)

57

The court finds the expert testimony regarding the necessity of neutralization to hydrogel formation to be largely unhelpful, with both experts offering conflicting views on the science and on the proper interpretation of the graphs in the Lubrizol Bulletin. Plaintiffs recognize that, while Maru does not disclose a neutralization step, Maru also does not disclose the pH of the composition. (DTX 64; D.I. 127 at 679:22-680:24)  Even if the court were to accept that neutralization is required for gel formation, the court is again left guessing as to the "true" dosage form in the absence of any expert testimony regarding the likely pH of the disclosed solution and the predicted viscosity at that pH given the percentage of Carbopol®.[51]  As such, the court relies on Maru's own characterization of the composition and determines that Maru discloses a hydrogel.

### b. Gasco

Gasco was published in 1991, and the parties stipulate that it is prior art to the '070 patent. (DTX 59 at GMG_0006359; D.I. 188, ex. 1 at ¶ 66)  Gasco reportedly improved on a prior art microemulsion that "could not be applied on the skin because of [its] fluidity" by viscosizing the microemulsion through the addition of Carbopol® 934. (DTX 59 at GMG_0006359; D.I. 127 at 682:10-22)  Dr. Michniak-Kohn testified that Gasco disclosed a hydrogel because the composition contained Carbopol® 934 and water, although she agreed that the microemulsion had a pH of 3.0.  (D.I. 127 at 602:19-603:22, 682:23-25)  Plaintiffs respond that no hydrogel was formed because the Lubrizol Bulletin shows no gel formation below pH 4.0 for the grade of Carbopol® used in Gasco.  (JTX 31 at BAYER549942-44)  Gasco performed Franz cell penetration

---

[51] The court is instead presented with attorney argument that the pH is lower than that required for gel formation because there is no "room" for a neutralizing agent. (D.I. 133 at 16-17)

58

studies comparing the viscosized microemulsion against the "gel" disclosed in Maru, but did not measure the amount of azelaic acid remaining in the skin. (DTX 59 at GMG_6361; D.I. 128 at 690:7-12) Gasco reported increased permeation of azelaic acid in the viscosized microemulsion as compared to both the gel and the prior art fluid microemulsion. (DTX 59 at GMG_0006361-62)

As with the preceding references, the court first examines the representation of the prior art author regarding the dosage form of the disclosed composition. Here, the authors of Gasco describe the composition as a viscosized "microemulsion," although they readily identify the composition in Maru as a "gel." The Lubrizol Bulletin also supports the conclusion that the composition is a microemulsion in that it shows no gel formation at a pH of 3.0 given the particular grade of Carpobol® used in Gasco. Accordingly, the court concludes that Gasco does not disclose a hydrogel.

### c. Pattarino

Defendants identify an article entitled "Topical delivery systems for azelaic acid: Effect of the suspended drug in microemulsion: by F. Pattarino et al. ("Pattarino") as a prior art reference. (DTX 67) Pattarino was published in 1994, and the parties stipulate that it is prior art to the '070 patent. (DTX 67 at GMG_0137017; D.I. 118, ex. 1 at ¶ 67) Dr. Michniak-Kohn testified that Pattarino improved upon the work of Gasco by adding an increased quantity of azelaic acid. (D.I. 127 at 670:6-671:7; DTX 67 at GMG_1037018) The composition with the smallest amount of azelaic acid showed the greatest penetration, but the results were difficult to interpret given the possibility of undissolved azelaic acid obstructing the flow-through. (DTX 67 at GMG_0137018) As the court has concluded that Gasco does not disclose a hydrogel and there is no

59

evidence that increasing the amount of azelaic acid alone would convert a
microemulsion into a hydrogel, the court finds that Pattarino similarly does not disclose
a hydrogel.

#### d. '943 patent

U.S. Patent No. 5,385,943 ("the '943 patent") is titled "Use of Topically Applicable
Preparations for Treatment of Presbyderma" and issued on January 31, 1195. (DTX
71) The parties stipulate that the '943 patent is prior art to the '070 patent. (D.I. 118,
ex. 1 at ¶ 62) The '943 patent describes using "topically applicable preparations"
containing dicarboxylic acids to treat skin conditions. (DTX 71 at GMG_006391) In the
preferred embodiment, the '943 patent describes using azelaic acid in a concentration
of 5 to 30% as the dicarboxylic acid. (DTX 71 at GMG_0006392-93; D.I. 127 at 638:17-
19) The excipients include a "fatty phase, oil/water emulsifier, aqueous phase and
preservatives." (DTX 71 at GMG_0006392) The '943 patent also discloses "moisture-
holding factors" such as propylene glycol and "emulsifiers" such as Carbopol®, but does
not disclose lecithin. (*Id.* at GMG_0006392; D.I. 127 at 639:3-13; D.I. 127 at 651:8-13)
Dr. Weiner opined that thousands of combinations of formulations could be created from
the "laundry list" of named ingredients. (D.I. 128 at 905:7-23) Plaintiffs highlight the fact
that the '943 patent discusses "milk, lotion or cream (oil/water emulsions)" and
"ointments (water/oil emulsions)," but does not disclose a gel. (DTX 71 at
GMG_0006392; D.I. 128 at 904:20-905:1)

The '943 patent suffers from the same deficiencies as several other prior art
references at issue; namely, the authors describe various potential dosage forms
including "lotion," "cream," or "ointment," but exclude any mention of gels. Additionally,

60

the '943 patent describes Carbopol® as an "oil/water emulsifier" and does not list a
neutralization step or specify a baseline pH. (D.I. 118, ex. 3 at ¶ 70; DTX 71 at col.
2:48-57) As such, nothing in the record compels the court to conclude that the '943
patent discloses anything more than a composition in cream or ointment form.

### e. '119 PCT

PCT Application Pub. No. WO 93/39119 ("the '119 PCT") is entitled "Topical
Vehicles Containing Solubilized and Stabilized Azelaic Acid." (DTX 74) The '119 PCT
was published on December 12, 1996, and is prior art to the '070 patent. (D.I. 118, ex.
1 at ¶ 63) The '119 PCT discloses "[a] completely solubilized topical composition of
azelaic acid in a glycol base which is stable at normal temperatures and pressures."
(DTX 74 at GMG_0006485) The '119 PCT achieves a solubilized composition by
adding a glycol (such as propylene glycol), which "easily and completely dissolves the
azelaic acid without affecting the stability of the azelaic acid." (*Id.* at GMG_0006491-92)
Example 2 discloses a cream formulation that may alternatively be a "translucent gel"
"by removing the glycol distearate therefrom." (*Id.* at GMG_0006494) Plaintiffs argue
that Dr. Michniak-Kohn could not explain how removing glycol distearate would result in
gel formation. (D.I. 127 at 642:5-655:2, 677:21-678:5) Plaintiffs also note that the '119
PCT does not disclose polysorbate, lecithin or polyacrylic acid, nor does it specifically
mention triglycerides. (*Id.* at 651:14-19; D.I. 128 at 910:15-20; DTX 74 at
GMG_0006492)

Although the authors of the '119 PCT described the formulation as a "translucent
gel," the '119 PCT does not disclose how removal of glycol distearate would result in gel
formation, and defendants' expert was similarly unable to explain the phenomenon. As

61

the transition from a cream to a "translucent gel" through removal of a single excipient is
unsupported by any evidence of record, the court concludes that the '119 PCT does not
disclose a hydrogel.

### 4. Motivation to combine

Dr. Michniak-Kohn opined that Skinoren® cream would be the "starting point" for
a POSITA who had already identified the relevant disease and drug. (D.I. 127 at
621:17-622:14)  From there, a person of ordinary skill working in industry would look for
"an alternative product," considering "cream, gels, ointments" and "topically applied
formulations." (*Id.*)  Dr. Michniak-Kohn testified that a person of ordinary skill in the art
would have questioned whether "to remain with a cream or . . . look at another
formulation," considering "interesting data . . . that would have led [a POSITA] to . . .
really consider hydrogels as a possible option." (*Id.* at 623:25-624:7)  Defendants argue
that the '163 PCT (DTX 73 at GMG_0006456), Maru (DTX 64 at GMG_0136987) and
Gasco (DTX 59 at GMG_0006362) all demonstrate improved drug delivery with
hydrogel formulations which would motivate a POSITA to reformulate Skinoren® cream
as a hydrogel.  Dr. Michniak-Kohn agreed that "a person of ordinary skill in the art as of
1998 [would] have had a reasonable expectation of success in making an azelaic acid
gel formulation instead of a cream formulation." (D.I. 127 at 657:10-14)  As additional
motivation to develop Skinoren® into a hydrogel, defendants cite Hoffman's testimony
that the developers of Finacea® hoped to "come up with a second formulation on the
market . . . to increase sales." (D.I. 128 at 761:2-6)

For the reasons discussed, *supra*, the court finds that of all the named prior art
references, only Maru discloses a hydrogel formulation.  The court accepts that a

62

POSITA would consider developing an alternative product to Skinoren® in a different

dosage form given the market forces (D.I. 128 at 761:2-6) and the agglomeration

instability and cosmetic deficiencies of Skinoren® cream (D.I. 125 at 63:8-15, 77:4-10).

Although the developers of Finacea® were skeptical about reformulating as a hydrogel

given the possibility that the active ingredient would be trapped in the hydrogel matrix

(D.I. 125 at 66:12-18), it is the court's opinion that such reservations would not prevent

further development, especially given Maru's report of a successful azelaic acid-

containing hydrogel formulation. The decision to pursue a hydrogel formulation would

be further reinforced by Maru's report of increased permeability of azelaic acid with the

gel formulation as compared to the cream and anhydrous ointment.[52] (DTX 64 at

GMG_0136987; D.I. 127 at 645:22-646:10)

        Having found that a POSITA would pursue a hydrogel formulation, the relevant

question then becomes whether a POSITA would combine the disclosure of the azelaic-

acid containing hydrogel from Maru[53] with the prior art in a manner that make obvious

claim 1 of the '070 patent. At trial, Dr. Michniak-Kohn provided testimony regarding two

prior art combinations: (1) Gasco and the '752 PCT; and (2) the '163 PCT with the '119

PCT. (D.I. 127 at 652:7-655:25) Defendants do not specifically address either

combination in their post-trial briefing. Rather, defendants urge the court to consider the

_____

[52] Even though Gasco later reporter greater azelaic acid permeation with its
viscosized microemulsion as compared to Maru's gel (DTX 59 at GMG_0006361), the
court is not convinced that this report, in isolation, "teaches away" from pursuing a gel
formulation.

[53] Although defendants argue that a POSITA could begin with an emulsion (such as
those disclosed in Gasco or the '163 PCT), convert it to a hydrogel and then combine
the hydrogel with either the '752 PCT or the '163 PCT, this method of combination was
not addressed by defendants' expert and amounts to pure attorney argument. (D.I. 131
at 33)

63

combination of two "buckets" of references, namely, those that disclose formulations
containing the claimed excipients in the form of a hydrogel (the '752 PCT and '163 PCT)
with those that disclose azelaic acid in the form of a hydrogel, but that do not contain all
of the claimed ingredients (Maru, Gasco, Pattarino, the '943 patent and the '119 PCT).
As support for this group-wise combination, defendants apparently rely on Dr. Michniak-
Kohn's statement at trial that a POSITA "could have put . . . information together from
another two publications" to render obvious claim 1. (D.I. 127 at 656:7-17) Such a
cursory statement, without more, cannot satisfy defendants' burden to demonstrate, by
clear and convincing evidence, that a POSITA would be motivated to combine Maru
with either the '752 PCT or the '163 PCT. Any attempt by the court to manufacture a
motivation to combine the references-at-issue without guiding testimony or evidence
would amount to pure speculation.

Even if the court were presented with a fully-developed record on motivation to
combine, defendants have not carried their burden to demonstrate a reasonable
expectation of success in making the combination. Contrary to defendants'
representation, Dr. Michniak-Kohn never testified as to the "routine nature of optimizing
a formulation," but instead provided pointed testimony regarding swapping particular
excipients in two specific combinations. (See D.I. 127 at 653:22-654:1, 655:13-1,
659:19-660:10) Defendants' own substantial efforts to swap ingredients to create a
bioequivalent formula, coupled with testimony from both experts that excipients and the
active ingredient react differently depending on the formulation (D.I. 126 at 296:9-14;
D.I. 128 at 693:18-694:2, 879:23-880:13), leads the court to understand that swapping
ingredients in complex chemical formulations is anything but "routine." The court was

not presented with testimony or other evidence regarding the expectation of success in swapping ingredients in the specific combination(s)-at-issue and, therefore, cannot conclude that defendants have carried their burden in this regard.

### 5. Secondary considerations[54]

Plaintiffs argue that the patented composition is nonobvious in light of: (1) the unexpected Franz diffusion cell results; (2) the commercial success of Finacea®; and (3) defendants' copying of the hydrogel.

#### a. Unexpected results

Plaintiffs argue that the Franz diffusion cell test reported in example 2 of the '070 specification was unexpected in that more azelaic acid both penetrated and remained in the skin. (D.I. 125 at 158:14-19) In Dr. Günther's words, this finding was contrary to the expectation that "the concentration in the skin and receptor fluid would point in the same . . . relationship direction." (*Id.* at 158:3-5) Plaintiffs argue that the Franz cell study is predictive of clinical effectiveness to the extent that both plaintiffs and defendants used the data to select compounds for further clinical study. (D.I. 126 at 241:4-7, 311:15-22; JTX 41 at GMG_15047) Additionally, in its formulation comparison report that was submitted to the FDA, defendants wrote that "[t]he [Franz cell] method has historic precedent for accurately predicting in vivo percutaneous absorption kinetics." (JTX 38 at GMG_0012957) As detailed, *supra*, the Franz diffusion cell results were confirmed by the scarification test comparing the efficacy of Finacea® to Skinoren® in human

---

[54] The court reads *In re Cyclobenzaprine*, *supra*, as requiring a review of such evidence even where it is apparent that defendants cannot meet their burden to prove obviousness by clear and convincing evidence.

65

subjects.[55] (DTX 92; DTX 111 at BAYER0384619; D.I. 129 at 1038:23-1039:3)

Plaintiffs admit that the 8-week double-blind pilot study comparing Finacea® and

Skinoren® cream in patients with papulopustular facial acne did not yield statistically

significant results, but argue that a population size of 30 would be unlikely to yield

statistical significance. (D.I. 125 at 165:4-7; JTX 11 at BAYER0154370)

Although defendants express concern about the reliability of the Franz cell study

given the study design and lack of statistical analysis (D.I. 125 at 178:10-15; 179:11-14;

175:1-3), the court is willing to accept the results of the study if for no other reason than

that the results were confirmed by defendants' own Franz cell test comparing Finacea®

and batch 041. (JTX 38 at GMG_0012949) Defendants do not dispute Dr. Günther's

testimony that the penetration profile, as reported, shows an unexpected relationship

between penetration and retention. To the extent that the unexpected in vitro results

must be verified by in vivo clinical trials, the court is persuaded that the scarification test

adequately confirmed the in vitro results. Although the scarification test did not gather

data regarding absorption of azelaic acid, hydrogel B had higher reaction scores than

Skinoren® (DTX 111 at BAYER384643-44), a difference that scientists involved in the

development of Finacea® interpreted as "indicat[ing] higher release of azelaic acid from

the type B AzA gel than from the azelaic acid 20% cream." (DTX 92; *see also* JTX 13 at

---

[55] Defendants argue that the scarification test does not confirm the Franz cell results because plaintiffs produced no expert testimony at trial regarding the study. However, defendants themselves admitted into evidence a presentation by two scientists involved in the development of Finacea® in which the authors conclude that "[t]he differences in scores also indicate higher release of azelaic acid from the type B AzA gel than from the azelaic acid 20% cream, despite its lower nominal strength, **confirming the results of the hairless mouse Franz flow-through diffusion cell study**." (DTX 92) (emphasis added)

66

BAYER219860) Defendants also argue that the scarification study cannot support a finding of unexpected results because it demonstrated that Finacea® performed worse than Skinoren® in terms of skin irritation. (DTX 111 at BAYER0384621) In an article titled "The Rationale for Advancing the Formulation of Azelaic Acid Vehicles" (JTX 13), Dr. Zoe Diana Draelos wrote that "[b]ecause a higher drug concentration in the viable skin favors a higher therapeutic effectiveness, the type B formulation was selected for final clinical development even though it appeared to be more irritating than AzA gel type A." (JTX 13 at BAYER0219860) This statement indicates that the drug delivery benefits of Finacea® outweighed any undesirable increase in local skin irritation. Altogether, the court finds that unexpected results weigh in favor of nonobviousness.

### b. Commercial success

Plaintiffs also claim that the success of Finacea® supports a finding of nonobviousness. Plaintiffs cite evidence that Finacea® is the number one prescribed branded topical treatment for rosacea in the United States with net sales exceeding $562 million. (D.I. 128 at 799:7-13; D.I. 129 at 1063:3-8; PTX 40 at BAYER138709; PTX 300) Mr. Ivan Hofman, defendants' rebuttal expert, agreed that "net sales have increased every year [since] Finacea® was introduced in 2003." (D.I. 129 at 1064:7-19; PTX 302; PTX 303) Although at the time of Finacea's® launch in March of 2003, there were no "other azelaic acid products on the market for the treatment of rosacea" (D.I. 128 at 778:21-24), it competed with "several other branded products" with metronidazole as the active ingredient (D.I. 128 at 832:14-834:14). Mr. John C. Jarosz, plaintiffs' expert on commercial success, testified that the composition of components in Finacea®, as a whole, delivered the benefits of increased bioavailability, greater

67

efficacy, and favorable cosmetic properties. (D.I. 128 at 843:11-844:1; *see also* JTX 19 at BAYER427623; PTX 140; PTX 13 at BAYER30453)

When a patentee offers objective evidence of nonobviousness, there must be a sufficient relationship between that evidence and the patented invention." *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994). "A prima facie case of nexus is made when the patentee shows both that there is commercial success, and that the product that is commercially successful is the invention disclosed and claimed in the patent." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310–11 (Fed. Cir. 2010). Commercial success must be "due to the merits of the claimed invention beyond what was readily available in the prior art." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *see also Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007).

Defendants do not dispute that Finacea® embodies the product disclosed and claimed in the patent. (D.I. 118, ex. 1 at ¶¶ 24-37) Instead, defendants argue that plaintiffs have failed to establish a prima facie case of nexus because commercial success was driven by ingredients in the claimed composition that were known in the prior art. Specifically, defendants argue that azelaic acid was known to be effective at treating skin disorders (DTX 113 at BAYER0435023; D.I. 126 at 300:17-301:4; D.I. 129 at 1020:3-8) and hydrogel formulations were known to be effective and well tolerated (D.I. 129 at 1018:19-1019:6). The court finds defendants' rationale unpersuasive where, as here, no ingredient or element on its own demonstrates the desirable characteristics of the claimed composition such as increased bioavailability and favorable cosmetic properties. (*See, e.g.*, D.I. 129 at 1031:13-18 (Dr. Michniak-Kohn

68

admitted that azelaic acid powder cannot be applied directly on the skin)) The fact that Finacea® also causes increased skin irritation is further testament to the desirability of the positive attributes of the composition.

Defendants offer evidence to rebut plaintiffs' prima facie case of nexus including a third-party assessment of the market for Finacea®, which concluded that "the frequency of sampling [is] a significant factor in the prescribing decisions for Finacea®. (D.I. 129 at 1058:9-25; DTX 136 at BAYER0047118) In addition to sampling, defendants point to plaintiffs' marketing campaign (D.I. 129 at 1059:1-18) and use of discounts (Id. at 1061:1-1062:10) as the predominant drivers of commercial success. Plaintiffs respond that marketing did not drive sales given that Bayer's marketing budget is dependent on the prior year's sales. (D.I. 128 at 784:15-22) Plaintiffs also argue that Finacea's® sampling and coupon programs are designed to stay competitive with other products. (D.I. 128 at 789:13-791:11; D.I. 129 at 1087:13-19) Finally, plaintiffs argue that the third-party assessment concluded that Metrogel, not Finacea®, was one of the top 5 drugs prescribed nationally with a sample. (D.I. 128 at 1087:2-1088:6; DTX 158 at GMG_137607) The court concludes that, even if Finacea® is heavily marketed and sampling is a "significant factor" driving prescriptions, defendants have not negated the possibility that the merits of the claimed composition also drive prescriptions and sales. As such, the court concludes that commercial success weighs toward a finding of nonobviousness.

### c. Copying

Finally, citing substantially the same facts set forth by the court in section II.A.3.b, *supra*, plaintiffs argue that defendants copied the '070 patent and Finacea® to make

69

their generic gel.  Plaintiffs further argue that defendants' alleged copying was

particularly egregious given the availability of non-infringing alternatives such as

Skinoren® cream and various metronidazole-based formulations.  The Federal Circuit,

however, has held that it "do[es] not find compelling . . . evidence of copying in the

ANDA context where a showing of bioequivalency is required for FDA approval."

*Purdue Pharma Products LP v. Par Pharm., Inc.*, 377 Fed.Appx. 978, 983 (Fed. Cir.

2010); *see also Bayer Healthcare Pharm., Inc. v. Watson Pharm., Inc.,* 713 F.3d 1369,

1377 (Fed. Cir. 2013) ("[C]opying in the ANDA context is not probative of

nonobviousness because a showing of bioequivalence is required for FDA approval.").

Accordingly, the court finds that, even if the process of reverse-engineering Finacea®

amounted to copying of the '070 patent, such conduct is not persuasive evidence of

nonobviousnessness.

### 6. Conclusion on obviousness

The court finds that defendants have not met their burden to prove, by clear and

convincing evidence, that claims 1-12[56] of the '070 patent are invalid for obviousness.

The court also finds that the secondary considerations of unexpected results and

commercial success, but not copying, support this finding of nonobviousness.

## III. CONCLUSION

For the foregoing reasons, the court finds that defendants infringe the asserted

claims of the '070 patent, and that the '070 patent is valid.  An appropriate order shall

issue.

_____

[56] Although the court's analysis focused on independent claim 1, dependent claims
2-12, which add additional limitations, are not obvious as a matter of law.  *See Ortho-
McNeil Pharm, Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).

70

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTENDIS GMBH, INTRASERV GMBH & CO. KG and BAYER HEALTHCARE PHARMACEUTICALS INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 13-421 (SLR) |
| GLENMARK PHARMACEUTICALS LIMITED and GLENMARK PHARMACEUTICALS INC., USA., | ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington this 24th day of July, 2015, consistent with the memorandum

opinion issued this same date;

IT IS ORDERED that:

1. Defendants infringe the asserted claims of the '070 patent.

2. The asserted claims of the '070 patent are valid.

3. The clerk of court is directed to enter judgment in favor of plaintiffs and

against defendants.

_____
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTENDIS GMBH, INTRASERV GMBH    )
& CO. KG and BAYER HEALTHCARE    )
PHARMACEUTICALS INC.,    )
    )
    Plaintiffs,    )
    )
    v.    ) C.A. No. 13-421 (SLR)
    )
GLENMARK GENERICS LIMITED and    )
GLENMARK PHARMACEUTICALS INC., USA,  )
    )
    Defendants.    )

### [PROPOSED] AMENDED JUDGMENT

Whereas the Court issued its post-trial Memorandum Opinion and Order and entered Judgment on July 27, 2015 stating that "IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of plaintiffs and against defendants," the Judgment is hereby amended in its entirety as follows:

IT IS HEREBY ORDERED AND ADJUDGED on this ~~14th~~ day of ~~August~~ , 2015, that:

1. Plaintiffs Intendis GmbH, Intraserv GmbH & Co KG, and Bayer HealthCare Pharmaceuticals Inc. ("Bayer") asserted claims 1-12 of U.S. Patent No. 6,534,070 ("the '070 patent");

2. Judgment is hereby entered in favor of plaintiffs Bayer and against defendants Glenmark Generics Ltd. and Glenmark Pharmaceuticals Inc., USA ("Glenmark") in accordance with the Court's Memorandum Opinion and Order dated July 27, 2015;

3. Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any approval of Glenmark's Abbreviated New Drug Application No. 204637 under § 505(j) of the Federal Food, Drug & Cosmetic Act (21 U.S.C. § 355(j)) for the drug product described therein ("Glenmark's

ANDA Product") shall be a date not earlier than the November 18, 2018 expiration of the '070 patent; and

        4.    In accordance with 35 U.S.C. § 271(e)(4)(B), Glenmark, its officers, agents, servants, employees, and attorneys, other persons who are in active concert or participation with them, and any person or entity to whom Glenmark transfers Abbreviated New Drug Application No. 204637 are enjoined from engaging in the commercial manufacture, use, offer to sell (as defined in 35 U.S.C. § 271(i)) and/or sale of Glenmark's ANDA Product within the United States or importing Glenmark's ANDA Product into the United States until after the November 18, 2018 expiration of the '070 patent.

 

                                                _____

                                    UNITED STATES DISTRICT JUDGE



U 7414673

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME;

### UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 25, 2013

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *6,534,070*
ISSUE DATE: *March 18, 2003*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. LAWRENCE
Certifying Officer

Intendis GmbH et al. v.
Glenmark Generics Limited et al.
1:13-cv-00421-SLR

**Joint Trial Exhibit**

**JTX-1**

BAYER0000001



US006534070B1

(12) **United States Patent**
Franke et al.

(10) Patent No.: **US 6,534,070 B1**
(45) Date of Patent: **Mar. 18, 2003**

(54) **COMPOSITION WITH AZELAIC ACID**

(75) Inventors: **Patrick Franke**, Berlin (DE); **Clemens Günther**, Berlin (DE); **Jutta Riedl**, Inzlingen (DE)

(73) Assignee: **Schering Aktiengesellschaft**, Berlin (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/554,738**

(22) PCT Filed: **Nov. 18, 1998**

(86) PCT No.: **PCT/EP98/07370**

§ 371 (c)(1),
(2), (4) Date: **Aug. 21, 2000**

(87) PCT Pub. No.: **WO99/25332**

PCT Pub. Date: **May 27, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/074,850, filed on Feb. 12, 1998.

(30) **Foreign Application Priority Data**

Nov. 19, 1997  (DE) ........................................ 197 53 044
Feb. 20, 1998  (DE) ........................................ 198 08 086

(51) Int. Cl.$^7$ ........................... **A61K 9/00**; A61K 6/00; A61K 9/14; A61K 31/74; A61K 31/20; A61K 31/19

(52) U.S. Cl. ...................... **424/401**; 424/400; 424/486; 424/487; 424/78.02; 424/78.05; 514/557; 514/574; 514/859

(58) Field of Search ............................. 424/400, 78.05, 424/401, 484, 486, 487, 78.02; 514/159, 557, 859, 574

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,362,494 A  * 11/1994 Zysman et al. ............. 424/401
5,618,522 A  *  4/1997 Kaleta et al. ................. 424/60

FOREIGN PATENT DOCUMENTS

| EP | 336880 A2 | 3/1989 |
| EP | 696452 A1 | 2/1996 |
| WO | 95 04537 | 2/1995 |
| WO | 95 05163 | 2/1995 |
| WO | WO 95/11700 A2 | 5/1995 |
| WO | 96 05806 | 2/1996 |
| WO | 96 39119 | 12/1996 |

OTHER PUBLICATIONS

Grant & Hackh's Chemical Dictionary, 1987, McGraw–Hlll, Inc., Fifth edition, p. 291.*

* cited by examiner

*Primary Examiner*—Michael G. Hartley
*Assistant Examiner*—Sharmila S Gollamudi
(74) *Attorney, Agent, or Firm*—Millen, White, Zelano & Branigan, P.C.

(57)                   ABSTRACT

The invention relates to a pharmaceutical composition having the following constituents: azelaic acid, polyacrylic acid, triacylglyceride, propylene glycol, polysorbate, soya lecithin, water and salts. The composition is a hydrogel which is suited for the treatment of rosacea, presbyderma, melasma or skin irritations.

12 Claims, No Drawings

Copy provided by USPTO from the PIRS Image Database on 04/23/2013

BAYER0000002

A03878

US 6,534,070 B1

**1**

## COMPOSITION WITH AZELAIC ACID

This application is a 371 of PCT/EP98/07370, filed Nov. 18, 1998, which claims benefit of 60/074,850, filed Feb. 12, 1998.

The invention relates to a composition with azelaic acid in a hydrogel. In addition, the use of azelaic acid-hydrogel as a pharmaceutical agent is part of the invention. This application claims the German priorities DE 197 53 044 with the application date of Nov. 19, 1997 and DE 198 08 086 with the application date of Feb. 20, 1998. The US filing of U.S. Ser. No. 60/074,850 with the filing date of Feb. 12, 1998 is claimed as an additional priority for the USA.

### PRIOR ART

EP 0 336 880 A2, which was applied for on Mar. 29, 1998, describes a pharmaceutical composition that consists of (i) azelaic acid at a concentration of 20% by weight, (iii) triacylglycerides and diacylglycerides, (iv) propylene glycol, (v) polysorbate, for example polyethylene (20) sorbitan monooleate, and (vii) water and salts. This composition that is to be administered topically is used for the treatment of various age-related changes in the facial skin. The composition exists as a cream. In addition, it is known to use the azelaic acid for inflammatory and infectious dermatoses, such as, for example, acne and rosacea.

Under the number 32 282, the 1996 Red List (ISBN 3-87193-167-5) describes a pharmaceutical composition with the name Skinoren that consists of (i) azelaic acid at a concentration of 20% by weight, (iii) triacylglycerides and diacylglycerides, (iv) propylene glycol, (v) polysorbate, for example macrogol stearate 1000 and (vii) water and salts. This composition that is to be administered topically is used for the treatment of acne. The composition exists as a cream. This document is regarded as the closest prior art.

International Application WO 96/11700, which was filed on Oct. 29, 1993, describes a pharmaceutical composition that is used as an adjuvant for a vaccine. This composition is to replace the Freund adjuvant. It is injected. As a (i) pharmaceutical active ingredient, for example, hepatitis B surface protein is used. In addition, (ii) polyacrylic acid, (iii) triacylglycerides and/or diacylglycerides, such as MIGLYOL, (iv) propylene glycol, and (v) polysorbates are used in the form of TWEEN, EMULROR and SIMULSOL M-53. (vi) Soybean lecithin is also to be added. The composition is an (vii) aqueous phase with salts. The composition is not administered topically. The emulsion has particles measuring 0.03 to 0.5 µm, preferably 0.05 to 0.2 µm.

International application WO 95/05163, which was filed on Aug. 5, 1994, describes a pharmaceutical composition that exists as an emulsion for the administration of biologically active substances on the skin surface. This composition contains particles measuring 30 to 500 nm, preferably 70 to 200 nm. As (i) pharmaceutical active ingredients, for example, anti-inflammatory medications are used. In addition, (ii) polyacrylic acid, (iii) triacylglycerides and/or diacylglycerides, (iv) propylene glycol, and (v) polysorbates are used in the form of TWEEN, EMULROR, TRITON X and SIMULSOL M-53. (iv) Soybean lecithin is also to be added. The composition is an (vii) aqueous phase with salts. The composition is administered topically.

European Patent Application EP 0 696 452, which was filed on Jul. 26, 1995, describes a nanoemulsion that is used for medication for treating the nanoemulsion, whereby the nanoemulsion is administered as eye drops that are to be applied topically. This composition contains particles of a mean size

**2**

of 520 nm. As (i) pharmaceutical active ingredients, for example, anti-inflammatory medications are used. In addition, (ii) polyacrylic acid, (iii) triacylglycerides and/or diacylglycerides, (iv) propylene glycol, and (v) polysorbates are used in the form of polyoxyethylene polyoxypropylene copolymers. The composition is an (vii) aqueous phase with salts. The composition is administered topically.

### Object and Achievement

The object is to offer a pharmaceutical composition with azelaic acid as a therapeutic active ingredient, whereby the bioavailability of the azelaic acid is to be increased.

In a composition according to the prior art that comprises the following features:

(i) azelaic acid as a therapeutic active ingredient,

(iii) triacylglycerides,

(iv) propylene glycol, and

(v) polysorbates

(vii) in an aqueous phase that comprises water and salts, the object is achieved in that the composition comprises

(ii) polyacrylic acid, and

(vi) lecithin

as other additives, and that in this case the composition is a hydrogel.

### Advantages

The composition according to the invention has the advantage that it allows a larger amount of pharmaceutical active ingredient to penetrate into living skin layers and/or cutaneous organs. In this connection, the availability of the azelaic acid in the composition according to the invention is higher by a factor of three to five than in the azelaic acid-cream according to the prior art. This availability was demonstrated in a FRANZ-flow-diffusion cell test, which is depicted in detail in the examples. Specifically the living skin layers and/or cutaneous organs are the desired target sites for azelaic acid. It is especially common to use the composition in azelaic acid at high concentrations.

### Another Embodiment of the Composition

A composition that is to be administered topically is advantageous.

Preferred is a composition according to the invention in which the azelaic acid is present at a concentration of 5 to 20% by weight, preferably at a concentration of 10 to 18% by weight, and most preferably at a concentration of 14 to 16% by weight.

The presence of polyacrylic acid is essential. It is decisive for the production of the hydrogel. In the gel, the soybean lecithin is preferred as lecithin. The lecithin or soybean lecithin is advantageous at a concentration of up to 3% by weight. More preferred is a concentration of up to 1.5% by weight and most preferred a concentration of up to 1% by weight. The last concentration has the effect that the hydrogel is no longer present as a nanoemulsion.

### Advantages

It has unexpectedly proven that the composition according to the invention in the case of concentrations in lecithin of 1% by weight and less does not form any standard nanoemulsion according to the prior art. Rather, a gel is present that comprises a homogenous mass with virtually no vesicles, but does have membrane fragments. The fact that azelaic acid and the remainder of the solution do not form

Copy provided by USPTO from the PIRS Image Database on 04/23/2013

**A03879**

BAYER0000003

US 6,534,070 B1

3

any nanoemulsion was not expected. Only with the aid of scanning electron microscope recordings was it possible to provide clarity. It turned out that no nanoemulsion could be identified in microscopic examination. Advantageously, the composition according to the invention has a high penetration in living skin layers and/or cutaneous organs, which cannot be observed in creams.

### Preferred Embodiments

Preferred is a composition in which the individual parameters, independently of one another, can have the following concentrations:

(ii) Polyacrylic acid at a concentration of 0.5 to 2% by weight,

(iii) triacylglycerides at a concentration of 0.5 to 5% by weight,

(iv) propylene glycol at a concentration of 5 to 15% by weight, and

(v) polysorbates at a concentration of 0.5 to 3% by weight. The components are to be adapted to one another, of course, so that a sum of 100% is achieved.

Most preferred is a composition in which the individual parameters, independently of one another, can have the following concentrations:

(ii) Polyacrylic acid at a concentration of 1±0.25% by weight,

(iii) triacylglycerides at a concentration of 2±1% by weight,

(iv) propylene glycol at a concentration of 10±2% by weight, and

(v) polysorbates at a concentration of 2±0.5% by weight. The components are to be adapted to one another, of course, so that a sum of 100% is achieved.

### Definitions

Azelaic acid and its production is described in German Patent DE 28 17 133.7. Cf. Römpp, Chemie Lexikon [Lexicon of Chemistry], issued by Jürgen FALBE and Manfred REGNITZ, 1989, 9th Edition, page 323, Thieme Verlag Stuttgart, ISBN 3-13-734609-6.

Polyacrylic acid represents an anion-active polymerizate of acrylic acid, which is only partially water-soluble. The one-percent aqueous suspension has a pH of 3 and approximately the same viscosity as water. It is only during neutralization with inorganic or organic bases that gel formation and the production of highly viscous products take place. Rudolf VOIGT and Manfred BORNSCHEIN, 1979, Lehrbuch der pharmazeutischen Technologie [Textbook of Pharmaceutical Technology], page 314, VEB Verlag Volk und Gesundheit Berlin. Cf. Römpp, Chemie Lexikon, issued by Jürgen FALBE and Manfred REGNITZ, 1992, 9th Edition, page 3508, Thieme Verlag Stuttgart, ISBN 3-13-735009-3.

"Triglyceride" is a designation for esters of the glycerine whose three hydrogen groups are esterified by carboxylic acids. The naturally occurring fats and fatty oils are triglycerides ("neutral fats"), which generally contain various fatty acids in the same glycerine molecule. J. Am.-Oil. Chem Soc. Vol. 62, page 730, (1985); and Parfum, Kosmet. [Perfume, Cosmet.], Vol. 58, page 353, (1977); and Römpp, Chemie Lexikon, issued by Jürgen FALBE and Manfred REGNITZ, 1990, 9th Edition, pages 1339–1342, Thieme Verlag Stuttgart, ISBN 3-13-734709-2.

Propylene glycol is described in H. P. FIEDLER: Lexikon der Hilfsstoffe [Lexicon of Adjuvants], 4th Edition, 1996, ISBN 3-87193-173 on pages 1278 to 1282.

4

Polysorbates are described in H. P. FIEDLER: Lexikon der Hilfsstoffe, 4th Edition, 1996, ISBN 3-87193-173 on pages 1251 to 1252.

Lecithins are obtained by extraction from biological material. A lecithin fraction from soybeans (the unknown raw material) thus comprises, e.g., palmitic acid, stearic acid, palmitoleic acid, oleic acid, linoleic acid and linolenic acid. Normally, the saturated fatty acid with the primary hydroxy group of the glycerine and the unsaturated fatty acid with the secondary hydroxy group of the glycerine are esterified. Lecithins are components of cell membranes of all living creatures. In water, lecithins first swell up like lyophilic colloids. Later, they produce transparent, colloidal solutions. Depending on water content, they form different textures, whereby the lamellae are formed from lipid-double layers. Liposomes are produced at higher water content. Lit.: Pardun, Die Pflanzenlecithine [The Plant Lecithins], Augsburg: Verl. für Chem. Ind. (Ziolkowsky KG) 1988. Other lecithins and their action are described in J. GAREISS et al. 1994, Parfümerie und Kosmetik [Perfumes and Cosmetics], Vol. 10/94, pages 652–659, Hüthing GmbH Heidelberg.

A gel is distinguished by the following properties: it is a dimensionally stable, easily deformable, liquid and optionally gas-rich, dispersed system that consists of at least two components. Römpp, Chemie Lexikon, issued by Jürgen FALBE and Manfred REGNITZ, 1990, 9th Edition, page 1511, Thieme Verlag Stuttgart, ISBN 3-13-734709-2; and Pharm. Unserer Zeit, Vol. 8, pages 179-to 188, (1979): and Parfüm., Kosmet., Vol. 58, pages 251 to 253 (1977).

Preservatives can be contained in the aqueous phase. Preservatives include, for example, benzoic acid. Based on its antimicrobial property, benzoic acid is especially useful as a preservative.

### Properties When Used as a Medication

The composition of the invention shows pharmacological action and can be used as a therapeutic active ingredient or as a medication.

Preferred is a composition according to the invention together with at least one physiologically compatible, pharmacological adjuvant or vehicle. Pharmacological adjuvants and vehicles are described in Remington's Pharmaceutical Science, 15th Edition, Mack Publishing Company, Easton, Pa. (1980).

The composition of the invention is suitable for the treatment of various indications. Preferred is a composition of the invention as a therapeutic active ingredient for treating rosacea, presbyderma, melasma, acne and/or skin irritations. More preferred is a composition of the invention as a therapeutic active ingredient for treating rosacea, presbyderma, melasma, acne and/or skin irritations together with at least one physiologically compatible, pharmacological adjuvant or vehicle. The treatment comprises prophylactic and therapeutic measures.

(i) In addition, the invention provides

(α) the use of the pharmaceutical composition of the invention for the production of a medication for treating rosacea, presbyderma, melasma, acne and/or skin irritations;

(β) a process for treating rosacea, presbyderma, melasma, acne and/or skin irritations, said process comprises an administration of a pharmaceutical composition according to the invention, whereby the amount suppresses the disease, and whereby the pharmaceutical composition is given to a patient who requires such a medication;

Copy provided by USPTO from the PIRS Image Database on 04/23/2013

BAYER0000004

A03880

US 6,534,070 B1

5

(γ) a pharmaceutical composition for treating rosacea, presbyderma, melasma, acne and/or skin irritations, said treatment comprises a pharmaceutical composition of the invention and at least one pharmaceutically compatible vehicle and additive.

For these therapeutic actions, the suitable dose is different and depends on, for example, the concentration of the individual elements in the pharmaceutical composition, the host, the type of administration and the type and severity of the conditions to be treated.

In the case of topical treatment, the pharmaceutical composition of the invention can be administered in any usual way. Gel is preferred.

The pharmaceutical composition of the invention can be administered in the usual topical methods of administration with the additives and/or vehicles that are commonly used in galenical pharmaceutics according to methods that are known in the art.

EXAMPLES

1. Production of the Pharmaceutical Composition

A pharmaceutical composition that contains azelaic acid has the following formulation and the following process steps:

Benzoic acid and EDTA are dissolved in usual concentrations in 60 to 70 parts of water. Then, a mixture of 1 part of mid-chain triglycerides and 1.5 parts of polysorbate 80 is to be added and homogenized while being stirred (pre-emulsion). One part of lecithin is introduced into 12 parts of propylene glycol. The solution that is produced is stirred into the pre-emulsion and homogenized. After 1 part of polyacrylic acid is added, 15 parts of azelaic acid are introduced into the pharmaceutical composition that is produced. Then, the orientation of the gel former is carried out with the necessary amount of sodium hydroxide solution. The resulting gel has an approximately 4-times higher availability of azelaic acid in living skin layers and/or cutaneous organs.

2. Detection of Bioavailability in the Skin

The percutaneous resorption of azelaic acid was examined from hydrogel formulations according to the invention in comparison to Skinoren(R) cream. The purpose of the study was to describe the bioavailability of azelaic acid in the skin, the penetration of azelaic acid through the skin and the dermal metabolism of azelaic acid. In this respect, various preparations that contain $^{14}$C-labeled azelaic acid were applied in the in vitro model of the FRANZ diffusion chamber on the intact complete skin of hairless mice (MF1 hr/hr Ola/Hsd; supplier: Winkelmann, Germany). An amount of 10 to 15 mg of the following compositions was applied to a skin area of 2 cm²:

A) 20% azelaic acid in a cream whose adjuvant composition corresponds to that of Skinoren(R) cream,

B) 15% azelaic acid in a composition according to the invention.

The time behavior of the $^{14}$C-azelaic acid was measured in the acceptor medium (Hepes Hanks Balanced Salt Solution: HHBSS), which flows along under the skin, at two-hour intervals over a period of 24 hours. In addition, at the end of each experiment, the radioactivity on the skin surface, in the stratum corneum and in the remaining skin was determined. To study the metabolism of azelaic acid in the skin, skin extracts and selected fractions of the acceptor medium were examined using radiochromatography (HPLC and radiometric detection).

6

The $^{14}$C-azelaic acid found in the skin at the end of the experiment was metabolized only to a proportion of 3 to 11%. Therefore, the data on the radioactivity in the skin was virtually be equated to the concentration of unchanged azelaic acid.

The following table contains a summary of the results:

| | Cream According to the Prior Art | | Composition According to the Invention | |
|---|---|---|---|---|
| | Mean | SD | Mean | SD |
| Not [one word non-penetrated azelaic acid | 79.9% | 14.3% | 63.6% | 20.6% |
| Azelaic acid in the stratum corneum | 0.9% | 0.7% | 4.0% | 1.9% |
| Azelaic acid in the remaining skin | 3.7% | 2.0% | 27.3% | 17.1% |
| Azelaic acid in the acceptor medium | 16.3% | 6.3% | 5.8% | 3.3% |

SD = standard deviation

In comparison to the standard cream, considerably higher azelaic acid concentrations in the skin were achieved with the agent according to the invention.

What is claimed is:

1. A composition that comprises:

(i) azelaic acid as a therapeutically active ingredient in a concentration of 5 to 20% by weight,

(iii) at least one triacylglyceride in a concentration of 0.5 to 5% by weight,

(iv) propylene glycol, and

(v) at least one polysorbate, in an aqueous phase that further comprises water and salts, and the composition further comprises

(ii) at least one polyacrylic acid, and

(vi) lecithin,

wherein the composition is in the form of a hydrogel.

2. A composition according to claim 1, wherein the composition is in a form for topical administration.

3. A composition according to claim 1, wherein the lecithin is soybean lecithin.

4. A composition according to claim 1, wherein the lecithin is present at a concentration within the range of greater than 0% to 1% by weight.

5. A composition according to claim 1, wherein the individual components, independently of one another, have the following concentrations:

(ii) at least one polyacrylic acid at a concentration of 0.5 to 2% by weight,

(iii) at least one triacylglyceride at a concentration of 0.5 to 5% by weight,

(iv) propylene glycol at a concentration of 5 to 15% by weight, and

(v) at least one polysorbate at a concentration of 0.5 to 3% by weight.

6. A composition according to claim 1, wherein the individual components, independently of one another, have the following concentrations:

(ii) at least one polyacrylic acid at a concentration of 1±0.25% by weight,

(iii) at least one triacylglyceride at a concentration of 2±1% by weight,

(iv) propylene glycol at a concentration of 10±2-% by weight, and

Copy provided by USPTO from the PIRS Image Database on 04/23/2013

BAYER0000005

A03881

US 6,534,070 B1

7

(v) at least one polysorbate at a concentration of 2±0.5% by weight.

7. A composition according to claim 1, wherein the composition further comprises at least one physiologically compatible, pharmacological adjuvant or vehicle.

8. A method for treating rosacea, presbyderma, melasma, acne and/or skin irritations in a patient, comprising administering to the patient in need thereof a therapeutically effective amount of the composition according to claim 1.

9. The method of claim 8, wherein the composition is administered topically.

8

10. A composition according to claim 1, wherein the azelaic acid is present at a concentration of 10 to 18% by weight.

11. A composition according to claim 1, wherein the lecithin is present at a concentration within the range of greater than 0% to 3% by weight.

12. A composition according to claim 1, further comprising benzoic acid.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 04/23/2013

BAYER0000006

A03882



BAYER0000007

**A03883**

PTO-1683
(Rev. 7-96)

BAYER0000008

**A03884**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2015, I electronically filed the

foregoing APPELLANTS' OPENING BRIEF with the United States Court of

Appeals for the Federal Circuit by using the CM/ECF system.  I certify that all

counsel of record are registered as ECF Filers and that they will be served by the

CM/ECF system.

Two copies of the foregoing brief will be served on counsel of record for

Appellees by first-class mail, with a courtesy copy by electronic mail, at the

following addresses:

> Bradford J. Badke
> Sona De
> ROPES & GRAY
> 1211 Avenue of the Americas
> New York, NY  10036
> *jim.badke@ropesgray.com*
> *sona.de@ropesgray.com*

September 4, 2015                              */s/ Elizabeth J. Holland*
                                              Elizabeth J. Holland

                                              *Counsel for Appellants*

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE SYTLE REQUIREMENTS**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2010.


September 4, 2015                           */s/ Elizabeth J. Holland*
                                            Elizabeth J. Holland

                                            *Counsel for Appellants*