No. 2015-1902

_____

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
_____

INTENDIS GMBH, INTRASERV GMBH & CO. KG,
BAYER HEALTHCARE PHARMACEUTICALS INC.

*Plaintiffs-Appellees*

V.

GLENMARK PHARMACEUTICALS INC. USA,
GLENMARK PHARMACEUTICALS LTD.,

*Defendants-Appellants*

_____

Appeal from the United States District Court for the
District of Delaware in Case No. 13-CV-421
Judge Sue L. Robinson
_____

**<u>BRIEF OF PLAINTIFFS-APPELLEES</u>**

Bradford J. Badke
Sona De
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York  10036
Tel: (212) 596-9000
*Plaintiffs-Appellees Intendis GmbH,*
*Intraserv GmbH & Co. KG, and*
*Bayer HealthCare Pharmaceuticals*
*Inc.*

Dated:  October 19, 2015

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**CERTIFICATE OF INTEREST**

| | |
|---|---|
| Court of Appeal Case Number:  2015-1902 | |
| District Court Case Number:  1:13-cv-00421-SLR | |
| Case Name:  *Intendis GmbH et al. v.*<br>*Glenmark Pharmaceuticals Inc. et al.* | |

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4, counsel for Plaintiffs-Appellees certify the following:

| | |
|---|---|
| 1. | The full name of every party or amicus represented by me is:<br><br>Intendis GmbH<br>Intraserv GmbH & Co. KG<br>Bayer HealthCare Pharmaceuticals Inc. |
| 2. | The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:<br><br>Not applicable |
| 3. | All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:<br><br>Bayer AG; Bayer Pharma AG; Bayer World Investments B.V.; Bayer Solution B.V.; Bayer US Holding LP; Bayer Corporation; Bayer HealthCare Holdings LLC; Schering Berlin Inc. |
| 4. | The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:<br><br>**Ropes & Gray LLP**<br>**1211 Avenue of the Americas**<br>**New York, NY 10036, (212) 596-9000:** |

Bradford J. Badke
Sona De
Crystal Lohmann Parker
Beth Finkelstein
Christin Sullivan
Jacqueline James
Rebecca Rabenstein
Michael S. Heesters
Michael P. Kahn


**Morris, Nichols, Arsht & Tunnell LLP**
**1201 North Market Street, P.O. Box 1347,**
**Wilmington, DE 19899, (302) 658-9200:**
Rodger D. Smith II

| October 19, 2015 | /s/ Bradford J. Badke |
|---|---|
| Date | Signature of counsel |
| | Bradford J. Badke |
| | Printed name of counsel |

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................. 1

INTRODUCTION ............................................................................................... 2

STATEMENT OF ISSUES ................................................................................. 5

STATEMENT OF THE CASE ............................................................................ 6

STATEMENT OF FACTS .................................................................................. 9

I.    TECHNICAL BACKGROUND ................................................................. 9

II.   BAYER'S AZELAIC ACID HYDROGEL INVENTION ......................... 11

III.  THE '070 PATENT ................................................................................... 15

IV.   GLENMARK COPIED THE '070 PATENT ............................................. 17

V.    GLENMARK'S CITED ART ..................................................................... 19

      A.   Non-Azelaic Acid References ........................................................ 19

      B.   Azelaic Acid References ................................................................ 21

SUMMARY OF ARGUMENT .......................................................................... 23

ARGUMENT ...................................................................................................... 28

I.    THE DISTRICT COURT'S INFRINGEMENT FINDING WAS NOT
      CLEAR ERROR ......................................................................................... 28

      A.   A POSA Would Understand That Lecithin And Triglyceride
           Function As Penetration Enhancers From The '070 Patent ................. 28

      B.   Particularized Testimony And Documents Confirm Function ........... 29

      C.   Lecithin And Triglyceride's Additional Functions Do Not Negate
           Their Penetration Enhancer Function ................................................. 34

      D.   Literature Described Penetration Enhancement By Lecithin And
           Triglyceride ...................................................................................... 36

      E.   The District Court's Findings On Way And Result Undercut
           Glenmark's Function Objections ........................................................ 37

i

II.    THE DISTRICT COURT CORRECTLY REJECTED ESTOPPEL ........... 38

    A.    Argument-Based Estoppel Does Not Apply ......................................... 39

    B.    Amendment-Based Estoppel Does Not Apply .................................... 41

III.    THE DISTRICT COURT CORRECTLY REJECTED
    ENSNAREMENT ................................................................................ 42

    A.    The District Court Adopted The Correct Hypothetical Claims ........... 43

    B.    The Correct Hypothetical Claims Do Not Ensnare The Art ............... 46

    C.    Glenmark's Incorrect Hypothetical Claims Do Not Ensnare
        The Art ................................................................................................ 50

IV.    THE DISTRICT COURT CORRECTLY FOUND THE '070 PATENT
    CLAIMS NON-OBVIOUS ................................................................... 51

    A.    There Is No Evidence Of Motivation To Combine The Art Or A
        Reasonable Expectation Of Success In Doing So ............................... 52

    B.    The Claimed Combination Of Ingredients Was Non-Obvious ........... 56

    C.    The Claimed Hydrogel Was Non-Obvious ......................................... 59

    D.    Objective Indicia Of Non-Obviousness ............................................. 63

        1.    Unexpected Results .................................................................... 63

            (a)    Bayer's Franz Study Was Reliably Performed ................... 63

            (b)    Bayer's Franz Results Were Confirmed By
                Clinical Testing .................................................................. 65

        2.    Commercial Success ................................................................. 67

CONCLUSION ................................................................................................ 68

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*A.H. Robins Co. v. Erbamont, Inc.,*
    No. C2-89-864, 1991 WL 229150 (S.D. Ohio Apr. 18, 1991), *vacated
    due to settlement*, Nos. 91-1352, 91-1375, 1991 WL 191144 (Fed. Cir.
    Aug. 12, 1991) ..............................................................................................45

*Abbott Labs. v. Sandoz, Inc.*,
    566 F.3d 1282 (Fed. Cir. 2009) ....................................................................34

*Abbott v. Dey*,
    287 F.3d 1097 (Fed. Cir. 2002) ..............................................................44, 49

*Allergan, Inc. v. Sandoz Inc.*,
    796 F.3d 1293 (Fed. Cir. 2015) ....................................................................28

*AquaTex Industries, Inc. v. Techniche Solutions*,
    419 F.3d 1374 (Fed. Cir. 2005) ..............................................................28, 29

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
    796 F.2d 443 (Fed. Cir. 1986) ......................................................................61

*Cordis Corp. v. Medtronic AVE, Inc.*,
    511 F.3d 1157 (Fed. Cir. 2008) ................................................25, 39, 40, 41

*Crocs, Inc. v. Int'l Trade Comm'n*,
    598 F.3d 1294 (Fed. Cir. 2010) ....................................................................68

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ..............................................................25, 42

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000) ..............................................................27, 68

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002)......................................................................................41

iii

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
   582 F.3d 1288 (Fed. Cir. 2009) ............................................................38, 40, 49

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
   527 F.3d 1318 (Fed. Cir. 2008) ............................................................38, 40, 49

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
   339 U.S. 605 (1950)............................................................................................3

*Insite Vision Inc. v. Sandoz, Inc.*,
   783 F.3d 853 (Fed. Cir. 2015) ....................................................................52, 53

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)............................................................................26, 51, 54, 56

*Marquip, Inc. v. Fosber Am., Inc.*,
   198 F.3d 1363 (Fed. Cir. 1999) ..................................................................44, 45

*Merck & Co. v. Mylan Pharms., Inc.*,
   19 F. Supp. 2d 334 (E.D. Pa. 1998), *aff'd on other grounds*, 190 F.3d
   1335 (Fed. Cir. 1990)......................................................................................46

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
   718 F. Supp. 2d 382 (S.D.N.Y. 2010), *aff'd* 2011 U.S. App. LEXIS
   16010 (Fed. Cir. Aug. 2, 2011).........................................................................68

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008) .........................................................................54

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ...........................................................................63

*Streamfeeder, LLC v. Sure-Feed Sys., Inc.*,
   175 F.3d 974 (Fed. Cir. 1999) ....................................................................42, 45

*Stumbo v. Eastman Outdoors, Inc.*,
   508 F.3d 1358 (Fed. Cir. 2007) .........................................................................29

*Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*,
   204 F.3d 1360 (Fed. Cir. 2000) ..................................................................42, 45

*United States v. Adams*,
   383 U.S. 39 (1966)....................................................................................56, 60

iv

*Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*,
  904 F.2d 677 (Fed. Cir. 1990) ...............................................................................44

**STATUTES**

35 U.S.C. § 103 .......................................................................................................56

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| '070 patent | U.S. Patent No. 6,534,070 |
| '070 prosecution history | Prosecution history for the '070 patent |
| '119 PCT | International Application Publication No. WO 96/39119 |
| '163 PCT | International Application Publication No. WO 95/05163 |
| '752 PCT | International Application Publication No. WO 93/18752 |
| '943 patent | U.S. Patent No. 5,385,943 |
| ANDA | Abbreviated New Drug Application |
| batch 036 | Glenmark developmental formulation batch 540/03-08/036 that replaced triglyceride and lecithin with PPG-20 methyl glucose ether distearate |
| batch 041 | Glenmark developmental formulation batch 540/03-08/041 that replaced triglyceride and lecithin with isopropyl myristate and which became Glenmark's Gel |
| Bayer | Intendis GmbH, Intraserv GmbH & Co. KG, and Bayer HealthCare Pharmaceuticals Inc. |
| Bayer's NDA | NDA No. 21-470 |
| Carbopol® | Trade name for polyacrylic acid. Also known as "carbomer." |
| DMSO | Dimethyl sulfoxide |
| Dr. Franke | Dr. Patrick Franke, Bayer's formulator and co-inventor on the '070 patent |
| Dr. Günther | Dr. Clemens Günther, Bayer's biologist and co-inventor on the '070 patent |
| Dr. Michniak-Kohn | Dr. Bozena Michniak-Kohn, Glenmark's expert witness |
| Dr. Riedl | Dr. Jutta Riedl, Bayer's formulator and co-inventor on the '070 patent |
| Dr. Weiner | Dr. Norman Weiner, Bayer's expert witness |
| Draelos article | Z. Draelos, *The Rationale for Advancing the Formulation of Azelaic Acid Vehicles*, 77 (suppl 2) Cutis 7-11 (2006) |
| Draelos poster | Z. Draelos & K. Graupe, *A New Topical Formulation for the Treatment of Mild to Moderate Papulopustular Rosacea: Azelaic Acid 15% Gel* |

| | |
|---|---|
| Draelos references | The Draelos article and the Draelos poster |
| Excipients-at-issue | Lecithin, triglyceride, and isopropyl myristate |
| FDA | U.S. Food and Drug Administration |
| Finacea® | Finacea® (azelaic acid) Gel, 15% |
| Franz study or Franz test | Franz flow-through diffusion cell *in vitro* skin penetration study |
| Gallarate | M. Gallarate *et al.*, In vitro *release of azelaic acid from oil in water microemulsions*, 40 Acta. Pharm. Jugosl 533-38 (1990) |
| Gasco | M.R. Gasco *et al.*, In vitro *permeation of azelaic acid from viscosized microemulsions*, 69 *Int'l J. Pharm.* 193-196 (1991) |
| Glenmark | Glenmark Pharmaceuticals, Inc. U.S.A. and Glenmark Pharmaceuticals Ltd. |
| Glenmark's ANDA | ANDA No. 204637 |
| Glenmark's Gel or Gel | Defendants-Appellants Glenmark's generic copy of Finacea® that is the subject of ANDA No. 204637 |
| Glenmark's patent application | U.S. Patent Application Publication US 2010/0004338 A1 |
| Handbook | Handbook of Pharmaceutical Excipients (Ainley Wade & Paul J. Weller eds., 2d ed. 1994) |
| hydrogel A | Bayer developmental formulation Hydrogel SH H 655 A that contained Arlatone 938S and cetearyl octanoate |
| hydrogel B | Bayer developmental formulation Hydrogel SH H 655 B that contained lecithin and triglyceride and which became Finacea® |
| Kaleta | U.S. Patent No. 5,618,522 titled "Emulsion Compositions" |
| Leopold | C.S. Leopold & B.C. Lippold, An Attempt to Clarify the Mechanism of the Penetration Enhancing Effects of Lipophilic Vehicles with Differential Scanning Calorimetry (DSC), 47 *J. Pharm. Pharmacol.* 276–281 (1995) |
| Maru | U. Maru *et al.*, *In Vitro Diffusion and Cutaneous Permeation of Azelaic Acid Preparations: Research of Correlations*, 37(3) *J. Pharm. Belg*. 207-13 (1982) |
| Mr. Maffia | Mr. Anthony Maffia, Glenmark's V.P. of Regulatory Affairs and corporate witness on FDA communications |

| | |
|---|---|
| Mr. Mehta | Mr. Kamal Mehta, Glenmark's V.P. of Formulation Development and corporate witness on the formulation of Glenmark's Gel |
| NDA | New Drug Application |
| Open. ___ | Appellant's Opening Brief (D.I. 20) |
| Pattarino | F. Pattarino *et al.*, *Topical delivery systems for azelaic acid: Effect of the suspended drug in microemulsion*, 49(1) Die Pharmazie 72-73 (1994) |
| POSA | Person of ordinary skill in the art |
| PPG-20 | PPG-20 methyl glucose ether distearate |
| Products-at-issue | Finacea® and Glenmark's Gel |
| PTO | U.S. Patent and Trademark Office |
| Skinoren® | 20% azelaic acid cream for the treatment of acne, also known as Finevin® cream |

**Emphasized Text:**  Unless otherwise noted, all emphasis has been added.

**STATEMENT OF RELATED CASES**

No other case is known to counsel for Plaintiffs-Appellees Intendis GmbH, Intraserv GmbH & Co. KG, and Bayer HealthCare Pharmaceuticals Inc. (collectively "Bayer") to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal by Defendants-Appellants Glenmark Pharmaceuticals Inc. USA and Glenmark Pharmaceuticals Ltd. (collectively "Glenmark").

## INTRODUCTION

In a well-reasoned 70-page Opinion, the District Court correctly found Bayer's U.S. Patent No. 6,534,070 ("'070 patent") on novel azelaic acid hydrogels both valid and infringed. Nothing in Glenmark's brief demonstrates clear error warranting reversal.

Before this case, Glenmark used the '070 patent as a roadmap to make its generic azelaic acid hydrogel ("Glenmark's Gel"). That Glenmark targeted Bayer's '070 patented Finacea® product is no surprise given its novelty and unexpected results. Finacea® is the number one branded topical product in the U.S. for treating rosacea, a skin disease that causes painful and embarrassing facial lesions. Its active ingredient, azelaic acid, was previously formulated in a cream known as Skinoren®. Bayer's invention advanced the art by creating an entirely new azelaic acid hydrogel, characterized by a three-dimensional polymer matrix structure that creams lack. The results surpassed expectation. It *penetrated* five-fold more azelaic acid into the skin and *retained* more medication in the living skin layers, where the drug needs to be to work, compared to Skinoren® cream. Lecithin and triacylglyceride (triglyceride[1]) are the '070 claimed ingredients responsible for this enhanced penetration. In issuing the '070 patent, the PTO

---

[1]    The term "triacylglyceride" in the '070 claims means "triglyceride." (A101).

emphasized that the art neither suggested the inventive hydrogel formulation nor its unexpected penetration results.

The only change Glenmark made was to substitute the claimed lecithin and triglyceride with their functional equivalent: isopropyl myristate. Glenmark, however, made sure this substitution made no real difference. Glenmark's scientists testified, and Glenmark told the FDA, that its isopropyl myristate shared the same penetration enhancer function and results as lecithin and triglyceride. The evidence also showed the excipients-at-issue work the same way. This is exactly the sort of unscrupulous copying that the doctrine of equivalents is designed to address. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950).

Throughout this case, Glenmark pursued infringement arguments contrary to its own witness testimony and ANDA admissions. It has now dropped many of them, conceding, as it must, that its isopropyl myristate functions as a penetration enhancer, in the same way, to get the same results, as the claimed lecithin and triglyceride. Its sole remaining argument against equivalents is that, contrary to its admissions, lecithin and triglyceride do not function as penetration enhancers. But Glenmark effectively admits they too enhance penetration because it does not dispute the court's findings that all three excipients-at-issue work the same way to

3

get the same penetration results. Accordingly, the court's infringement judgment should be affirmed.

Glenmark's estoppel and ensnarement defenses fail to bar equivalents as a matter of law. Glenmark waived amendment-based estoppel by omitting it from its post-trial briefs. And because there was no narrowing amendment or disclaimer regarding lecithin, there is no estoppel by law. Glenmark's hypothetical ensnarement claims, which broadly cover not just its accused isopropyl myristate, but *all* penetration enhancers, are legally impermissible. Nevertheless, because Glenmark's sole ensnarement reference, Gasco, lacks the excipients-at-issue and a "hydrogel," neither the correct hypothetical claims that the court applied nor Glenmark's overbroad claims ensnare Gasco.

Turning to Glenmark's invalidity defense, Glenmark's expert impermissibly used the '070 patent to search the art, which she divided into two "buckets" (*i.e.*, references with azelaic acid, and those without). This art was before the PTO or cumulative thereof. Although its expert raised two specific art combinations at trial, Glenmark's post-trial brief abandoned them to combine the two buckets of art in a way no POSA ever did or would. As the court found, Glenmark provided no evidence of a motivation to combine these buckets to arrive at the claimed hydrogels, let alone to show there would have been a reasonable expectation of

success in doing so.  The court's validity judgment can be affirmed on this basis alone.

The District Court rejected Glenmark's attempts to rewrite history and denied every one of Glenmark's defenses under established law.  This Court should affirm.

## STATEMENT OF ISSUES

1.    Whether the finding that Glenmark's Gel infringes by equivalents, where Glenmark told the FDA that the claimed lecithin and triglyceride function as penetration enhancers based on the '070 patent as does Glenmark's isopropyl myristate, should be affirmed.

2.    Whether the finding that estoppel does not apply because Bayer did not narrow the scope of the '070 lecithin limitations during prosecution, but merely clarified that certain dependent claims always included lecithin by virtue of their dependency from a claim reciting lecithin, should be affirmed.

3.    Whether the finding that hypothetical claims that literally cover Glenmark's Gel are not ensnared by Gasco, which undisputedly lacks lecithin, triglyceride, and isopropyl myristate, and is not a hydrogel, should be affirmed.

4.    Whether the conclusion that the '070 claims are non-obvious because the District Court correctly found that (i) no prior art disclosed azelaic acid hydrogels with lecithin and triglyceride, (ii) Glenmark presented no evidence that

POSAs would have been motivated to combine the prior art as it now suggests, and (iii) real-world evidence of unexpected penetration results and commercial success confirm non-obviousness, should be affirmed.

## STATEMENT OF THE CASE

On July 27, 2015, following a five-day bench trial, the District Court issued a detailed Opinion finding every '070 claim infringed and valid.  (A1-71).

**Infringement:**  The court found that Glenmark's Gel, which substitutes isopropyl myristate for the claimed lecithin and triglyceride, infringes the '070 patent by equivalents under the well-established "function-way-result" test.  (A28-41).

The court determined that the claimed lecithin and triglyceride share the same function as the isopropyl myristate in Glenmark's Gel:  penetration enhancer.  (A32-34).  Bayer's expert, Dr. Weiner, testified that a POSA would understand that lecithin and triglyceride are the excipients responsible for penetration enhancement in the '070 formulations.  (A28-29).  The court credited testimony by inventor Dr. Franke, Glenmark's expert Dr. Michniak-Kohn, and Glenmark's V.P. of Formulation Development Mr. Mehta, indicating that the excipients-at-issue share this penetration enhancer function.  (A32-33).  The court further relied on Glenmark's repeated statements to the FDA confirming Glenmark's understanding of this common penetration enhancer function.  (A33-34).

The court next found that the excipients-at-issue work in substantially the same way: by disrupting the lipids in the stratum corneum, the outermost skin layer. (A34-39). It relied on Dr. Weiner's "credible and well-supported" testimony about this mechanism of action as well as Glenmark's cited Leopold article. (A38-39). Leopold tested what Dr. Michniak-Kohn identified as the lecithin/triglyceride combination and isopropyl myristate and showed they both disrupt these lipids. (A36-38).

The court found, based on the '070 patent's reported penetration data, as well as Glenmark's own patent application, Franz skin penetration study, and clinical trial, that the excipients-at-issue allow their respective formulations to achieve the same result: a therapeutically effective azelaic acid composition able to penetrate the stratum corneum to deliver the active ingredient. (A41).

**Estoppel:** The court rejected Glenmark's assertion of estoppel based on a clarifying amendment to two '070 dependent claims and corresponding statement. During prosecution, Bayer changed language in these claims reciting lecithin concentrations from "up to 1% [or 3%]" to "more than 0 to 1% [or 3%]," explaining that these claims always required some lecithin given that their independent claim always recited lecithin. (A46-47). Because the two dependent claims were amended to clarify what they already required, there was no "clear and unmistakable" surrender of a lecithin-free composition. (*Id.*). The court found this

7

did not meet the stringent legal standards for argument-based or amendment-based estoppel.

**Ensnarement:** The court denied Glenmark's ensnarement defense. Glenmark crafted hypothetical claims that went far beyond its isopropyl myristate to encompass all penetration enhancers. The court correctly rejected Glenmark's overly broad claims because the proper hypothetical claims extend the lecithin and triglyceride limitations only enough to literally cover the isopropyl myristate in the accused Gel. (A42-43).

The court then correctly determined that Bayer proved these claims would have issued over Gasco. (A43-46). It relied on the undisputed fact that Gasco does not disclose the excipients-at-issue to conclude that it cannot anticipate the hypothetical claims. (A43). It also found that it would not have been obvious to substitute these excipients for Gasco's penetration enhancer, DMSO. (A43-46).

**Non-Obviousness:** The court rejected Glenmark's obviousness defense. It evaluated each prior art reference Glenmark raised at trial plus Skinoren® and found that none disclosed every element of the claimed compositions. (A52-63). Moreover, because Glenmark's post-trial combinations of those references differed from those its expert made at trial, there was no evidence that a POSA would have been motivated to combine the references as Glenmark suggested, let alone with any reasonable expectation of success in making the claimed formulations. (A64-

66).  Given this absence of proof, Glenmark could not prove obviousness.  (A64-66; A71).

The court further found that non-obviousness was confirmed by objective indicia.  (A66-70).  It found that '070 Example 2 shows the inventive hydrogel gave unexpected results in that more azelaic acid both penetrated and remained in the skin compared to the art.  (A66-68).  These results were confirmed by Glenmark's own Franz tests and Bayer's clinicals.  (*Id.*).  The court also found commercial success given Finacea®'s significant sales and Bayer's showing that the '070 invention caused this success.  (A68-70).

## STATEMENT OF FACTS

## I.    TECHNICAL BACKGROUND

Topical pharmaceutical formulations are applied directly to the skin.  (A2746 (289:5-10)).  Skin is made up of multiple layers, the outermost dead layer of cells being the stratum corneum that serves as a protective barrier, with the living epidermis and dermis layers below.  (A2747-49 (290:10-292:4)).  The site of action for azelaic acid is the living skin.  (A3879 (2:37-39); A2748 (291:2-10); A2749 (292:5-11)).  For a topical to work, the active ingredient(s) must penetrate the stratum corneum into the living skin layers.  (A2746 (289:11-17)).

One can measure an active's ability to penetrate skin from a given formulation by running a Franz test.  Franz tests use a cell with a donor chamber

on top of a receptor chamber separated by a piece of skin. (A2602 (145:16-21)). The receptor chamber contains a buffer fluid representing the systemic circulation beneath the skin. (A2605 (148:14-18)). The topical is applied to the skin surface. The amount of active that penetrates the skin, and the amount that goes all the way through the skin into the receptor, is measured over time. The potential efficacy of a formulation (represented by the active retained in the skin) and unwanted systemic exposure (represented by the active in the receptor) can then be assessed. (A2613 (156:17-25); A2662 (205:4-21)).

Topicals come in different dosage forms or vehicles, such as creams, ointments, and gels. (A2750-52 (293:6-295:21); A5555; A5608; A5614; A5618; A5627; A5785; A5799). These vehicles are defined by their different structures. For example, creams are emulsions, meaning they are a two-phase liquid-in-liquid (*e.g.*, oil-in-water) dispersed system stabilized by components called emulsifiers. (A2519 (62:3-17)). Gels, in contrast, are a one-phase system defined by a three-dimensional backbone matrix structure made of polymers. (A2521-22 (64:23-65:9); A3130-31 (673:6-674:13)). Emulsions have no such three-dimensional matrix structure. (A2522 (65:2-9)).

Polyacrylic acid (trade name Carbopol®) may act as a thickener or a gelling agent. In order to form a gel, it must be neutralized, meaning pH must be sufficiently raised by adding a neutralizing agent. (A2761-62 (304:20-305:5);

A2805-07 (348:2-350:19); A3137 (680:1-14); A3326-27 (869:3-870:11)).  Before

neutralization, Carbopol® has a pH of 3.0.  (A3880 (3:42-47)).  Its manufacturing

specifications identify a threshold pH of 4.0 for gel formation.  (A5587; A5590;

*see also* A5597; A3145-46 (688:22-689:18)).  Absent neutralization, Carbopol®

may thicken the formulation, but it will not form a gel.

## II.    BAYER'S AZELAIC ACID HYDROGEL INVENTION

Bayer is the worldwide leader in innovative azelaic acid topical medications.

Bayer's predecessor first introduced azelaic acid in the form of Skinoren®, a 20%

azelaic acid cream for acne.  (A2514 (57:14-16); A2516-17 (59:20-60:13)).  But,

after Skinoren® hit the market, problems with the formulation emerged, including

agglomeration of the active, which led to phase separation of the emulsion.  (A4-5;

A2517-19 (60:16-62:12)).

In late 1996, '070 inventor and formulator, Dr. Franke, took on the challenge

of troubleshooting these problems.  (A2517 (60:2-25)).  He and his co-inventor,

formulator Dr. Riedl, began work on a new topical azelaic acid formulation to

address the agglomeration problem as well as certain cosmetic issues.  But they

could not sacrifice efficacy in the process.  (A2519-20 (62:18-63:15)).

Believing that less active drug would cause less agglomeration, their first

idea was to reduce azelaic acid content from 20% to 15%.  (A2518 (61:1-10);

A2520-21 (63:2-64:6)).  But less active risked a corresponding reduction in

11

efficacy. (A2528 (71:6-12)). Drs. Franke and Riedl nevertheless pushed forward with the 15% azelaic acid target. They then debated two possible vehicles for their new formulation: (1) another cream, similar in type and composition to Skinoren®; or (2) an innovative hydrogel. (A2521 (64:11-22)).

Because these two formulation approaches were fundamentally different (*supra* p. 10), and Skinoren® cream had known efficacy, their colleagues preferred the cream formulation. (A2522-23 (65:10-66:14)). Drs. Franke and Riedl were also concerned about achieving efficacy with a gel because its three-dimensional structure could trap the azelaic acid inside its matrix instead of delivering it to the patient. (A2523(66:5-18)). Still believing that a hydrogel might offer the greatest potential for solving the problems with Skinoren® while also providing enhanced cosmetic properties, they pursued an innovative hydrogel in the face of this skepticism. (A2522-24 (65:10-67:16)).

Once the inventors narrowed their target vehicle to hydrogels, they considered two different strategies for determining the best excipients to use. (A2524-25 (67:17-68:1)). The first involved formulating Skinoren®'s ingredients into a hydrogel. (A2524-25 (67:21-68:7)). The second involved formulating a hydrogel with new ingredients not in the cream. (*Id.*). Again, the internal preference was to stick with known cream ingredients because of the many unknowns associated with a new formulation. (A2525 (68:11-17)).

Even with these two hydrogel strategies in mind, designing a formulation was no simple task. Drs. Franke and Riedl assessed more than twenty possible hydrogel formulations. (A2527 (70:11-17)). They ultimately narrowed that down to two for additional testing: hydrogels A and B. (A2527-28 (70:18-71:20); A2529-30 (72:17-73:8); A2609-10 (152:9-153:4); A4854). Hydrogel A contained ingredients similar to Skinoren® cream. (A2528-29 (71:21-72:16); A2552 (95:15-17)). Hydrogel B, which ultimately became Finacea®, had ingredients Skinoren® did not, including the combination of lecithin and triglyceride. (A2525-27 (68:18-70:10); A2528-29 (71:21-72:4); A2530 (73:6-8); A2552 (95:11-14); A2609-10 (152:21-153:4)).

Co-inventor and biologist, Dr. Günther, then designed a Franz test comparing skin penetration by both hydrogels to Skinoren®, which had proven efficacy in humans. (A2529-30 (72:17-73:8); A2599-2600 (142:17-143:24); A2609 (152:9-25); A4836-72). He measured the amount of drug that penetrated each layer of skin at the end of 24 hours as well as the amount that went through the skin into the receptor. (A2606 (149:11-20); A2608 (151:11-17); A4854).

The Franz study revealed surprising and unexpected results with hydrogel B. (A2530 (73:2-25); A2614-15 (157:12-158:1)). Conventional wisdom dictated that the formulation with the highest amount of drug penetrating into the skin would also yield the corresponding highest amount of drug passing through the skin into

13

the receptor.  (A2615 (158:2-12); A3374-75 (917:23-918:13)).  Hydrogel B,

however, defied convention.  (A2615 (158:2-20)).  In spite of having less azelaic

acid than Skinoren® cream (15% v. 20%), hydrogel B not only penetrated

significantly more azelaic acid into the skin than Skinoren® (five times as much),

but had less azelaic acid pass into the receptor than the cream.  (A2612 (155:10-17);

A2615 (158:2-20); A4854).  That is, hydrogel B managed to deliver ***and retain***

more active in the skin itself where the drug needs to be to work.  Based on these

results, Bayer pursued hydrogel B in clinical testing.  (A2531 (74:1-11); A2618

(161:5-24)).

Clinical tests confirmed these unexpected results.  The first was a

scarification study in humans to assess the tolerability of Finacea® against

Skinoren® cream.  (A6248-84).  Samples were applied to impaired skin and

reaction scores were taken starting 24 hours post-treatment (the same time point

the Franz study measured).  (A6248; A6259).  Finacea® had a statistically

significant higher total reaction score than Skinoren®, demonstrating its increased

penetration, consistent with the Franz study.  (A3494-96 (1037:17-1039:8);

A6246-47; A6273).

A pilot study comparing Finacea® and Skinoren® in acne patients followed.

(A2619 (162:22-25); A4747-4807).  The data exhibited a trend consistent with the

Franz results.  For instance, Finacea® achieved higher efficacy than Skinoren® for each point of comparison.  (A2625 (168:2-17); A2662 (205:13-21); A4782).

This work culminated in FDA approval of Finacea®.  (A2531 (74:8-19); A2625 (168:18-25)).

## III.    THE '070 PATENT

The '070 patent discloses and claims novel topical azelaic acid hydrogels, including Bayer's Finacea®, and the use of these hydrogels to treat skin conditions such as rosacea.  (A3881-82 (6:27-8:8)).  Sole independent claim 1 recites an azelaic acid hydrogel composition comprising:  (1) 5 to 20% by weight azelaic acid; (2) 0.5 to 5% by weight of at least one triglyceride; (3) propylene glycol; (4) at least one polysorbate, in an aqueous phase that further comprises water and salts; (5) at least one polyacrylic acid; and (6) lecithin.  (A3881 (6:28-39)).

The Patent Examiner was made aware that azelaic acid creams and emulsions existed before the '070 invention, as did non-azelaic acid formulations that used the other ingredients claimed.  The patent's "Prior Art" section describes two azelaic acid-containing creams, EP 0 336 880 A2 and Skinoren®, and identifies Skinoren® as the "closest prior art."  (A3879 (1:15-36)).  It goes on to describe additional references that disclosed non-azelaic acid formulations, including emulsions, with polyacrylic acid, triglyceride, propylene glycol, polysorbates, lecithin, and an aqueous phase with salts.  (A3879 (1:37-2:7)).

15

The '070 invention significantly advanced the art.  Unlike prior art creams and emulsions, the '070 patent is directed to novel azelaic acid ***hydrogels***.  (A3879 (1:6-7)).  The advantage of these novel formulations is their ability to deliver up to five-fold more azelaic acid to the living skin compared to prior art creams.  (A3879 (2:29-35)).

The '070 Examples showcase this advantage.  Example 1 describes how to make the inventive hydrogel.  (A3881 (5:20-39); A2536-37 (79:1-80:8)).  Example 2 reports Dr. Günther's Franz results and explains that this data shows "considerably higher azelaic acid concentrations in the skin were achieved with the agent according to the invention" compared to the cream.  (A3879 (2:10-40); A3880 (3:4-7); A3881 (5:40-6:26); A2616 (159:13-15)).

The PTO recognized both the novelty and the unexpected results of the claimed hydrogels over prior art creams/emulsions in its reasons for allowance:

> The prior art of record ***neither teaches nor suggests an azelaic acid hydrogel*** composition containing [the] instant amount of azelaic acid in the form of a hydrogel ***and said hydrogel enabling over four times higher bioavailability and penetration*** of azelaic acid in the stratum corneum and in the skin as a whole compared to conventional creams/emulsions of the prior art.

(A4423).

## IV.    GLENMARK COPIED THE '070 PATENT

Glenmark used the '070 patent as its roadmap to make its Gel.  In 2008, Glenmark reverse-engineered Finacea® based on Bayer's '070 patent.  (A2671 (214:11-16); A2676-77 (219:17-220:20); A2679 (222:18-21); A5867; A5956; A6992).  According to its ANDA, Glenmark then made five experimental batches in which it systematically swapped out the claimed lecithin and triglyceride for other excipients to find a substitution that matched Finacea®.  (A2677-84 (220:21-227:10); A5867; *see also* A7116-21).  The first three substitutions failed.  (A2677-84 (220:21-227:10); A5867).

Glenmark selected two batches that passed preliminary testing for a Franz study:  batch 036, which replaced lecithin and triglyceride with PPG-20, and batch 041, which became Glenmark's Gel.  (A2677-84 (220:21-227:10); A2690-92 (233:18-235:12); A5646-49; A5653; A5867; A5961-63).  Glenmark's ANDA states it substituted lecithin and triglyceride with isopropyl myristate in the latter "to improve the penetration."  (A5866-67; A6244-45; A2682-83 (225:14-226:13)).  Because penetration enhancers and their mechanisms of action are categorized by chemical class, Glenmark selected isopropyl myristate from the same "fatty acid ester" class as lecithin and triglyceride.  (A35-36; A39; A3162-63 (705:2-706:1); A3168-69 (711:3-712:2); A5942).  All other excipients in Glenmark's Gel remained the same as Finacea®.  (A2770-71 (313:1-314:16); A5866; A6244-45).

Glenmark's Franz study used the same basic methodology reported in '070 Example 2 and showed that batch 041 demonstrated skin penetration most similar to Finacea®. (A5646-49; A5653; A5961-63; A2604 (147:8-14); A2690-92 (233:18-235:12); A2697-98 (240:20-241:23)). Even after 48 hours, more azelaic acid remained in the skin with both Finacea® and batch 041 than went through to the receptor. (A5652; A3176-77 (719:6-720:12)). Glenmark also plotted the flux profiles (*i.e.*, the amount of azelaic acid going through the skin per hour) (A2784-85 (327:24-328:4)), showing that Finacea® and batch 041 both reached peak flux between 1 and 5 hours after application. (A5651-53). Glenmark concluded that there was no statistically significant difference between batch 041 and Finacea®. (A2669-71 (212:25-214:10); A2683-84 (226:14-227:4); A5653; A5756).

Given these results, Glenmark expected batch 041 to have the best chance of passing clinicals and selected it for further development. (A2669-71 (212:25-214:10); A2683-84 (226:14-227:4); A2697-98 (240:24-241:23); A5653; A5756). Glenmark filed a patent application on its Gel reporting its Franz results. (A5760 (¶35)). Glenmark then undertook one of its largest clinical trials and demonstrated that its Gel is bioequivalent to Finacea®. (A2715-16 (258:14-259:19); A2718 (261:6-21); A7041).

By copying the '070 patented formulations and simply swapping excipients that served the same function, in substantially the same way, to get substantially

18

the same results as those claimed, Glenmark landed its Gel squarely within the scope of the '070 claims by equivalents.

## V.    GLENMARK'S CITED ART

At trial, Dr. Michniak-Kohn mentioned no fewer than eight prior art references that she found using impermissible hindsight. She admittedly used "keywords" from the '070 patent, including its "Prior Art" section and claims, to search for this art. (A3155-58 (698:10-701:13)). She divided these references into two "buckets": (1) those without azelaic acid (the '752 and '163 PCTs); and (2) those with azelaic acid (the '119 PCT, '943 patent, Maru, Gallarate, Gasco, and Pattarino). (A52-63; A3094 (637:13-23); A3105-06 (648:15-649:2); A3131 (674:20-25)).

### A.    Non-Azelaic Acid References

Glenmark's non-azelaic acid '752 and '163 PCT references focused on entirely different actives. (A52; A3132 (675:4-6, 675:20-25)). As Dr. Weiner explained, they failed to disclose any active that is even structurally related to azelaic acid. (A3339 (882:7-12); A3350 (893:15-22)). Moreover, their formulations could not readily accommodate azelaic acid because they lacked the '070 claimed solvent critical for dissolving azelaic acid: propylene glycol.[2]

---

[2]    While Dr. Michniak-Kohn conclusorily asserted that glycerol in these PCT's and propylene glycol are "interchangeable," (A53 n.43), no art showed that azelaic acid is soluble in glycerol. In fact, Glenmark's own work shows that such ingredients are not interchangeable when dealing with this active. When Glenmark

(A53; A3133 (676:1-3); A3344-45 (887:3-888:3); A3351-52 (894:24-896:6)).

They were also missing benzoic acid, the preservative recited in '070 claim 12.

(A53; A3341-42 (884:22-885:17); A3351 (894:22-23)).  Neither PCT reported any

skin penetration data.  (A3132 (675:7-17); A3347-48 (890:13-891:2); A3359-60

(902:13-903:3)).

The non-azelaic acid references did not disclose gels by name or science.

Glenmark suggests '752 PCT Example 30 and certain '163 PCT Examples were

gels because they disclosed neutralized Carbopol® formulations.  (Open. 14).  But,

as Dr. Weiner explained, neutralization does not automatically make a gel if there

is something else in the formulation that blocks gel formation.  (A3345-46

(888:18-889:25)).  This is because formulations are complex and whether a gel

forms depends on the totality of the formulation.  (*Id*.).

Dr. Weiner testified that '752 PCT Example 30, which described a

"homogenous cream," was not a gel because it contained a large amount of oil (17

grams) that impedes gel formation.  (A3345-47 (888:18-890:8); A6139-40).

Similarly, every '163 Example described the end products as emulsions or creams.

(A6168-88).  Moreover, '163 Example 22 saw viscosity drop upon addition of

Carbopol®.  (A6179-81).  Because the formation of a gel's three-dimensional

---

tried substituting another type of glycol for propylene glycol in Finacea®, its
formulation attempts failed.  (A3387-88 (930:13-931:5); A5867).

structure increases viscosity (A3326-27 (869:3-870:11)), a POSA would

understand this to mean that no gel formed.  (A3353-54 (896:7-897:22)).

### B.    Azelaic Acid References

Glenmark does not even mention most of its azelaic acid references on

appeal, including Gallarate, Pattarino, the '943 patent, and the '119 PCT.  And,

while Glenmark addresses Gasco for ensnarement, it does not raise Gasco to argue

obviousness.  That leaves only Maru on appeal.

Maru made three 15% azelaic acid formulations, one of which the article's

French-to-English translation called a "gel ointment."  (A6098; A3101-02 (644:23-

645:1-15)).  None of Maru's formulations contained triglyceride, lecithin,

polysorbate, or benzoic acid as required by the '070 claims.  (A6098; A3881-82

(6:27-8:9); A3135 (678:19-24)).

Maru's so-called "gel" contained Carbopol®, but Maru did not report that

formulation's pH, or that pH was ever neutralized for Carbopol® to form a gel.

(A6098-6103; A3136-37 (679:22-680:24); A3371 (914:7-16)).  In fact, Maru left

no room for any neutralizing agent.  It listed the weight percent of each "gel"

component, adding up to 100%; but no component was a neutralizing agent.

(A6098; A3371 (914:7-16)).  Without neutralization, the Carbopol® in Maru's

"gel" could not have gelled.  (*Supra* pp. 10-11).[3]

Maru's Franz results showed that its "gel" tracked conventional

expectations:  as more azelaic acid penetrated into the skin, more passed through

the skin into the receptor fluid.  (A6100; A6102; A3374-75 (917:23-918:13)).

Following Maru, Gasco and his colleagues co-authored a series of

publications targeting azelaic acid "microemulsions" and showed they were

superior to Maru's so-called "gel."  The Gasco group's microemulsions lacked

triglyceride, lecithin, salts, and benzoic acid and, like Maru, were not gels.  (*Infra*

pp. 22-23; A3074 (617:16-17); A3109 (652:2-6); A3376-77 (919:4-920:4); A3379-

80 (922:22-923:2); A3384 (927:14-17); A6079; A6085; A6109).  While Glenmark

does not mention these subsequent references, they help place Maru in context and

teach away from Maru's "gel."

The first publication, Gallarate, made microemulsions, which Dr. Michniak-

Kohn conceded were not hydrogels.  (A6078-79; A3138 (681:19-23); A3376-77

(919:4-920:4)).

---

[3]    The '119 PCT, not raised on appeal, was also a gel in name only.  (A3367-
69 (910:15-912:3)).  It made a passing statement that a gel could form by removing
a particular excipient from Examples 1 and 2.  The court dismissed that as
"unsupported" because Glenmark's expert could not explain this phenomenon.
(A62-63).  Glenmark's remaining azelaic acid references disclosed unneutralized
creams and other emulsions, and identified their formulations as such, same as
Skinoren® cream.  (A4-5, A59-63).

The second publication, Gasco, added Carbopol® to Gallarate's microemulsions to make them more viscous.  (A6084-85; A3139 (682:2-22)).  As Dr. Michniak-Kohn admitted, Gasco never neutralized these microemulsions to make a gel.  (A3139-40 (682:14-683:7); A6084).  Gasco also recreated Maru's "gel" as a reference but reported that his viscosized microemulsions out-performed Maru's "gel" in Franz tests.  (A6085-87; A3147-48 (690:24-691:5)).  Based on these results, Gasco added the penetration enhancer DMSO to its microemulsions, and did nothing further with Maru's so-called "gel."  (A6085-87; A3147-48 (690:24-691:20)).

The third publication, Pattarino, continued work with Gasco's DMSO microemulsions, but did not revisit Maru's "gel."  (A6108-09; A3073 (616:1-9); A3149-50 (692:7-693:17); A3382-83 (925:5-926:8)).

## SUMMARY OF ARGUMENT

**Infringement:**  The District Court correctly found Glenmark's isopropyl myristate infringes by equivalents because it meets every prong of the function-way-result test.

Glenmark admits the isopropyl myristate in its Gel functions as a penetration enhancer.  Glenmark does not contest the court's findings that it does so in the same way, and to obtain the same result, as the claimed lecithin and triglyceride.

Glenmark only contests whether lecithin and triglyceride also function as penetration enhancers. The evidence showed they do.

Glenmark's assertion that the '070 patent is silent on this function ignores that the patent showcased increased penetration results. Bayer's expert testified that a POSA would understand from the '070 patent that lecithin and triglyceride are the excipients enhancing penetration in the invention. And Glenmark's own witnesses and ANDA documents confirmed Glenmark scientists read the '070 patent the same way. (A32-34). While Glenmark now dismisses its admissions to the FDA as irrelevant, Glenmark cannot liken its Gel to the claimed composition to obtain FDA approval, yet ignore its comparison for purposes of infringement. (A34).

Glenmark's argument that lecithin and triglyceride have additional functions is unavailing. The evidence showed that excipients may serve more than one function in the claimed formulations, but the only function that matters when analyzing '070 equivalents is enhanced penetration, which lecithin and triglyceride undoubtedly perform. (A33).

Moreover, the undisputed findings that the excipients-at-issue work the same way to achieve the same penetration results underscore that they share the same penetration enhancer function. This is the only function that accounts for this way and result.

The Court's infringement decision was not clear error.

**Legal Defenses**: The District Court properly rejected Glenmark's estoppel and ensnarement defenses.  (A42-47).

Glenmark waived any amendment-based estoppel theory by failing to raise it post-trial.  Nor can there be any estoppel because Bayer did not unequivocally disclaim or make any narrowing amendment regarding lecithin.  (A46-47).  Instead, Bayer merely clarified that dependent claims already included lecithin.  Glenmark's assertion that this constitutes estoppel fails as a matter of law.  *Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1157, 1177-78 (Fed. Cir. 2008).

Glenmark's ensnarement theory likewise runs afoul of the law.  Glenmark relies on impermissibly broad hypothetical claims extended to encompass ***all*** penetration enhancers.  The court rejected that in favor of hypothetical claims just broad enough to literally cover the isopropyl myristate in Glenmark's Gel.  *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1324-25 (Fed. Cir. 2009).  Its findings show these claims do not ensnare Gasco, which does not disclose or suggest the excipients-at-issue, let alone in hydrogel form.  (A43-46; A59-60).  Gasco's lack of a hydrogel means that there would be no ensnarement even using Glenmark's overly broad claims.

**Non-Obviousness**:  Because Glenmark engaged in impermissible hindsight by using the '070 patent, including its prior art description, to find its cited art, it is no surprise that Glenmark's art was either before the PTO or cumulative thereof.

The District Court soundly rejected Glenmark's obviousness defense as lacking any evidence of motivation to combine the art as Glenmark suggests, or a reasonable expectation of success in doing so.  (A63-66).  Post-trial, Glenmark abandoned the specific art combinations its expert raised at trial to pursue a vague combination of its two "buckets" of art.  But, as the court found, any attempt to manufacture a motivation to make this combination at this point is nothing but attorney argument.  (A64-66).  For that reason alone, Glenmark's invalidity defense should be rejected.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

Moreover, as the court's findings show, none of Glenmark's art disclosed or suggested the claimed invention.  One cannot simply mix and match ingredients from different references, as Glenmark argues, given the complexities of formulation work, as evidenced by Glenmark's own unsuccessful attempts at substituting excipients into the claimed hydrogels.  (A52-66).  Glenmark's references show that when the prior art used azelaic acid, it was formulated as creams and emulsions, not gels, and never with the claimed combination of lecithin and triglyceride.

**Objective Indicia:**  Real-world evidence of the '070 patent's unexpected skin penetration results and commercial success underscore non-obviousness, as the District Court properly concluded.  (A66-70).

No prior art achieved the surprising penetration results Bayer did. Glenmark's criticisms of Bayer's Franz study ring hollow given it applied the same methodology in its own testing and told the FDA and PTO that it achieved the same penetration results.  Although clinical trials were not needed to substantiate these results, as the court found, Bayer's clinicals did.  (A67-68).

The magnitude of Finacea®'s sales is undisputed.  The only thing Glenmark contests is nexus.  The evidence showed it was the benefits of the patented invention that drove consumer demand, and this success.  Glenmark's claim that marketing efforts contributed to sales fails to prove that the claimed invention did not.  *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000).

The court's well-reasoned findings underlying non-obviousness were not clear error.

# ARGUMENT

## I.     THE DISTRICT COURT'S INFRINGEMENT FINDING WAS NOT CLEAR ERROR

As explained *supra* pp. 23-24, on appeal, Glenmark only contests the function prong of the court's analysis and only as to whether the claimed lecithin and triglyceride function as penetration enhancers.  But Glenmark's own witnesses and documents confirm that Glenmark itself understood they do.

Glenmark's suggestion that the District Court's infringement decision is reviewed *de novo* is wrong.  (Open. 24).  Rather, "[a] determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact and is reviewed for clear error following a bench trial." *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1311 (Fed. Cir. 2015).  Glenmark has not, and cannot, find clear error in the court's infringement determination.

### A.     A POSA Would Understand That Lecithin And Triglyceride Function As Penetration Enhancers From The '070 Patent

The crux of Glenmark's argument is its incorrect assertion that lecithin and triglyceride's penetration enhancer function has no basis in the '070 patent because the patent does not expressly state function.  (Open. 25, 27).  But Glenmark's own cited case, *AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. 2005), shows patents need not spell out an excipient's function for equivalents to apply.  This Court reviewed the same *AquaTex* language Glenmark cites (Open.

28

27) and explained one looks to what a POSA would understand from the patent's disclosure:

> But this [*AquaTex* language], of course, does not mean that discussion of the equivalence of the function, way, or result between a claimed invention and an accused product is irrelevant when the claims and specification of a patent are silent on the subject. ***When the claims and specification of a patent are silent*** as to the result of a claim limitation, as they are in the '338 patent, ***we should turn to the ordinary skilled artisan***.

*Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1365 (Fed. Cir. 2007).  As discussed *infra* pp. 29-34, both Bayer and Glenmark witnesses understood the '070 patent used lecithin and triglyceride as penetration enhancers.

If patents had to expressly state penetration enhancer function, Glenmark would have done so for isopropyl myristate in its own application.  It did not. (A5758-61).

## B.    Particularized Testimony And Documents Confirm Function

Dr. Weiner analyzed '070 Example 2 and determined that the excipients responsible for the invention's enhanced penetration were lecithin and triglyceride. In reaching this conclusion, he considered two potential reasons for this increased penetration:  (1) increased azelaic acid dissolution, or (2) penetration enhancers. (A28-29).  Dr. Weiner was able to rule out dissolution because the amount of propylene glycol, the only excipient therein known to dissolve azelaic acid, is actually slightly less (12%) in Finacea® than in Skinoren® (12.5%).  (A2777-78

(320:19-321:21); A2779-80 (322:21-323:16); A2797 (340:1-20); A2289 (¶26); *see also* A3184 (727:10-21)).  With solvent held effectively constant, he understood that the difference in penetration must be due to penetration enhancers.  He looked at the remaining ingredients and identified the only excipients that enhance penetration:  lecithin and triglyceride.  (A2779-80 (322:21-323:16)).

Glenmark's scientists read the '070 patent the same way Dr. Weiner did. They listed each "ingredient" in Finacea® in a table in Glenmark's ANDA along with the "function" they understood each performed based on the '070 patent. (A5856; A5931; *see* A5866; A5943).  The only lecithin and triglyceride "function" identified was "penetration enhancer."  Glenmark also told the FDA that "[i]sopropyl myristate was selected as [a] penetration enhancer instead of lecithin and medium chain triglyceride."  (A5865; *see also* A5867; A5942; A5962).

Glenmark's Franz study confirmed this shared function.  Glenmark told the FDA that there was no significant difference in penetration results between its Gel and Finacea®.  (*Supra* p. 18).  Where results remained constant, and the sole difference between these formulations was Glenmark's substitution of its penetration enhancer for lecithin and triglyceride, the only conclusion is that they too perform this function.  In fact, Glenmark told the FDA, in direct response to a question about the different penetration enhancers in the products-at-issue, that its

Franz results "***demonstrate the equivalence*** between [Finacea®] and Glenmark's drug products." (A7326).

Glenmark tries to undercut Dr. Weiner's conclusion that the excipients-at-issue function as penetration enhancers by citing, in isolation, the court's comment that this position lacked scientific rigor. (Open. 2, 4, 11, 18, 26 (citing A32)). The surrounding text shows that the comment reflected that Dr. Weiner did not realize that Skinoren® also includes triglyceride. It also noted that two documents, Dr. Franke's marketing slide and the Draelos poster, suggested the hydrogel had more dissolved azelaic acid than Skinoren®. (A32). Neither undermines Dr. Weiner's conclusion or the court's finding of function.

First, Glenmark cites no evidence that any triglyceride in Skinoren® met the claimed 0.5%-5% amount. Moreover, the claims require ***both*** lecithin and triglyceride, and it is this combination, which is indisputably not present in Skinoren®, that Dr. Weiner explained enhances penetration. (A2777-80 (320:15-323:16)).

Second, Dr. Franke's slide stated that the proposed dissolution numbers were merely "calculated" approximates. (A4624). Neither the slide nor poster, which repeated the slide's "calculated" dissolution numbers, included any data to show this was anything more than an untested theory. (A3183 (726:5-19); A6246-

47; A4624).  In fact, Bayer later removed this point from its materials because there is no supporting data.  (A3245 (788:6-20); A4885).

The court correctly found these points to be outweighed by the rest of the evidence showing lecithin and triglyceride function as penetration enhancers.  It credited Dr. Franke's testimony that he included lecithin for its "penetration enhancement" properties and triglyceride for its compatibility with lecithin.  (A33; A2526-27 (69:11-70:10)).  The court also properly noted Dr. Michniak-Kohn's admission "that a [POSA] would understand that *lecithin contributed to the better results of the claimed gel*."  (A32 (citing A3020 (563:9-12))).  It also cited testimony by Glenmark's scientist, and its ANDA statements, confirming this function.  (A32-33).  Glenmark's assertion that Dr. Weiner was Bayer's only witness on function and that, absent his testimony, there was no "particularized testimony" on this issue (Open. 26, 31) ignores this record.

Glenmark mischaracterizes Dr. Michniak-Kohn's admission that lecithin contributes to the claimed penetration results by suggesting that she meant lecithin was acting as an emulsifier.  (Open. 34-35 (citing A3010-11)).  She said no such thing.  To make this claim, Glenmark cites unrelated testimony where Dr. Michniak-Kohn said the Handbook includes emulsifier as one possible lecithin function (A3010-11), but that does not limit its function in the '070 patent.  In terms of the claimed formulation, she later agreed lecithin increases penetration,

but speculated it does so by increasing azelaic acid solubility. (Open. 35 (citing

A3045-46)). But, on cross, she admitted no art showed lecithin dissolves azelaic

acid. (A3183-84 (726:20-727:5)). Moreover, Glenmark does not contest that the

claimed lecithin actually alters stratum corneum lipids (*supra* pp. 7, 23-24),

confirming it is a penetration enhancer. (*Infra* pp. 37-38).

Glenmark runs from its ANDA admissions about lecithin and triglyceride

function by arguing its representations are legally irrelevant hypotheses. (Open.

32-33). Nothing in Glenmark's cited cases suggests an ANDA holder should not

be bound by all statements made to the FDA. The District Court did not err in

finding that Glenmark "should not be permitted to liken their product to the

claimed composition to support their bid for FDA approval, yet avoid the

consequences of such a comparison for purposes of infringement." (A34). And, as

both its V.P. of Regulatory Affairs, Mr. Maffia, and expert testified, Glenmark's

ANDA tables identifying function were truthful and accurate and did not contain

theoretical or scientifically invalid statements. (A2723-24 (266:11-267:25);

A2726-27 (269:7-270:19); A2730-33 (273:6-276:20); A3161-62 (704:221-705:1);

A6967-68).

Glenmark's claim that the court relied on ANDA statements addressing

bioequivalence (Open. 21 (citing A33-34)) is wrong. The court cited Glenmark's

tables identifying excipient "function" and its accompanying discussion of

33

excipient selection in the ANDA's "Drug Product" section, not Glenmark's clinical trial establishing "bioequivalence."  (A33 (citing A5856; A5865-67); A5851).  To the extent Glenmark claims these tables nevertheless supported bioequivalence, its own case confirms bioequivalence can be relevant to the function prong of equivalents.  *See Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009).

## C.    Lecithin And Triglyceride's Additional Functions Do Not Negate Their Penetration Enhancer Function

Despite the fact that Glenmark understood lecithin and triglyceride's penetration enhancer function from the '070 patent, Glenmark claims the additional functions listed in Bayer's NDA indicate Bayer did not.[4]  (Open. 11-12, 30, 33).  But, as the court found, Bayer's NDA listing of lecithin and triglyceride as moisturizers or emollients does not mean these excipients cannot also enhance

---

[4]    Glenmark's reliance on Dr. Franke's testimony and his marketing presentation to suggest that he could not identify any Bayer document showing that these excipients function as penetration enhancers (Open. 35-36) is baseless.  In citing the marketing presentation describing lecithin and triglyceride as an "emulsified re-fattening complex," Glenmark omits Dr. Franke's testimony that lecithin "had further abilities," that he included lecithin in the first place to enhance skin penetration, and added triglyceride to compliment lecithin.  (A2526-27 (69:11-70:10); A2545 (88:3-11)).  Dr. Franke further testified that these excipients function together to enhance penetration in the claimed hydrogel.  He specifically cited the '070 Franz results as "indirect evidence" of this function because they showed lecithin and triglyceride's penetration effect when acting together in the context of the invention.  (A2546 (89:11-18); A2591-92 (134:2-135:24)).

penetration in the same formulation. (A33). These functions are not mutually exclusive.

Glenmark mischaracterizes this finding as based on an absence of evidence. (Open. 31-32). But the court drew this conclusion from both sides' experts, who agreed "that a given excipient may perform more than one function." (A33 (citing A2777 (320:7-18); A3009-10 (552:12-553:4))). Likewise, Glenmark formulator Mr. Mehta testified that lecithin, triglyceride, and isopropyl myristate share the same three functions: penetration enhancer, emulsifying agent, and emollient. (A2685 (228:5-24); A2686-87 (229:20-230:3); A2689-90 (232:13-233:14)). Thus, Glenmark's own witnesses supported the court's finding that additional functions do not erase the fact that lecithin and triglyceride, or isopropyl myristate, also act as penetration enhancers. (A33).

Moreover, Glenmark's argument regarding Bayer's NDA ignores that Bayer was not required to list every excipient function in its NDA. (A2823-24 (366:21-367:10)). Having already proved efficacy through clinicals, which efficacy necessarily meant azelaic acid penetrated into skin, Bayer focused on additional triglyceride and lecithin functions in other NDA sections.

Glenmark, in contrast, had to convince the FDA that its isopropyl myristate substitution did not compromise Finacea®'s efficacy. (*See* A7326). Consequently,

the shared function Glenmark focused on is what drives efficacy and matters for equivalents:  penetration enhancement.  (*Supra* pp. 30-31).

Glenmark also argues that the '070 patent indicates that lecithin was being used as an emulsifier.  (Open. 27-28).  Yet Glenmark's own scientists did not read the '070 patent this way and, as the court found, both sides' experts agreed that excipients can perform more than one function in a given formulation.  (A33).

### D.     Literature Described Penetration Enhancement By Lecithin And Triglyceride

Glenmark's claim that no literature in evidence identifies lecithin and triglyceride as penetration enhancers (Open. 12, 31) is belied by its own expert's cited Leopold and Handbook references.  Leopold reported that the combination of lecithin and triglyceride alters stratum corneum lipids the same way as isopropyl myristate.  (A36-37; A3165-67 (708:23-710:13); A6238-42).  Moreover, the Handbook identified "good penetration properties" as an advantage of triglyceride.  (A31 n.28; A3165 (708:1-19); A5816).  Dr. Michniak-Kohn testified that lecithin may constitute a mixture that includes triglycerides (A3164 (707:23-25)), through which lecithin must possess the same penetration properties stated in the Handbook.[5]

---

[5]     These references are consistent with Mr. Mehta's testimony that Glenmark's scientists identified literature noting lecithin and triglyceride's potential penetration enhancer function.  (A2689-90 (232:19-233:14)).

Glenmark then mischaracterizes an article by Dr. Weiner, ***not*** in evidence, to suggest lecithin cannot enhance penetration.  (Open. 21, 31).  Dr. Weiner's corresponding testimony explains that his article did not specify lecithin, and what it said about penetration was specific to phospholipids in the particular emulsion therein.  (A2887 (430:9-22 ("When the ***phospholipids*** are incorporated ***into an emulsion, in this particular study*** they did not serve as a penetration enhancer.")))  There is nothing to suggest Dr. Weiner ever applied this notion generally, let alone to lecithin in the context of the '070 formulations.

### E.    The District Court's Findings On Way And Result Undercut Glenmark's Function Objections

The court's findings that the excipients-at-issue enhance penetration in substantially the same way to achieve substantially the same result (A39, 41), which findings Glenmark does not dispute and affirmatively cites (Open. 30 n.4), further underscore that these excipients share the same function.

The penetration enhancer function of the excipients-at-issue goes hand-in-hand with the court's analysis of the way that function is achieved (*i.e.*, by disrupting stratum corneum lipids) and its result (*i.e.*, a composition able to penetrate the stratum corneum to deliver azelaic acid).  (A39, A41).  As Dr. Michniak-Kohn testified, and Glenmark agrees, excipients that work by altering the stratum corneum lipids to obtain enhanced penetration are functioning as penetration enhancers.  (Open. 12; A2961-63 (504:2-506:13)).  Given the District

37

Court's unchallenged way and result findings, Glenmark's function objections fall flat.

## II.    THE DISTRICT COURT CORRECTLY REJECTED ESTOPPEL

Glenmark argues that equivalents to lecithin are barred by both argument-based and amendment-based estoppel based on Bayer's clarification that two claims, which depended from a claim that recited lecithin, also required lecithin. Neither estoppel theory shields Glenmark from infringement as a matter of law. (A46-47).

As a threshold matter, Glenmark has waived any amendment-based estoppel contention.  Because Glenmark's estoppel theory was unclear at trial, Bayer addressed both amendment-based and argument-based estoppel in its opening post-trial brief.  (A3628-31).  Glenmark's responsive brief, however, raised only argument-based estoppel.  (A3800-3801; A3837-38).  The court nevertheless rejected *both* estoppel theories.  (A46-47).  Regardless, having waived amendment-based estoppel post-trial, Glenmark cannot now resurrect it on appeal. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1295-96 (Fed. Cir. 2009); *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322-23 (Fed. Cir. 2008).  In the event this Court nevertheless hears that argument, as explained below, it fails on its merits.

38

The prosecution history of the claimed lecithin limitations confirms that no estoppel applies. During prosecution, the PTO noted that dependent claims 3 and 5 that recited "up to" certain lecithin amounts could include zero lecithin. (A4379). The PTO's comment was not tied to any prior art. In response, Bayer explained that the use of the term "up to" was "only in claims dependent on independent claims, which clearly require the recited components. Since the dependent claims must limit the independent claims, the meaning is clear that zero amounts are not included." (A4386-87; A46). Bayer then amended the language of the dependent claims from lecithin at concentrations of "up to 1% [or 3%] by weight" to "more than 0 to 1% [or 3%] by weight." (A4402; A46-47). Bayer said these claims were "amended to expressly state what has already been made clear on the record." (A4398).

## A.    Argument-Based Estoppel Does Not Apply

Bayer's clarifying statement did not "clear[ly] and unmistakabl[y]" disavow claim scope to distinguish art as required to constitute argument-based estoppel. *Cordis*, 511 F.3d at 1177. Accordingly, the court correctly found no clear and unmistakable surrender of equivalents to lecithin. (A46-47).

Glenmark misreads the District Court's cited *Cordis* case to argue it supports estoppel on these facts. (Open. 40-41). In *Cordis*, the patentee first defined its invention, and then distinguished that invention from prior art the PTO raised to

reject its claims. *Cordis*, 511 F.3d at 1176. This Court held that merely describing one's own invention by making "explicit the meaning of the term [ ] that was already implicit in the patent" does not give rise to estoppel. *Id*. at 1177-78. Rather, the patentee's ***only*** clear and unequivocal disclaimer occurred when it distinguished its invention from the art. *Id*. at 1178. Similarly, Bayer's statement that its claims always included lecithin cannot give rise to estoppel as it only made explicit what the claims already described as the invention. And Bayer did not distinguish any art in the process to constitute disavowal. Thus, the District Court correctly applied *Cordis*, and cited additional case law consistent with *Cordis*, to support its conclusion. (A25-27; A46-47).

Recognizing that the absence of any statement distinguishing the art based on lecithin is fatal to its defense, Glenmark argues, for the first time on appeal, that Bayer indicated multiple elements of the '070 compositions were critical by distinguishing them from the Kaleta reference. (Open. 39). Glenmark never raised this theory before the District Court and has therefore waived it. *See Fresenius*, 582 F.3d at 1295-96; *Golden Bridge*, 527 F.3d at 1322-23. However, it too fails on the merits.

In the Response Glenmark cites (A4383-88), Bayer never distinguished its invention from Kaleta based on lecithin, the '070 component relevant to Glenmark's estoppel defense. In fact, Bayer specifically noted that Kaleta

40

disclosed lecithin.  (A4385).  Instead, Bayer argued that even if Kaleta disclosed

every claimed component, a POSA would have no motivation to create the '070

compositions from Kaleta's laundry list of ingredients.  (A4385-86).  Such a

general statement is not a "clear and unmistakable" disavowal of lecithin.  *Cordis*,

511 F.3d at 1177.  Glenmark cites no law suggesting that it meets the exacting

estoppel standard.

### B.    Amendment-Based Estoppel Does Not Apply

Bayer's clarifying amendment did not narrow claim scope, let alone to

obtain the patent or protect its validity, as amendment-based estoppel requires.  *See*

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734-736

(2002).  As the court recognized, claim scope stayed the same because some

amount of lecithin was a required element of claim 1 both before and after this

amendment.  (A46 (citing 35 U.S.C. § 112 ¶4 (2006)); A4250; A3881 (6:27-39)).

It correctly found that, when taken in context, Bayer's amendment did not disclaim

any subject matter, but explained what the claims already covered, *i.e.*, greater than

zero amounts of lecithin.  (A46-47 (citing *Cordis*, 511 F.3d at 1177)).  Moreover,

in making the amendment-at-issue, Bayer warned competitors that "the

amendments are not intended to and do not limit the scope of equivalents . . . ."

(A4398).  Because Bayer's amendment was neither narrowing nor made for any

reason of patentability, the court correctly found that amendment-based estoppel does not apply.  (A46-47).

## III.    THE DISTRICT COURT CORRECTLY REJECTED ENSNAREMENT

Ensnarement applies only if extending the scope of equivalents to the accused product would also encompass the art at the time of filing.  To test for ensnarement, this Court applies a two-step inquiry:  (1) construct a hypothetical claim that extends the actual claim *just enough* to literally recite the accused product, then (2) compare that hypothetical claim to the prior art and determine if it would have issued.  *Depuy Spine*, 567 F.3d at 1324-25.

It was Glenmark's burden to set forth its ensnarement defense by constructing proper hypothetical claims and identifying the art ensnared by those claims.  *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1365 (Fed. Cir. 2000) (accused infringer must "come forward with evidence that the hypothetical claim reads on the prior art"); *see also Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 982-83 (Fed. Cir. 1999).

Glenmark's ensnarement theory, however, is premised on overly broad and impermissible hypothetical claims that seek to capture all "penetration enhancers." Because the correct hypothetical claims add only isopropyl myristate, and are free of Glenmark's cited art, Glenmark's ensnarement defense fails.  Indeed, not even Glenmark's overbroad claims ensnare the art.

### A.    The District Court Adopted The Correct Hypothetical Claims

The District Court carefully considered both sides' proposed hypothetical claims:

| Glenmark's Hypothetical Claim 1 | Bayer's Hypothetical Claim 1 |
|---|---|
| 5-20% Azelaic Acid | 5-20% Azelaic Acid |
| Propylene Glycol | Propylene Glycol |
| Polysorbate | Polysorbate |
| Water and Salts | Water and Salts |
| Polyacrylic Acid | Polyacrylic Acid |
| ~~0.5-5% Triglyceride and Lecithin~~ <br><br> **Penetration Enhancer** | **0.5-5% Triglyceride and Lecithin;** <br><br> **or Isopropyl Myristate** |
| In the Form of a Hydrogel | In the Form of a Hydrogel |

Mindful of this Court's guidance to construct a hypothetical claim "that 'literally' covers the accused product," it rejected Glenmark's "broad construction" and adopted Bayer's proposal in which isopropyl myristate is added as an alternative to lecithin and triglyceride.  (A42-43).

Glenmark's argument that a broader claim applies is wrong as a matter of fact.  As Dr. Michniak-Kohn conceded, all that is required to draft hypothetical claims that cover Glenmark's Gel is the addition of isopropyl myristate to '070 claim 1 as Bayer's proposed claims did.  (A3188 (731:10-21)).

Contrary to Glenmark's claim (Open. 43-46), Bayer did not argue infringement based on all penetration enhancers.  Rather, it was the specific excipients-at-issue that dictated their shared enhancer function.  Bayer showed that

43

the claimed lecithin and triglyceride, and Glenmark's isopropyl myristate, enhance

penetration, and do so in the same way to get the same result under the function-

way-result test.  (*Supra* pp. 6-7).  The single transcript page from opening

statements Glenmark cites (Open. 45 (citing A2464)) does not suggest otherwise.

There, counsel specified that the excipients-at-issue "act as penetration enhancers,"

and later explained that they meet each function-way-result prong.  (A2464;

A2476-80).[6]  As Glenmark's Brief repeatedly confirms (Open. 8, 21, 25, 29-31),

the equivalents inquiry was limited to isopropyl myristate.

Glenmark misstates the law to argue that because ensnarement cases show

hypothetical claims cover the full "scope" or "range" of equivalents, the claims

here must extend to all penetration enhancers.  (Open. 43-45, 47).  Glenmark omits

the explanation in these cases that this hypothetical "scope" or "range" is limited

by the product ***alleged to infringe***.  *See e.g., Wilson Sporting Goods Co. v. David

Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed. Cir. 1990) ("***sufficient in scope to

literally cover the accused product***"); *Abbott v. Dey*, 287 F.3d 1097, 1105-07 (Fed.

Cir. 2002) ("range of equivalents ***asserted to infringe***"); *Marquip, Inc. v. Fosber*

---

[6]     Contrary to Glenmark's assertion (Open. 45-46), the court did not find
equivalence solely because isopropyl myristate is a penetration enhancer, nor did it
"expressly refuse[] to consider" different ways the excipients-at-issue function.
The court separately evaluated function, way, and result before finding
infringement.  (A32-41).  And it specifically rejected Glenmark's "way" argument
as unsupported by the record.  (A38-39).

*Am., Inc.*, 198 F.3d 1363, 1367 (Fed. Cir. 1999) ("***sufficient in scope to cover***

***literally the accused device***").  Thus, contrary to Glenmark's suggestion, the case

law shows hypothetical claims need only extend to Glenmark's Gel, the accused

product.  *Ultra-Tex*, 204 F.3d at 1366 n.4.

Glenmark's additional cited cases (Open. 48-50) are distinguished on their

facts.  In *Ultra-Tex*, this Court rejected a hypothetical claim that deleted one claim

limitation and added four more because it simultaneously "impermissibly

broaden[ed] and narrow[ed] [the claim]."  204 F.3d at 1365-66.  *Streamfeeder*

rejected the same approach.  175 F.3d at 982-83.  The correct hypothetical claims

here do not do either.

Unlike the '070 claims, which use "limited language" (A42-43) directed to

specific ingredients, the claims in *A.H. Robins*[7] recited a broad class of hydrophilic

surfactants.  Because the accused product used a hydrophobic surfactant, the Ohio

court extended the hypothetical claim to all surfactants.  *Id*. at *12.  That

unpublished decision was vacated before appellate review.  In any event, the '070

claims do not recite classes of compounds.  And the inclusion of isopropyl

myristate with lecithin and triglyceride does not represent all penetration enhancers.

---

[7]     *A.H. Robins Co. v. Erbamont, Inc.,* No. C2-89-864, 1991 WL 229150 (S.D.
Ohio Apr. 18, 1991), *vacated due to settlement*, Nos. 91-1352, 91-1375, 1991 WL
191144 (Fed. Cir. Aug. 12, 1991).

There are entire chemical classes of enhancers outside these excipients.  (*Supra* p. 17; *infra* p. 47).

Glenmark's *Merck & Co. v. Mylan Pharms., Inc.*, 19 F. Supp. 2d 334 (E.D. Pa. 1998), *aff'd on other grounds*, 190 F.3d 1335 (Fed. Cir. 1990) case shows the District Court here used the correct hypothetical claims.  In *Merck*, the patent claimed a numerical range of 5-25 mg of HPC while the accused product contained 29.3 mg.  *Id*. at 338-39.  Recognizing that "a hypothetical claim should be structured to be ***similar to*** the patentee's claims, but ***broad enough to literally cover*** the accused's device," the *Merck* court adopted a hypothetical claim that extended the HPC range to 5-29.3 mg (*i.e.*, just enough to cover the accused product).  *Id.* at 343.  Here, extending the claims to cover the accused product requires only adding the ingredient isopropyl myristate, as the court did.

Finally, Glenmark's argument that broader hypothetical claims would avoid assessing ensnarement case by case (Open. 47-48) ignores that ensnarement is not designed to foreclose equivalents altogether, but to test its limits based on the specific accused product.

## B.    The Correct Hypothetical Claims Do Not Ensnare The Art

Glenmark's assertion that the court did not address whether the hypothetical claims would be anticipated or obvious (Open. 50 n.7) is demonstrably false.  The very pages Glenmark cites for this proposition include the court's analysis of the

correct hypothetical claims against Glenmark's ensnarement reference, Gasco, to find them free of that art.  (*See* A43-46).

As the court found, because there is no dispute that Gasco does not disclose the lecithin, triglyceride, or isopropyl myristate of the hypothetical claims, it cannot anticipate.  (A43 (citing A2796 (339:5-7); A3109 (652:2-6); A3188 (731:22-24); A3379 (922:22-25))).

The court also found that Gasco cannot obviate the hypothetical claims because a POSA would not substitute the excipients-at-issue for DMSO, Gasco's penetration enhancer.  (A45).  As Dr. Weiner explained, DMSO falls in a different chemical class of enhancers than the excipients-at-issue; DMSO is also water-soluble and interacts with proteins in the stratum corneum whereas the excipients-at-issue are water-insoluble and only interact with the lipids.  (A44-45; A6228; A6231; A6233-34; A6072; A6074; A2937-38 (480:5-481:23); A3380 (923:6-13); A3162-63 (705:2-706:1); A3167-69 (710:14-712:2)).  There was nothing in Gasco to prompt a POSA to use something other than DMSO in Gasco's microemulsions, let alone from a different class or with a different solubility profile.  (A2753 (296:9-14); A2794-96 (337:21-339:1); A3380-81 (923:17-924:13)).  Gasco reported no problems with DMSO.  Indeed, Gasco's team continued work with their DMSO microemulsions in Pattarino.  (*Supra* p. 23).  Glenmark itself never considered DMSO as a substitute for lecithin and triglyceride.  (A2796 (339:2-4)).

Glenmark does not challenge the court's conclusion that a POSA would not substitute lecithin and triglyceride for DMSO. (A45). Its sole argument, that the court never considered whether a POSA would have substituted isopropyl myristate for DMSO (Open. 50 n.7), is false. The court credited Dr. Weiner's testimony that different excipients behave differently and are formulation-dependent, and noted Glenmark's own substantial efforts to develop its formulation. It concluded that a POSA would not have reasonably expected success when swapping "*the penetration enhancers at issue*" for DMSO. (A45-46). Thus, the court's finding applied equally to lecithin, triglyceride, *and* isopropyl myristate.

That Gasco neither disclosed nor suggested the excipients-at-issue was reason enough for the court to deny ensnarement. Because hypothetical claim 1 is not ensnared by Gasco, its dependent hypothetical claims are not either. (A43 n.38).[8]

---

[8]    The dependent claims contain additional limitations not disclosed in Gasco. Gasco did not include hypothetical claim 12's benzoic acid. (A6085; A3074 (617:12-17)). Nor would a POSA add benzoic acid to azelaic acid formulations given its pH dependence. (A3341-42 (884:22-885:17); A3343-44 (886:5-887:2)). Moreover, because Gasco did not suggest lecithin or triglyceride, it would not lead a POSA to the type or amounts of lecithin in hypothetical claims 3, 4, and 11 or to the amounts of triglyceride and other excipients in hypothetical claims 5 and 6. Gasco also did not suggest the 10-18% azelaic acid range of hypothetical claim 10 because Gasco reported better results with its 6.4% microemulsions than with the 15% Maru formulation. (A6086-87).

48

Because the prior art must be compared to the hypothetical claims as a whole, *see Abbott v. Dey*, 287 F.3d at 1105-06, the claimed "hydrogel" and "salt" limitations, which Gasco also lacks, are further independent reasons why Gasco does not invalidate the hypothetical claims. Although the court did not need to reach these additional distinctions that Bayer raised to defeat ensnarement (A43), its validity findings and Dr. Michniak-Kohn's testimony confirm Gasco is also missing these limitations.

As Glenmark admits and the court found, Gasco's formulations were microemulsions, not hydrogels. (Open. 50; A59-60). For this additional reason, Gasco does not anticipate.

Gasco also fails to obviate the claimed "hydrogel." Glenmark cites the court's findings concerning Skinoren® to argue that a POSA would have been motivated to pursue a hydrogel. (Open. 51 (citing A64)). But Glenmark never raised Skinoren®, alone or in combination with Gasco, as ensnarement art before the District Court. It thereby waived this argument. *See Fresenius*, 582 F.3d at 1295-96; *Golden Bridge*, 527 F.3d at 1322-23.

Glenmark mischaracterizes Dr. Weiner's testimony to suggest he said it would be obvious to convert Gasco's microemulsion to a hydrogel. (Open. 51 (citing A3401)). But Glenmark never asked him whether a POSA would have been motivated to reformulate an azelaic acid cream/emulsion as a hydrogel.

Instead, Dr. Weiner's cited testimony related to a hypothetical that ***already assumed*** that a POSA had a Carbopol® formulation and further assumed he wanted to make it gel. (A3401 (944:9-22)). Such questioning, which improperly presupposes a motivation to make the '070 patent's hydrogel solution, is irrelevant to whether it would have been obvious to a POSA to make a gel ***before*** the '070 patent. The court properly rejected the notion that converting Gasco's microemulsion to a hydrogel and further modifying it to obtain the claimed formulations was obvious as "pure attorney argument." (A64 n.53).

The Court's no ensnarement finding is also supported by Gasco's failure to disclose the claimed "salts." Glenmark's sole basis for arguing otherwise is Dr. Michniak-Kohn's conclusory testimony that Gasco's microemulsions would contain salts because Gasco adjusted pH. (Open. 52 n.8 (citing A3061)). But on cross she admitted Gasco did not adjust the pH of its microemulsions. (A3139-40 (682:14-683:4)). Thus, Gasco's microemulsions cannot invalidate for this reason as well.

Because the correct hypothetical claims would have issued over Gasco, the District Court's finding of no ensnarement should be affirmed.

## C.    Glenmark's Incorrect Hypothetical Claims Do Not Ensnare The Art

Having rejected Glenmark's overly broad hypothetical claims, the court was under no obligation to analyze those claims against the art. However, the evidence

shows that even Glenmark's impermissibly broad hypothetical claims do not ensnare Gasco.

Glenmark suggests that its hypothetical claims are "anticipated by or obvious over the prior art" (Open. 50), but fails to explain how Gasco, which it admits is not a hydrogel (*id.*), can possibly anticipate such claims.  Because each of Glenmark's hypothetical claims require a "hydrogel" and "salts" (Open. 46), there can be no anticipation because, as described *supra* pp. 49-50, Gasco does not disclose these limitations.  Glenmark waived any obviousness argument regarding its hypothetical claim 1 by failing to raise it before the District Court.  Glenmark only asserted Gasco would obviate the additional limitations of its dependent hypothetical claims 5, 6, 10, and 12.  (*See* A3068-69 (611:22-612:4); A3073 (616:10-16); A3075 (618:10-13)).  In any event, because Gasco does not suggest "hydrogel" or "salts" as explained *supra* pp. 49-50, even Glenmark's overly broad hypothetical claims cannot ensnare the art.

## IV.   THE DISTRICT COURT CORRECTLY FOUND THE '070 PATENT CLAIMS NON-OBVIOUS

The District Court based its non-obviousness decision on findings of underlying fact, including:  (1) the scope and content of the prior art; (2) the differences between the prior art and the asserted claims; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness.  (A49-71); *KSR*, 550 U.S. at 406-07, 427.  While the ultimate finding of obviousness is reviewed *de*

*novo*, the District Court's underlying factual determinations are reviewed for clear error. *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 858, 860 (Fed. Cir. 2015).

Glenmark used impermissible hindsight to find its cited art. (A3155-58 (698:10-701:13)). Even then, no reference disclosed or suggested every limitation of the '070 claims, which Glenmark admits are narrowly directed to a specific formulation. (Open. 6). Instead, Glenmark argues that a POSA would somehow arrive at the claimed hydrogels by mixing and matching different art. But, as the court found, Glenmark presented no evidence that a POSA would have been motivated to combine the art as Glenmark suggests, or would have reasonably expected success in doing so. (A63-66). Because Glenmark cannot remedy this failure of proof on appeal, the court's finding of non-obviousness should be affirmed.

## A. There Is No Evidence Of Motivation To Combine The Art Or A Reasonable Expectation Of Success In Doing So

Glenmark's position as to which art combination obviates '070 claim 1 has been a moving target. At trial, Dr. Michniak-Kohn testified about only two specific combinations of art with respect to '070 claim 1: (1) Gasco with the '752 PCT; and (2) the '163 PCT with the '119 PCT. (A64; A3109 (652:7-17); A3111 (654:12-19)).

In its post-trial briefs, Glenmark abandoned these two specific art combinations, relying instead on a vague combination of its two "buckets" of art. (A64-65; A3853).

The District Court properly found that there was no evidence in the record that a POSA would have been motivated to make Glenmark's post-trial "bucket" combination.  It was certainly not any combination Glenmark's expert endorsed at trial.  (A64-65).  Glenmark's only support for its new post-trial combination was Dr. Michniak-Kohn's vague statement that there **may** be other art combinations (A3113 (656:2-18)), but the court rejected this cursory statement as failing to show motivation to combine.  (A65).  The court specifically considered the post-trial bucket combination Glenmark suggested (*i.e.*, the '752 and '163 non-azelaic acid PCTs with Maru's azelaic acid "gel") and found there was no motivation evidence to support it.  (A64-65).  It correctly observed that "[a]ny attempt by the court to manufacture a motivation to combine the references-at-issue without guiding testimony or evidence would amount to pure speculation."  (A65).  Glenmark has failed to show that finding was clear error.  *See Insite*, 783 F.3d at 860 (motivation to combine is reviewed for clear error).

On appeal, Glenmark's obviousness argument addresses only these three references, yet remains vague as to precisely what art combination it makes and blames the court for its own failure of proof.  It criticizes the court's analysis as

"constricted" and involving a "narrow approach to motivation" because it focused

on the '752 and '163 PCTs with Maru.  (Open. 53, 55).  But, the court did exactly

what Glenmark advocated post-trial:  combine references from the non-azelaic acid

and azelaic acid art buckets.  (A64-65).  And, while Glenmark alleges that the

court "discounted" prior art references (Open. 53-54), it never identifies what those

references are, let alone what they add to the court's finding that there was no

motivation to combine given the complete absence of evidence on the issue.

With no showing of motivation to combine, Glenmark misreads *KSR* as

eliminating the need for such motivation evidence.  (Open. 23-24).  To the

contrary, while *KSR* explained that such motivation need not be found in the art

itself, it emphasized that the motivation analysis "should be made explicit."  *KSR*,

550 U.S. at 418.  Even after *KSR*, a teaching, suggestion, or motivation to combine

prior art is not only critical, it "remains the primary guarantor against a non-

statutory hindsight analysis . . . ."  *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,

520 F.3d 1358, 1364 (Fed. Cir. 2008).

The court further found that even if Glenmark had developed a full record on

motivation, it failed to demonstrate a reasonable expectation of success in making

the claimed hydrogels.  (A65-66).  Glenmark argues that its obviousness case did

not depend on proving that a POSA would expect the combination of the '752 and

'163 PCTs with Maru to succeed.  (Open. 57-58).  Instead, it claims both sides'

experts said a POSA would have expected success because optimizing formulations is "routine." (*Id.*). Yet no expert did.

The District Court reviewed Glenmark's cited Michniak-Kohn testimony and confirmed she never talked about the "routine nature of optimizing a formulation"; she only gave "pointed testimony" about "two specific combinations." (A65 (citing A3110-12, A3116-17)).[9] Testimony limited to specific combinations, which Glenmark long since abandoned, cannot support a broader finding of success. Nor does Glenmark's cited Weiner testimony that a POSA would have had access to the Handbook (Open. 58) help. He was never asked whether that Handbook provided any expectation of success.

Glenmark cannot cure its failure of proof at this stage. Glenmark has no record to show a POSA would combine the '752 and/or '163 PCTs with Maru or expect success in doing so. It cannot revert back to the two specific combinations Dr. Michniak-Kohn made because those are waived. It cannot raise any other combination of art for the first time on appeal, let alone on reply. Even if it could, any new combination of art would suffer the same lack of supporting testimony as its post-trial combination. That alone is reason for this Court to dismiss Glenmark's defense.

---

[9]     Glenmark's additional cited Michniak-Kohn testimony for this point is about the same two claim 1 art combinations. (Open. 58 (citing A3114, A3121-23, A3125)).

### B.    The Claimed Combination Of Ingredients Was Non-Obvious

Not only is there no motivation evidence, but Glenmark's theory that the '070 claims are obvious because individual ingredients in the claims were known (Open. 53), is contrary to law and fact.

Picking apart an invention into its component parts, as Glenmark does, is improper when evaluating obviousness. It is black-letter law that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418; *United States v. Adams,* 383 U.S. 39, 51-52 (1966). Rather, obviousness must be determined with respect to the ***invention as a whole***. *See* 35 U.S.C. § 103; *KSR*, 550 U.S. at 406-07. As the Supreme Court recognized, "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 550 U.S. at 418-19.

The PTO understood as much. Glenmark's cited art adds nothing to what was already before the '070 Examiner during prosecution. He had exemplary references from each "bucket." From the non-azelaic acid category, the Examiner had the '163 PCT. (A3153-54 (696:25-697:19); A3878; A3879 (1:50-2:7)). Glenmark argues that the '752 PCT is critical, but ultimately admits it had the same disclosure as the '163 PCT. (Open. 13-14, 56). From the azelaic acid art, the

Examiner had Skinoren®, the '119 PCT, and the '943 patent's foreign counterpart. (A3154-55 (697:20-698:9); A3361 (904:2-11); A3878; A3879 (1:16-2:7)). As Dr. Michniak-Kohn conceded, the PTO had before it art that included azelaic acid as well as art disclosing *every one* of the specifically claimed excipients. (A3151-55 (694:24-698:9)). The Examiner appreciated that this was not enough to suggest the inventive combination. (A4422-23).

The District Court analyzed each of the references Glenmark presented at trial and also found them lacking. (A52-63).

Glenmark's argument that the "claimed excipients" appear together in prior art formulations (Open. 53) overstates the art. Glenmark cites the '752 and '163 PCT's for this notion, but neither disclosed every claimed excipient, let alone azelaic acid. (*Supra* pp. 19-20). Nor would a POSA be motivated to add azelaic acid to these compositions because this art used no related actives and lacked the propylene glycol needed to dissolve azelaic acid. (*Supra* p. 19; A3339-41 (882:7-884:3); A3350-51 (893:17-894:7); A3386-87 (929:13-930:12)). Moreover, there is nothing in these references to suggest their formulations would deliver the inventive penetration results.

Left with this void in the art, Glenmark assumes an unlimited ability to swap out or add ingredients, including actives, to prior art formulations. But the court correctly rejected this approach as ignoring the complexities of formulation work.

(A65). Both sides' experts agreed that the way a formulation behaves depends on the interactions among all of the excipients and their interaction with the active. (A2752-53 (295:22-296:14); A3150-51 (693:18-694:2); A3336-37 (879:23-880:13); A3339-40 (882:7-883:24); *see also* A2520 (63:16-23)). One cannot simply add or remove ingredients from a formulation and expect success.

In fact, the real-world evidence shows that ingredient selection is far from predictable and that even slight excipient modifications can affect results. Even after the '070 inventors decided to pursue hydrogels, they made and screened more than twenty possible formulations. (*Supra* pp. 12-13). Of those, they Franz tested hydrogel A, with ingredients similar to Skinoren®, and hydrogel B, which had lecithin with triglyceride. (*Supra* pp. 13-14). Bayer got very different, unexpected penetration results with hydrogel B than with hydrogel A. (A2530 (73:2-25)).

Glenmark's own ANDA demonstrates that one cannot simply swap excipients. (A65). Even when Glenmark started with the '070 patent and methodically swapped out specific ingredients, its formulation attempts failed more often than not. (*Supra* p. 17; A3387-88 (930:13-931:5); A5867). Glenmark suggests that the difficulties it encountered when swapping out Finacea®'s ingredients to make its Gel, even with the '070 patent in hand, are irrelevant to assessing the complexities of formulation work. (Open. 58-59). But developing an azelaic acid formulation without the benefit of the '070 teachings would entail at

least as many difficulties and would not have led to the invention.  Moreover,

Glenmark's suggestion that its process was complicated by the need for its product

to be bioequivalent to Finacea® ignores the fact that it rejected formulations due to

issues wholly unrelated to bioequivalence (*e.g.*, appearance, consistency, viscosity,

stability).  (A5867).

Thus, while individual components of the '070 invention were scattered

throughout the art, no art suggested they be combined as claimed.  Absent

hindsight, Glenmark's cited art left the POSA with nothing more than a mountain

of possible excipients to choose from in a myriad of potential combinations.  (*See

generally* A3362 (905:10-23)).  The District Court did not err in finding that this

cannot render the '070 patent invalid.  (A64-66).

### C.    The Claimed Hydrogel Was Non-Obvious

Glenmark's obviousness arguments further fail because it would not have

been obvious to formulate the claimed azelaic acid hydrogels from the art.

The District Court found the '752 and '163 PCTs did not disclose gels

because they do not describe their end products as such.  (A54-57).  Glenmark

criticizes this finding (Open. 14) but fails to show how it was clear error when

these formulations are not gels as a matter of science.  (*Supra* pp. 20-21).

Tellingly, Glenmark does not complain that the court took Maru's

description of its "gel" at face value.  (A58).  The court did so because, at trial,

Glenmark asserted that Carbopol® need not be neutralized in order to form a gel (A3796), notwithstanding both experts' testimony to the contrary. (A58; *supra* pp. 10-11). On appeal, Glenmark concedes neutralization is required for gel formation. (Open. 55). While the District Court did not decide the issue, given Glenmark's concession on appeal, there can no longer be any dispute that Maru, which lacks neutralization (*supra* p. 21), is not a gel as a matter of science either.

But, even crediting Maru's "gel" nomenclature in Glenmark's favor, the court found non-obviousness because the art still failed to suggest the claimed invention. (A63-66). Moreover, although the court said that Gasco "in isolation" did not teach away from gels (A64 n.52), the art as a whole did. Once Gasco's microemulsions outperformed Maru's "gel," Gasco and his colleagues had no further use for Maru. (*Supra* p. 23). In fact, the only reference that post-dates the Gasco group's work, the '119 PCT, focused on creams and emulsions. (A62-63; *supra* p. 22 n.3). This trend away from Maru's "gel" is the antithesis of obviousness. *See Adams*, 383 U.S. at 51-52.

Glenmark misrepresents the court's Opinion as finding that it would have been *per se* obvious to formulate azelaic acid as a hydrogel. (Open. 20, 51, 53-54). But the court merely found that, in trying to solve Skinoren®'s problems, a POSA would consider "an alternative product to Skinoren® in a different dosage form." (A63-64). It noted that the reservations Bayer scientists had about gels (*supra* p.

12) would not necessarily prevent a POSA from pursuing a gel because Maru reported a "gel." (A64). But, as explained *supra* p. 21, POSAs would understand that Maru was not actually a gel. Thus, the '070 inventors were the only ones who conceived azelaic acid in hydrogel form. *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc*., 796 F.2d 443, 447-48 (Fed. Cir. 1986) (obviousness is not determined "by inquiring into what patentees (*i.e.*, inventors) would have known or would have done").

Glenmark asserts, based on a 1999 report, that Finacea® was nothing more than a market pressure driven line extension of Skinoren® (Open. 6, 57, 62-63), to ignore the formulation challenges the inventors overcame. (*Supra* pp. 11-15). The report's author, Dr. Hoffmann, had no involvement in Finacea®'s development, and did not speak with any of the '070 inventors when drafting the document. (A2589-90 (132:23-133:8); A3209-11 (752:5-754:20)).

But even assuming that one would try to convert Skinoren® into a hydrogel does not compel a finding of obviousness. Simply changing Skinoren® into a gel does not lead to the claimed invention. For instance, Skinoren® lacks the claimed combination of lecithin and triglyceride responsible for the unexpected penetration results. (A4763; *supra* pp. 29-31). Indeed, Bayer told the PTO Skinoren® was the closest prior art and demonstrated its inventive hydrogel's superior penetration over Skinoren® in '070 Example 2. (A3879 (1:27-35); A3881 (5:40-6:23)).

Moreover, the District Court's comment about converting an azelaic acid cream to a gel was limited to Skinoren®.  It rejected the notion that it would be obvious to convert other emulsions into gels.  Specifically, it denied Glenmark's assertion that it would be obvious to begin with emulsions, such as those disclosed in the '163 PCT, convert them to hydrogels, and then add the remaining claimed ingredients, as "pure attorney argument" that was "not addressed by defendants' expert."  (A64 n.53).

Glenmark mischaracterizes Dr. Weiner's testimony to repeatedly suggest he agreed that a POSA would have been motivated to convert Glenmark's cited art into hydrogels.  (Open. at 16, 51, 53, 54, 55-56 (citing A3401)).  He did not.  As explained *supra* pp. 49-50, Glenmark's question assumed that a POSA had a Carbopol® formulation and wanted to make it gel.  Such questioning presupposes the '070 solution.  It does not establish motivation to make a gel ***before*** the '070 invention.

Of all the art, only Maru and the subsequent work by the Gasco group measured skin penetration.  But none got the '070 patent's surprising results.  (A3374-75 (917:23-918:13); A3381 (924:14-18); A3384 (927:18-928:11)).  Tellingly, ***none*** of Glenmark's azelaic acid art contained the claimed combination of lecithin and triglyceride responsible for these unexpected results.  (A60; A3367

(910:4-20); A3372-73 (915:22-916:3); A3379 (922:22-25); A3384 (927:14-17);

*supra* pp. 21-22).

Glenmark's obviousness defense is nothing more than hindsight analysis.

The District Court correctly denied it. *See Procter & Gamble Co. v. Teva Pharm.*

*USA, Inc.*, 566 F.3d 989, 994, 997-98 (Fed. Cir. 2009).

### D.    Objective Indicia Of Non-Obviousness

Although Glenmark failed to establish a *prima facie* case of obviousness, the

District Court looked to objective indicia of non-obviousness and correctly found

that unexpected results and commercial success further confirm validity.

### 1.    Unexpected Results

As the PTO recognized, '070 Example 2's unexpected penetration results

defied convention:  the inventive hydrogel both penetrated and retained more

azelaic acid in the skin than the prior art cream.  (A66-68; s*upra* pp. 13-14, 16).

At trial, Glenmark did not dispute that these results were unexpected (A67),

but criticized Bayer's Franz study.  The court soundly rejected Glenmark's

arguments as failing to undermine unexpected results.

### (a)    Bayer's Franz Study Was Reliably Performed

Glenmark complains that Dr. Günther had to discard replicates in Bayer's

study that gave aberrant results.  (Open. 59-60).  Glenmark ignores that Dr.

Günther ran his test over the course of two days and found that his day one test

results were at odds with the rest of the usable data he obtained because the

63

hydrogels had not reached equilibrium until day two.  (A2606-08 (149:21-151:10);

A4851).  Ultimately, Dr. Günther's tests yielded at least three reliable runs for each

hydrogel.  (A2606-08 (149:21-150:2); A2655-56 (198:19-199:1)).

No expert challenged Dr. Günther's methodology or suggested his data was

lacking.  Indeed, Glenmark itself similarly discarded replicates from its own Franz

study, submitted to the FDA, that gave "aberrant results."  (A5646-48; A5650).

Glenmark's conduct shows it is common practice to ensure that only valid data

points are used.

Glenmark's criticism that Bayer did not run a statistical analysis on its Franz

data (Open. 59-60) is a red herring.  Contrary to Glenmark's assertion, Dr. Günther

never said one cannot otherwise assess the difference between the inventive

hydrogel and Skinoren® results.  Rather, he explained that these results were so

different that no additional analysis was needed.  (A2634-35 (177:21-178:4); *see

also* A2633 (176:7-12); A2657 (200:10-22)).  As Dr. Weiner explained, the '070

patent reported everything needed to run a statistical analysis if desired.  (A2827-

29 (370:25-372:21); *see* A2656-57 (199:2-200:9); A4851; A3881 (6:6-22)).  But

the PTO never ran or asked for such analysis.  It was able to appreciate '070

Example 2's unexpected results as is.  (*Supra* p. 16).  And no expert offered any

analysis explaining how the reported five-fold increase in penetration could be

anything but significant.

(b)    Bayer's Franz Results Were Confirmed By Clinical
Testing

Glenmark argues that relying on Bayer's Franz data, without clinical
verification, is dubious (Open. 60); but Glenmark never questioned this data when
it copied the '070 patent.  Indeed, its own patent application reported Franz data
before any clinicals.  (A5759-60; *compare* A5758 *with* A6993).  Glenmark's cited
art likewise relies on Franz data alone.  (*See, e.g.*, A6100-02).

Glenmark's claim that all trial witnesses agreed Franz tests must be
confirmed through clinicals (Open. 60) is wrong.  Glenmark's cited Günther and
Weiner testimony merely recognized that efficacy must be proven by clinical trials
for FDA purposes.  (A2641-42 (184:24-185:5); A2645 (188:17-24); A3452-59
(995:4-1002:6); A3462-63 (1005:25-1006:25)).[10]  In fact, Dr. Franke and Mr.
Mehta testified that they relied on Franz results to select which formulation to
pursue before any clinicals.  (A2530-31 (73:2-74:13); A2667-69 (210:3-212:15);
A2695-98 (238:12-241:23); *see also* A5756-57).

Contrary to Glenmark's assertion (Open. 59), the court never said
unexpected results required clinical confirmation.  What it found was, to the extent
Bayer's Franz results needed to be clinically verified, they were.  (A66-68).

---

[10]    Similarly, Glenmark's reliance on Dr. Hoffmann to discount the Franz data
in Example 2 (Open. 60) is misplaced.  She testified about a different Franz test
involving a synthetic membrane, not the '070 Franz study that used skin.  (A3221-
22 (764:22-765:10)).

The scarification study confirmed that Finacea® outperformed Skinoren® at the same 24 hour time point Bayer's Franz study measured.  Statistical analysis found this difference "significant."  (A66-67; A6259; A6273; A6281-82).  Two Draelos references analyzed the scarification results and concluded they "***confirm[ed] the results of the hairless mouse Franz flow-through diffusion cell study***."  (A67 n.55 (emphasis in original); A6246-47; A4818; *see also* A3495-96 (1038:23-1039:8)).

Glenmark's criticism that the court gave the scarification study weight when no expert did (Open. 54) is disingenuous.  Its own expert introduced the study ***and*** Draelos references into evidence.  (A67 n.55; A3046 (589:6-15); A3481 (1024:1-17)).  Glenmark never asked Dr. Weiner about the scarification study.

Glenmark suggests the Draelos references only confirm Finacea®'s superior azelaic acid ***release*** into skin, not its ***retention*** in skin.  (Open. 61-62).  The references themselves dispel this allegation.  Draelos stated the scarification study showed Finacea's greater "permeat[ion] into the skin" and "higher drug concentration ***in the viable skin***."  (A4818; A6246-47).

The pilot study also tracked Bayer's Franz results.  After eight weeks, Finacea® had higher efficacy and lower systemic exposure than Skinoren®, consistent with the higher skin penetration and lower receptor values in Bayer's Franz study.  (A4782-83; A2622-25 (165:9-168:17); A2661-62 (204:12-205:21)).

Glenmark's complaint that this study did not show that these differences were significant (Open. 60) ignores that its small population size was not powered for statistics.  (A4749).

### 2.    Commercial Success

It is undisputed that Finacea® embodies the '070 patent and, as the number one prescribed branded topical rosacea treatment in the U.S. with total net sales over $562 million, is commercially successful.  (A68-69; A3256 (799:7-13); A3287 (830:14-23); A3520 (1063:3-8); A6846; A7319).  As the court correctly recognized, this alone establishes a *prima facie* case of nexus.  (A69).

Glenmark's sole argument, that Bayer did not present "competent evidence" that the patented invention, as opposed to marketing, drove sales (Open. 62-63), is false.

The evidence showed that the patented formulation drives Finacea®'s success.  (A68-70).  Market research confirmed that patients and physicians value Finacea®'s efficacy and cosmetic features.  (A3304-08 (847:18-851:14); A4663-64; A6879).  The patented formulation is responsible for Finacea®'s efficacy and, as Dr. Michniak-Kohn admitted, its cosmetic benefits as well.  (A68-69; A3488-91 (1031:19-1034:23); A3300-01 (843:11-844:1); *see also* A3451 (994:11-21); A2532-33 (75:25-76:13); A2404; A3488 (1031:13-18); A3527-28 (1070:21-1071:18)).

Glenmark's suggestion that Bayer had to prove that the patented formulation is the only reason for Finacea®'s success (Open. 62-63) fails as a matter of law. *See Ecolochem*, 227 F.3d at 1378. Once Bayer showed *prima facie* nexus, the burden shifted to Glenmark to prove that commercial success was ***not*** due to the patented invention. *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1311 (Fed. Cir. 2010); *Ecolochem*, 227 F.3d at 1377-78. The court correctly determined that even if marketing helps sales, Glenmark failed to show that the patented formulation does not. (A69-70). Thus, nexus is established. *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 718 F. Supp. 2d 382, 436 (S.D.N.Y. 2010), *aff'd* 2011 U.S. App. LEXIS 16010 (Fed. Cir. Aug. 2, 2011).

## CONCLUSION

Bayer respectfully submits that this Court should affirm judgment of infringement and validity.

Dated: October 19, 2015

By:   /s/ Bradford J. Badke
    Bradford J. Badke
    Sona De
    ROPES & GRAY LLP
    1211 Avenue of the Americas
    New York, NY 10036-8704
    Tel.: (212) 596-9000
    Fax: (212) 596-9090

    *Attorneys for Plaintiffs-Appellees*
    *Intendis GmbH, Intraserv GmbH &*
    *Co. KG, and Bayer HealthCare*
    *Pharmaceuticals Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2015, I electronically filed the foregoing BRIEF OF PLAINTIFFS-APPELLEES INTENDIS GMBH, INTRASERV GMBH & CO. KG, AND BAYER HEALTHCARE PHARMACEUTICALS INC. with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system, causing the foregoing to be served upon all counsel of record by the appellate CM/ECF system.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with Federal Express Service for delivery to:

> Clerk of Court
> United States Court of Appeals
> for the Federal Circuit
> 717 Madison Place N.W.
> Washington, D.C.  20439

|  |  |
|---|---|
| _____October 19, 2015_____ | ___/s/ Bradford J. Badke___ |
| Date | Bradford J. Badke |
|  | *Attorney for Defendant-Appellee* |
|  | *Nova Biomedical Corporation* |

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

☒      The brief contains 13,965 words, as reported by the word count function in the Microsoft Word 2010 word processing program, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), or

☐      The brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒      The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 pt. font, or

☐      The brief has been prepared in a monospaced typeface using [*name and version of word processing program*] with [*of characters per inch and name of type style*].

_____October 19, 2015_____                    ___/s/ Bradford J. Badke___
                Date                                          Bradford J. Badke
                                                          *Attorney for Defendant-Appellee*
                                                          *Nova Biomedical Corporation*